

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO:  05-CIV-21113/JORDAN

**SLIP-N-SLIDE RECORDS, INC.,**

     Plaintiff,

v.

**TVT RECORDS, LLC,**

     Defendant.

_____/

**TEEVEE TOONS, INC.**

     Counterclaimant,

v.

**SLIP-N-SLIDE RECORDS, INC.,**
**RUDEBWOY ENTERTAINMENT,**
**INC., 305 MUSIC, INC., and DOES 1-20,**
**inclusive,**

     Counter-Defendants.

_____/

### PLAINTIFF/COUNTERDEFENDANT'S MOTION FOR
### SUMMARY JUDGMENT, CONCISE STATEMENT
### OF UNDISPUTED FACTS AND SUPPORTING MEMORANDUM OF LAW

Plaintiff, SLIP-N-SLIDE RECORDS, INC. ("SNS"), and Counter-Defendants, SLIP-N-SLIDE RECORDS, INC. ("SNS"), RUDEBWOY ENTERTAINMENT, INC. and 305 MUSIC, INC. ("305"), pursuant to Fed.R.Civ.P. 56, move the Court to enter partial summary judgment in their favor on the issue of liability on the Complaint and summary judgment in their favor on the Counterclaim and state:

    1.    There is no genuine issue as to any material fact and Plaintiff/Counter-Defendants

are entitled to judgment in their favor as a matter of law.[1]

2.      SNS is entitled to summary judgment as to the liability of the Defendants on the claim asserted in the Complaint because TVT Records LLC ("TVT") tortiously interfered with SNS' advantageous business relationship with its distributor, ADA DISTRIBUTION, INC. ("ADA"), by wrongfully and without justification threatening ADA with meritless litigation if it distributed an album that SNS had the legal right to sell.

3.      TVT's Counterclaim, based upon a trademark claim has no merit, and  the Counter-Defendants are entitled to judgment as a matter of law on the Counterclaim.

Wherefore, Plaintiff, SLIP-N-SLIDE RECORDS, INC., and Counter-Defendants, SLIP-N-SLIDE RECORDS, INC., RUDEBWOY ENTERTAINMENT, INC. and 305 MUSIC, INC., move the Court to enter partial summary judgment in their favor on the issue of liability on the Complaint and summary judgment in their favor on the Counterclaim

## CONCISE STATEMENT OF UNDISPUTED FACTS

### OVERVIEW

SNS and TVT are each record companies having contractual rights to release sound recordings by a popular musical recording artist named ARMANDO PEREZ ("Perez"), who performs under the name and service mark "Pitbull." After TVT effectively blocked distribution of a recording owned by SNS, the record album titled "Welcome To The 305" (the "305 Album"), SNS sued TVT for tortious interference with SNS' advantageous business relationship with its distributor, ADA.   As has been shown in the proceedings on SNS' motion for preliminary injunction, SNS had the clear contractual right to sell its 305 Album.   TVT

---

[1] In this motion, the following references are used: references to the Exhibits submitted jointly by the parties at the hearing on Motion for Temporary Injunction are referred to as ("Exhibit __").  The parties have previously stipulated to the admissibility of each of the exhibits.  References to testimony at the hearing on the Motion for Temporary Injunction are referred to as "A-____." which was filed with this Court as an Appendix to TVT's Objections to the Report and Recommendation.  D.E. #65.

unlawfully interfered by sending a cease and desist letter to ADA and ADA's customers threatening suit under the Lanham Act if they participated in the distribution of the 305 Album. However, TVT possessed no legal rights to the mark that underlies the alleged Lanham Act claim. In addition, TVT's contract with Perez does not, and cannot, extinguish Perez's prior grant of rights to SNS. Therefore, TVT knowingly and purposefully threatened meritless litigation. TVT's cease and desist letter effectively intimidated ADA into refusing to distribute SNS' 305 Album, causing SNS damage.

TVT admits that it acted with the intent to interfere with SNS' lawful sale of the 305 Album, which might have competed with TVT's Pitbull album titled "M.I.A.M.I." Perez, who is a neutral but interested observer to this dispute, has claimed it is TVT and not SNS who has acted illegally, by its improper assertion of trademark claims under the Lanham Act. In his Report and Recommendation recommending that SNS be granted preliminary injunctive relief, Magistrate Judge Stephen Brown found that TVT misrepresented its legal position in its cease and desist letter and thus TVT's "interference with SNS' business relationship with ADA was intentional and unjustified." Magistrate Judge Brown found that SNS has proven each of the elements underlying its tortious interference claim. [2]

## THE CONTRACTS

Prior to 2001, Perez began performing as a musical artist under the name "Pitbull." He first entered into an exclusive recording contract with LUKE RECORDS, INC. (A-76, 120). When that contract term concluded, Perez entered into a second recording contract with JULIAN BOOTHE ("Boothe") dated October 1, 2001 (the "Boothe Contract"). (A-76-92) (Exhibit 3 at A, Vol. III, P. 667).

---

[2] References to his Report and Recommendation granting SNS' request for a temporary injunction are referred to as R&R at P. __ (D.E. #56).

3

On December 4, 2002, Perez filed an application with the United States Trademark Office seeking registration of his service mark, "Pitbull" in the name of his corporation, Pitbull Productions Inc. (A-78, 83) (Exhibit 10 at A, Vol. III, P. 713). The application resulted in federal registration of the mark on August 5, 2005. (A-76) (Exhibit 10 at A, Vol. III, P. 713.

During 2001 and 2002, Boothe spent approximately $30,000.00 recording 27 songs that were each written in whole or in part by Perez (the "Boothe Recordings"). (A-102-103). Perez's services as a recording artist on the Boothe Recordings were completed during the term of the Boothe Contract. (A-103). Pursuant to Section 7 of the Boothe Contract, Perez conveyed to Boothe full and complete ownership of all rights in and to the Boothe Recordings, including the copyrights thereto (A-96) and the right to exploit them as Boothe saw fit, without limitation (A-61, 77, 78; Exhibit 3, P. 7 at A, Vol. III, P. 669). Pursuant to Paragraph 7(b), Perez granted Boothe a non-exclusive right to use Perez's name, image and likeness in connection with the exploitation, marketing and distribution of the Boothe Recordings. (A-61, 77, 99). On March 1, 2002, Boothe released Perez from further obligations and Perez re-confirmed that Boothe owned the Boothe Recordings. (A-77) (Exhibit 4 at A, Vol. III, P. 670).

On October 23, 2003, the DIAZ BROTHERS MUSIC GROUP ("DBMG"), not a party to this proceeding, entered into a two-album recording contract with TVT for Perez's future recording services (the "DBMG/TVT Agreement"). (A-96) (Exhibit 13 at A, Vol. III, P. 725). Perez signed a one-page artist inducement letter (his third recording contract) agreeing to be bound by the terms and conditions of the DBMG/TVT Agreement (A-100) (the "Inducement Letter"). (Exhibit 13 at A, Vol. III, P. 725).

TVT never executed the DBMG/TVT Agreement or the Inducement Letter. (A-100). The DBMG/TVT Agreement states "TVT's standard long form agreement" "is attached hereto"

4

and that Perez "agrees to be bound thereby." The Inducement Letter signed by Perez also states the parties shall negotiate the terms of the Long Form Agreement in good faith and failing such negotiation, the parties agreed to arbitrate any disputed terms. However, at the time Perez signed the Inducement letter, TVT's standard long form agreement was not attached and it was not provided to either Perez or his counsel until months later (the "Long Form Agreement"). (A-96, 100) (Exhibit 13 at A, Vol. III, P. 725). Further, Perez and TVT never executed, negotiated or arbitrated the terms of the Long Form Agreement. (A-96, 100). Essentially, Perez and TVT never reached a meeting of the minds as to the terms of the agreement for Perez to provide recording services to TVT.

On November 15, 2004, Boothe entered into a contract with 305 to finance distribution of the Boothe Recordings (A-102) (Exhibit 4 at A, Vol. III, P. 670). On February 1, 2005, 305 and Boothe licensed to SNS the rights to release the Boothe Recordings. (Exhibit 6 at A, Vol. III, P. 684). SNS entered into a written, non-terminable distribution agreement with ADA pursuant to which ADA agreed to distribute all records recorded and marketed by SNS. (A-278-279). Thirteen of the Boothe Recordings were compiled in the 305 Album. (A-102).

### TVT INTERFERED WITH SNS' BUSINESS RELATIONSHIP WITH ADA

On or about March 20, 2005, SNS and ADA began marketing the 305 Album (A-134). SNS accurately marketed the album as "previously unreleased masters." The advertisements were not deceptive or untruthful. (A-135, 136) (the "ADA Ad"). SNS expended over $200,000.00 to re-record, edit, master, mix and develop the marketing campaign for the 305 Album. (A-138). Wholesale buyers placed pre-orders, that is, purchases prior to commencement of advertising to the public and official release of the album (A-138), for more than 103,000 units of the 305 Album. (A-138).

It is common and acceptable in the music industry for older recordings (such as the Boothe Recordings) to be released after an artist achieves commercial success, as long as the releasing company (like SNS here), has the legal right to do so. (A-85, 145).

When TVT saw the ADA Ad, it embarked on a campaign to stop ADA's distribution of the 305 Album. TVT's Executive Vice President in charge of legal and business affairs, JACQUELINE M. SUSSMAN, ESQ. ("Sussman"), sent letters dated March 29, 2005, to ADA and to more than 100 customers of ADA (the "Cease and Desist Letter"). (A-238; Exhibit 2 at A, Vol. III, P. 666). The recipients of those letters were targeted by TVT's sales department as entities likely to buy the 305 Album from ADA (A-238). Sussman's letters threatened that if the recipients failed to cease buying the 305 Album, that TVT would sue them for claims under the Lanham Act, threatening to assert claims for "compensatory and treble damages, attorney's fees, court costs and interest." (Exhibit 2; A-136, 137, 148).

TVT undertook no due diligence to determine what legal rights SNS had to sell the 305 Album or if such sales actually infringed upon the legal rights of TVT. (A-246, 247). Sussman, a lawyer with substantial trademark expertise, had knowledge of the contracts in question and the lack of support to TVT's threatened Lanham Act claims. (A-250, 254, 255).

At the time TVT sent the Cease and Desist Letter:

1.      TVT was aware that Perez had recorded previously unreleased masters before the time that he entered into the Inducement Letter (A-52, 250);

2.      TVT relied solely on the ADA Ad for information about the 305 Album and its contents, had not analyzed the contents of the album, and had not even listened to the album (A-242);

3.      TVT had been told by both Perez's lawyer, Ms. Martinez, and Allen Jacobi that

6

Perez had a prior contractual relationship with Boothe under which he had recorded the Boothe Recordings (A-243-244, 259);

4.      TVT conducted no due diligence to determine what rights Perez had legally conveyed to Boothe or SNS, or how SNS obtained its rights to release the 305 Album (A-242, 246, 248);

5.      TVT was aware that Perez had filed a prior trademark application to register the service mark "Pitbull" (A-252); and

6.      TV was aware that SNS had a written distribution agreement with ADA to distribute the 305 Album and it specifically targeted ADA to receive the Cease and Desist Letter (A-245).

Because of TVT sending the Cease and Desist Letter, ADA's wholesale buyers cancelled the pre-orders of 103,000 units (A-148) and ADA refused to distribute the 305 Album. (A-279). After publishing its Cease and Desist letter, TVT filed its own trademark applications seeking registration of "Pitbull" in a stylized (Old English) font even though TVT's contracts with Perez did not give TVT permission to do so. One of TVT's applications claimed the right to use the mark in connection with advertising services, even though TVT does not offer advertising services under that mark (A-252, 254, 255). The other TVT application sought registration for use in connection with musical sound and video recordings. (A-256-257). Sussman signed each of TVT's trademark applications under penalties of perjury stating "no other person . . . has the right to the Mark in commerce, either in the identical form or in such near resemblance." The statement is false, as Sussman now admits that Perez owned the rights to the mark at the time she filed the applications. (A-258). Thus, TVT perpetrated a fraud upon the United States Trademark Office.

On June 29, 2005, Perez had his lawyer, Nicole Page of the New York law firm of Reavis Parent Lehrer LLP, send a cease and desist letter to TVT, asserting that TVT had no rights in Perez's trademark and that TVT acted illegally by claiming it owned rights in Perez's trademark (A-83, 260) ("Perez's Cease and Desist Letter" ). (Exhibit 8 at A, Vol. III, P. 705).

## PROCEDURAL HISTORY

On March 28, 2005, Plaintiff SNS filed the underlying suit alleging that TVT had, by virtue of sending the Cease and Desist Letter, tortiously interfered in its advantageous business relationship that it had with ADA. On April 29, 2005, TVT filed a Counterclaim seeking a declaration that SNS had no right to distribute the 305 Album. Both sides sought preliminary injunctions, which motions were heard by Magistrate Judge Stephen T. Brown on August 30, August 31 and September 7, 2005.  On September 28, 2005, the Magistrate Judge entered a Report and Recommendation determining that:

1.      SNS' sale of the 305 Album does not violate TVT's rights under the Lanham Act (R & R at P.  20-25);

2.      That SNS has satisfied each of the elements supporting its claim of tortious interference with SNS' business relationship with ADA (R & R at P.  16-18);

3.      That TVT's actions to send the Cease and Desist Letter to ADA and its customers was not proper nor legally justified, as TVT's assertion that such recipient's distribution of the 305 Album would violate TVT's rights under the Lanham Act was a fraudulent misrepresentation (R & R at P.  17-18); and

4.      That TVT should be enjoined from any further efforts to interfere with SNS' marketing and sale of the 305 Album (R & R at P.  26).

## MEMORANDUM OF LAW

To recover for interference with an advantageous business relationship, a Plaintiff must show:

    1.      the existence of an economic relationship with a third party;

    2.      a probability of future economic benefit for the Plaintiff;

    3.      that the Defendant had knowledge of this business relationship; and

    4.      the Defendant acted intentionally and without justification to interfere with the

relationships. Gossard v. Adia Services, Inc., 723 So.2d 182 (Fla. 1998); Tamiami Trail Tours, Inc. v. Cotton, 463 So.2d 1126 (Fla. 1985)

The written, non-terminable distribution contract that SNS had with ADA and the appurtenant business relationship satisfies SNS' first element. Plaintiff need only establish "a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered" Gossard at 184.

TVT sold more than 500,000 units of its Pitbull album "M.I.A.M.I.". (A-194). For its 305 Album, SNS had expended about $200,000 in a marketing campaign, and ADA had obtained initial pre-orders from its customers of more than 103,000 units representing profits of $800,000 to one million dollars. (A-138-139). SNS anticipated achieving sales of 500,000 units. (A-139). If such a sales level were achieved, it would have meant three to four million dollars in profits. Thus, SNS easily satisfies the second element, a probability of future economic benefit resulting from its business relationship with ADA.

As to the third element, that TVT knew of the advantageous business relationship, and part of the fourth element, that TVT acted intentionally, Sussman admitted that: (1) TVT had knowledge of the business relationship that SNS had with ADA, in which ADA would distribute

the 305 Album; and (2) that TVT acted with the express intent to interfere with that relationship by causing ADA and its customers to cease buying the 305 Album (A-267, 244, 245).

SNS' entitlement to summary judgment turns on whether TVT acted without justification when it published the Cease and Desist Letter. SNS does not need to show that TVT acted with malice, just that the harm caused by TVT's Cease and Desist letter was inflicted without justification or excuse. KMS Restaurant v. Wendy's, 361 F.3d 1321 (11th Cir. 2004); Digiorgio Corp. v. Mendez & Co., 230 F.Supp. 2d 552 (N.J. 2002). In Digiorgio Corp., at 565, the court stated:

> The inquiry as to whether a defendant's action were improper is guided by reference to the Restatement, which offers the following factors as relevant:  (i) the nature of the actor's conduct; (ii) the actor's motive; (iii) the interests of the party with which the actor's conduct interferes; (iv) the interests sought to be advanced by the actor; (v) the social interests in protecting the freedom of action of the actor and the commercial interests of the other party; (vi) the proximity or remoteness of the actor's conduct to the interference; and (vii) the relations between the parties.  Restatement (Second) of Torts, §767 (1979).

Also see JTA Factors Inc. v. Philcon Services, 820 So.2d 367, 370 (Fla. 3rd DCA 2002) ("malice is conspicuously absent from the prerequisite elements to show a tortious interference with a business relationship"); Florida Standard Jury Instruction, M.I. 7.2, 778 So.2d 264 (Fla. 2000) (malice is not required where the interference is of a non-terminable contract or where the Defendants seek a business advantage).

As Magistrate Judge Brown determined, TVT acted without justification by intentionally and knowingly misrepresenting its legal rights and by threatening meritless claims. At the very least, TVT had actual knowledge of the Boothe Contract and it acted recklessly by conducting no due diligence to determine that SNS possessed valid rights to market and sell the 305 Album. In either instance, TVT acted without proper justification and SNS satisfies the final element. In

10

McCurdy v. JC Collis, 508 So.2d 380 (Fla. 1st DCA 1987), the court found that a party tortiously interfered (including a finding of malice) where the defendant asserted claims about the Plaintiff to a third party without first performing basic due diligence to determine the validity of those claims. Also, see Ethyl Corp. v. Balter, 386 So.2d 1220 (Fla. 3rd DCA 1982) and Yoder v. Shell Oil Co., 405 So.2d 743 (2nd DCA 1981).

Clearly, TVT's threatened Lanham Act claims were meritless.  TVT's Counterclaim under the Lanham Act claims that:

1.      TVT owns the exclusive right to use Perez's name, image and likeness in connection with the sale of record albums (Counterclaim, Par. 26); and/or

2.      TVT has acquired ownership of a stylized logo to the Pitbull name (Counterclaim, Pars. 27 and 28).

## A.      TVT HAS NO OWNERSHIP INTEREST IN PEREZ'S MARK

The contracts and testimony at the preliminary injunction hearing demonstrate that TVT does not own Perez's mark, "Pitbull"; nor has Perez licensed to TVT exclusive rights to the mark.  Thus, TVT does not have superior rights to overcome the license contained in the Boothe Contract.  TVT's reliance upon the unsigned, undelivered Long Form Agreement is misplaced.  First, that agreement is not legally valid, as Perez and TVT never reached a meeting of minds as to the terms included in TVT's form. David v. Richman, 568 So.2d 922 (Fla. 1990) (terms cannot be added to a contract after it is signed); BS Holloway v. Gutman, 707 So.2d 356 (Fla. 5th DCA 1998) (to have a binding contract, the parties must agree to all material terms).  Second, even if the Long Form Agreement is effective, it does not grant TVT the rights it claims. The form merely grants to TVT limited rights for use in connection with the marketing of recordings Perez makes for TVT. Third, as Magistrate Judge Brown has found, the Long Form Agreement

11

could not, in any event, divest the prior grant of rights in the Boothe Contract.  (R & R at P. 17-18).

Contrary to its assertion in the Counterclaim, TVT now admits it does not own, nor is it the exclusive licensee of the "Pitbull" mark (A-252).  The only grant of such rights in the questionable Long Form Agreement is contained in Paragraph 5.01, which merely gives TVT the right to use Perez's name and image in connection with "records delivered under (that) agreement," i.e., only in connection with the sale of the M.I.A.M.I. Album and subsequent albums prepared for TVT under the agreement.  (A-84; R & R at P.  20). Thus, SNS' prior obtained rights to use Perez's name and image in connection with the distribution of recordings Perez made for its predecessor Boothe are unaffected by TVT's later alleged contract.

**B.     TVT CANNOT OWN A STYLIZED LOGO
INDEPENDENT OF THE UNDERLYING MARK**

TVT cannot claim ownership to a stylized "Pitbull" logo because it does not, and cannot, own the underlying trademark right to the name "Pitbull." TVT now admits that Perez did not assign his trademark rights to it (A-252). TVT has failed to cite any authority for the proposition that rights to a stylized logo can be a proprietary and protectable mark, separate and apart from the underlying rights to the tradename that is owned by a third-party.  In the case at bar, the stylized logo is nothing more than Perez's mark, "Pitbull," printed in standard Old English font and created from a standardized word processing program (A-121, 253).  There is no original art or original creation in that "stylized" logo (A-253).

Florida Courts have held that only the musical performer can own the rights to his mark. Even an attempted assignment by Perez to TVT of the rights to the tradename would have been void as an illegal "assignment in gross," as a performer's mark is not assignable. M&J Enterprises v. Outler, 717 So.2d 620 (Fla. 3rd DCA 1998); Marshak v. Green, 505 F.Supp. 1054

12

(S.D.N.Y. 1981); Bell v. Streetwise Records, Ltd., 640 F.Supp. 575 (D. Mass. 1986) (each holding that it is the artist or group that is the owner of the trademark). The cease and desist letter sent to TVT by Perez's attorney states Perez's objections to "TVT's false claims of ownership and unauthorized use of the Pitbull Mark. (Exhibit 8, A-705). The letter states, ". . . [n]owhere in [the TVT Agreement] does [Perez] grant permission to TVT to assert ownership rights in the Pitbull Mark." (A-260).

Thus, the true owner of the mark Pitbull had repudiated TVT's claim of ownership in the mark. Despite Perez's demand that TVT withdraw its applications to register the mark Pitbull, TVT has not done so and has not responded to Perez's Cease and Desist Letter (A-261).

## C.    TVT LACKS STANDING TO ASSERT CLAIMS BELONGING TO PEREZ

The owner of the trademark  is an indispensable party to the type of claim alleged by TVT. United States Auto Club, Inc. v. United States Motor Club Corp., 1979 U.S. Dist. Lexis 13313 (E.D. LA. 1979). Thus, TVT could not enforce an infringement claim in Perez's mark without Perez joining in the claim. Perez has not done so.

Sussman, a lawyer with trademark experience, had knowledge of these facts when she sent the Cease and Desist Letter. TVT's admitted failure to perform the most basic of due diligence demonstrates its bad faith and its failure to act in a proper, legally justified manner by threatening ADA and its customers with meritless claims. TVT's threats accomplished its improper goal and effectively halted the commercial distribution of SNS' 305 Album. While the Court should infer malice in TVT's actions, (even though  malice is not a prerequisite), the issue is merely whether TVT acted by proper and legally justified means when it sent the Cease and Desist Letter. To threaten claims that one knows or should know are meritless is neither justified

13

nor proper. See Ethyl Corp. at 1225; KMS Restaurant Corp. at 1327 (malice is not required if improper means include interfering by way of misrepresentations, citing Florida Standard Jury Instruction (Civil) MI 7.2); Restatement (Second) of Torts §767 cmt. c. (1979) ("Fraudulent misrepresentation are ordinarily a wrongful means of interference and make interference improper. A representation is fraudulent when, to the knowledge or belief of its utterer, it is false in the sense in which it is intended to be understood by the recipient . . ."); Universal City Studios, Inc. v. Nintendo Co., 797 F.2d 70 (2nd Cir. 1986), cert. denied, 479 U.S. 987, 93 L. Ed. 581, 107 S. Ct. 578 (1986) (defendant whose lawyer sent cease and desist letters to plaintiff's distributor threatening Lanham Act claims was held liable for tortious interference because it knew it did not have a valid underlying trademark supporting the threatened Lanham Act claim); Gregg v. U.S. Industries, 887 F.2d 1462 (11th Cir. 1989) (defendant's actions of withholding payment of dividends, absent legal justification, supported a claim for tortious interference with relationship with a lender to whom plaintiff had pledged those dividends).

Here, TVT's Cease and Desist Letter was either an intentional misrepresentation, or at the very least, a reckless misrepresentation of TVT's rights, which was clearly intended to cause, and did cause, the recipients not to purchase the 305 Album. Either instance satisfies the final element that TVT acted without justification.

## CONCLUSION

Based on the foregoing, Plaintiff requests that the Court enter summary judgment in its favor on the issue of TVT's liability for tortious interference with Plaintiff's business relationship with ADA, and the Counter-Defendants request that the Court enter summary judgment in their favor on the Counterclaim. Following the grant of such summary judgments, Plaintiff requests that this case be set for jury trial on the remaining issue of Plaintiff's damages.

14

## <u>CERTIFICATE OF SERVICE</u>

We certify that a copy hereof was mailed on November 11, 2005, to:

     Peter L. Haviland, Esq.
     Rhonda R. Trotter, Esq.
     Kaye Scholer LLP
     1999 Avenue of the Stars, Suite 1700
     Los Angeles, California 90067

     Manuel Kushner, Esq.
     Kaye Scholer LLP
     777 S Flagler Drive, Suite 900
     West Palm Beach, FL 33401-6163

          WOLFE & GOLDSTEIN, P.A.
          Counsel for Slip-N-Slide Records, Inc., 305 Music,
          Inc. and Rudebwoy Entertainment, Inc.
          100 S.E. Second Street, Suite 3300
          Miami, Florida  33131
          Telephone:  (305) 381-7115
          Facsimile:  (305) 381-7116

          By:_____
               RICHARD C. WOLFE
               FL Bar No. 0355607
               MARK GOLDSTEIN
               FL Bar No. 882186

          DAVID M. ROGERO P.A.
          Co-Counsel for Slip-N-Slide Records, Inc., 305
          Music, Inc. and Rudebwoy Entertainment, Inc.
          2600 Douglas Road, Suite 600
          Coral Gables, Florida 331346100
          Phone:  (305) 441-0200
          Fax:  (305) 460-4099

          By:/s/David M. Rogero/_____
               DAVID M. ROGERO
               FL Bar No. 212172

H:\Slip 'N Slide\v. TVT\Pldgs\motion for summary judgment with DMR changes.doc