FILED by _____ _EG_ D.C.
ELECTRONIC

**Nov 29 2005**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO: 05-CIV-21113/JORDAN

SLIP-N-SLIDE RECORDS, INC.,

      Plaintiff,

v.

TVT RECORDS, LLC,

      Defendant.

_____/

TEEVEE TOONS, INC.,

      Counter-plaintiff,

v.

SLIP-N-SLIDE RECORDS, INC.,
RUDEBWOY ENTERTAINMENT,
INC., 305 MUSIC, INC., and DOES 1-20,
inclusive,

      Counter-defendants.

_____/

**DEFENDANT/COUNTER-PLAINTIFF, TEEVEE TOONS, INC.'S,
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

79/aj

## TABLE OF CONTENTS

Page

I.    STATEMENT OF MATERIAL DISPUTED AND UNDISPUTED FACTS ................... 1

II.   SUMMARY JUDGMENT STANDARD .......................................................... 6

III.  ARGUMENT ..................................................................................................... 1

      A.    Summary Judgment on TVT's Lanham Act Counterclaims Must Be
            Denied, Because Counterdefendant's Use of TVT's Stylized Pitbull Logo
            Is Likely to Cause Consumer Confusion. .............................................. 1

      B.    Summary Judgment on Plaintiff's Tortious Interference Claim Must Be
            Denied As TVT Was Justified in Sending out the Cease and Desist
            Letters. ...................................................................................................... 1

      C.    Under FRCP 56(f), Plaintiff's Motion Should Be Denied...................... 1

V.    CONCLUSION................................................................................................... 1

i

## TABLE OF AUTHORITIES

Page(s)

*ABC v. Maljack Productions,*
  34 F.Supp.2d 665 (N.D. Ill. 1998) ...................................................13, 14, 15

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986).................................................................................16

*Christian Science Board of Directors v. Robinson,*
  2000 U.S.Dist. LEXIS 21309 (W.D.N.C. 2000)...............................10, 11

*Daesang Corp. v. Rhee Bros., Inc.,*
  2005 U.S.Dist. LEXIS 9066 (D. Md. 2005) .........................................13

*Davidoff & Cie, S.A. v. PLD International Corp.,*
  263 F.3d 1297 (11th Cir., 2001)...............................................................7

*Ethyl Corp. v. Balter,*
  386 So.2d at 1220 (Fla. 3d DCA 1980) .................................................12

*Focus on the Family v. Pinellas Suncoast Transit Authority,*
  344 F.3d 1263 (11th Cir. 2003)................................................................8

*Gay Enterprises, Inc. v. John Hall Electrical Contracting,*
  792 So.2d 580 (Fla. 4th DCA 2001) ........................................................9

*Generation X International Corp. v. No Excuses Sportswear, Ltd.,*
  1998 U.S.Dist. LEXIS 4693 (S.D.N.Y. 1998) .......................................10

*Heinz v. Frank Lloyd Wright Foundation,*
  762 F.Supp. 804 (N.D. Ill. 1991).....................................................13, 15

*Hickson Corp. v. Northern Crossarm Co., Inc.,*
  357 F.3d 1256 (11th Cir. 2004)..............................................................15

*Hunter v. Tartan Construction Co.,*
  522 So.2d 77 (Fla. 4th DCA 1988) ..........................................................9

*IBP, Inc. v. Hady Enterprises, Inc.,*
  267 F.Supp.2d 1148 (N.D. Fla. 2002).....................................................13

*James Register Construction Co. v. Bobby Hancock Acoustics, Inc.,*
  525 So.2d 339 (Fla. 1st DCA 1988)..........................................................9

*KMS Restaurant Corp. v. Keitel,*
  361 F.3d 1321 (11th Cir. 2004)...............................................................12

Page(s)

*McCurdy v. Collis,*
 508 So.2d 380 (Fla. 1st DCA 1987)..................................................................12, 16

*Metlife, Inc. v. Metropolitan National Bank,*
 388 F.Supp.2d 223 (S.D.N.Y. 2005)..........................................................................10

*Murphy v. Provident Mutual Life Insurance Co. of Philadelphia,*
 756 F.Supp. 83 (D. Conn. 1990) ...............................................................................7

*Nassau v. Unimotorcyclists Society of America, Inc.,*
 59 F.Supp.2d 1233 (D. Fla. 1999).............................................................................7

*Publications International, Ltd. v. Western Publishing Co., Inc.,*
 1994 U.S.Dist. LEXIS 558 (N.D. Ill. 1994).............................................................13

*Rich v. RCA Corp.,*
 390 F.Supp. 530 (S.D.N.Y. 1975).............................................................................11

*Rockledge Mall Associate, Ltd. v. Custom Fences of S. Brevard, Inc.,*
 779 So.2d 554 (Fla. 5th DCA 2001) .........................................................................13

*Rostropovich v. Koch International Corp.,*
 1995 U.S.Dist. LEXIS 2785 (S.D.N.Y. 1995) .........................................................11

*Seminole Tribe of Florida v. Times Publishing Co.,*
 780 So.2d 310 (Fla. 4th DCA 2001) .........................................................................12

*Smith v. Montoro,*
 648 F.2d 602 (9th Cir. 1981).....................................................................................10

*SNF Enterprises v. Paramount Pictures Corp.,*
 1983 U.S.Dist. LEXIS 19692 (S.D.N.Y. 1983) .......................................................13

*Snook v. Trust Co.,*
 859 F.2d 865 (11th Cir. 1988)...................................................................................16

*Southern Bell Telegraph & Telegraph Co. v. Roper,*
 482 So.2d 538 (Fla. 3rd DCA 1986) .........................................................................13

*Spangler Candy Co. v. Crystal Pure Candy Co.,*
 235 F.Supp. 18 (N.D. Ill. 1964) ...............................................................................14

*United States Automobile Club, Inc. v. United States Motor Club Corporation,*
 1979 U.S.Dist. LEXIS 13313 (E.D. La. 1979) .........................................................8

*Valley Drug Co. v. Geneva Pharms.,*
 344 F.3d 1294 (11th Cir. 2003)...............................................................................6, 7

iii

<u>Page(s)</u>

## STATUTES

15 U.S.C. § 1125(a) ..............................................................................................................7, 10

Fed. R. Civ. P. 19(a) ...............................................................................................................8

Fed. R. Civ. P. 56(f) ..............................................................................................................16

## OTHER

Florida Standard Jury Instruction (Civil)
   MI 7.2..............................................................................................................................12

iv

Defendant and Counter-Plaintiff TeeVee Toons, Inc. dba TVT Records ("TVT") submits this opposition to Plaintiff and Counterdefendants' Motion for Summary Judgment. The motion for summary judgment must be denied because:

(1) TVT is the exclusive licensee of the Pitbull mark for Perez recordings made during the Term of the agreement, and it is undisputed that the 305 Album contains, not the original recordings Perez delivered to Boothe, but "new recordings." In addition, TVT has exclusive rights to the stylized Pitbull logo it developed in connection with the M.I.A.M.I. album. Hence, TVT has standing as the user of the stylized Pitbull logo to bring its trademark infringement counterclaim;

(2) As to its separate counterclaim for false designation of origin under the Lanham Act -- which protects against the use of any name, symbol, or other designation likely to cause consumer confusion as to the origin, sponsorship or approval of goods -- TVT has established that it developed the stylized Pitbull logo, owns the stylized logo as part of the "cover art" of the M.I.A.M.I. album, used that logo extensively in marketing and promoting its recordings with Perez, and that consumers are likely to be confused -- indeed have been confused -- as to TVT's sponsorship or approval of the 305 Album;

(3) As to plaintiff's tortious interference with business relationship claim, TVT has a qualified privilege to send out the cease and desist letters to protect against plaintiff's Lanham Act violations. At a minimum, TVT has raised a genuine issue of material fact as to its good faith belief in its privilege to send out cease and desist letters asserting that the plaintiff's 305 Album -- containing TVT's stylized logo -- violates the Lanham Act.

## I. STATEMENT OF MATERIAL DISPUTED AND UNDISPUTED FACTS

Effective as of October 23, 2003, TVT entered into an exclusive recording agreement ("the TVT/Pitbull Recording Agreement") with The Diaz Brothers Music Group, Inc.

1

("DBMG"), as agent of and furnishing the recording services of Armando Perez ("Perez"), professionally known as "Pitbull." (See A-722, Exh. 13)[1]  The TVT/Pitbull Recording Agreement consists of a letter agreement and two exhibits, Exhibits "A" and "B." (A-722, Exh. 13).  Contrary to the plaintiff's assertion that the TVT/Pitbull Recording Agreement is for two albums, it in fact is for six albums: one initial and five option albums.  (A-722, Exh. 13).

Under the letter agreement, DBMG and TVT agreed to negotiate the terms of a long form agreement based upon TVT's standard "long form" recording agreement, referenced and incorporated as Exhibit "A" to the letter agreement.  (A-724, Exh. 13).  However, if at the end of six months after the date of the letter agreement, the parties had not executed a long-form agreement, the terms of the Exhibit "A" long-form agreement were expressly incorporated into the letter agreement. (A-724, Exh. 13).  Plaintiff asserts that the parties agreed to arbitrate terms of the agreement, but in fact, the right to arbitrate would only arise if one party asserted the other was not negotiating in good faith.  (A-724, Exh. 13).  Neither TVT nor DBMG ever asserted a lack of good faith negotiations. (A-178, 8/31/05 Transcript).

Exhibit B to the letter agreement, entitled "Artist Inducement Agreement," and dated as of October 23, 2003, is the document in which Perez, among other things, acknowledged DBMG's authority to enter into the letter agreement on his behalf, agreed to be bound by its terms, and guaranteed DBMG's performance of all of its obligations under the Short Form Agreement. (A-725, Exh. 13).

Pursuant to Section 5(a) of the letter agreement, DBMG "warrant[ed] and represent[ed], among other things, that it had the right to enter this agreement and Exhibit 'A' annexed hereto

---

[1]     All citations herein to "A-___" are to the Appendix filed by TVT in support of its
Objections to the Magistrate's Report and Recommendations re Preliminary Injunction.

2

<u>and made a part hereof</u>, and to grant the rights provided for hereunder and fully perform hereunder." (A-723, Exh. 13) (emphasis added).  Not only was Exhibit A expressly made "a part hereof" of the letter agreement, but Section 5(c) provides that "[a]ll other terms and conditions where not inconsistent with the terms hereof will be as set forth in our standard exclusive 'long form' recording agreement attached hereto as Exhibit 'A.'" (A-724, Exh. 13).  And, it is undisputed that DBMG, as agent for Perez, received a copy of Exhibit A. (A-823, Exh. 48).

In addition, the parties agreed in Section 5(c) that "promptly following execution of this agreement they will engage in good faith negotiations with regard to changes to the (nonsubstantive) terms of said Exhibit "A" to the extent such changes would not be inconsistent with the terms of this agreement; in the event that said standard agreement is not fully executed within six months from the date hereof, then Exhibit A shall be deemed to have been fully executed and no further negotiations shall take place . . . ." (A-724, Exh. 13).

It is undisputed that the TVT Exclusive Recording Artist Agreement which is "Exhibit A" is TVT's "standard exclusive long form recording agreement," and that TVT has no other "long form recording agreement." (A-164, A-174, A-178-79; 8/31/05 Transcript).

In the Artist Inducement Agreement, Perez personally agreed to be bound by all of the terms of the letter agreement, including the terms set forth in the Long Form Agreement.  Indeed, the Artist Inducement Agreement expressly defines the Short Form Agreement to include the Long Form Agreement:

"To induce TeeVee Toons, Inc. ("TVT") to enter into the foregoing agreement with the Diaz Brothers Music Group, Inc. (the "Furnishing Party") dated as of October 23, 2003 (including the standard exclusive recording agreement annexed thereto and made a part thereof) (the 'Agreement') . . . I hereby (a) represent to TVT that I have read the Agreement and have had

3

the legal effect of each of its provisions explained to me by a lawyer chosen by me; (b) assent to the execution of the Agreement and agree to be bound by all grants, restrictions, and other provisions of it relating to me . . . ." (A-725, Exh. 13).

Pursuant to the TVT Pitbull Recording Agreement, TVT has made substantial payments to, and on behalf of, Perez and DBMG. Perez has delivered to TVT under the Agreement, and at no time has Perez, DBMG, or TVT ever asserted that any of the terms of the agreement, including the long form, were unenforceable. (11/29/05 Sussman Decl., ¶ 7). Under the TVT/Pitbull Recording Agreement, TVT has exclusive rights to use Pitbull's name and likeness in connection with any recordings distributed during the term. (A-734, Exh. 13, § 10.08). Also, TVT has exclusive rights to all cover art developed by TVT in connection with the promotion, marketing and sale of Pitbull's TVT albums. (A-727, Exh. 13, § 3.03).

In November 2004, TVT released its debut Pitbull album, entitled "M.I.A.M.I", which has sold in excess of 500,000 units. (See A-194, 8/31/05 Transcript). TVT developed a stylized logo of Perez's professional name ("the TVT Pitbull Logo"), and placed that logo on the cover of *M.I.A.M.I.* and in various promotional and marketing materials. (A-192-93, 8/31/05 Transcript; A-739, Exh. 15; A-754, Exh. 19; A-790, Exh. 34).

Prior to signing to TVT, Perez apparently made some recordings for Jullian Boothe. (A-667, Exh. 3). Boothe never released these recordings. (A-103; 8/30/05 Transcript). Boothe took the unfinished recordings, created new musical beds, added new vocalists, producers, and materials, and created the new recordings embodied on the album entitled "Welcome to the 305" (the "305 Album"). (A-105, A-122, A-143, 8/30/05 Transcript). Boothe concedes that the recordings on the 305 Album are not the original recordings Perez made, but are "new versions." (A-718; Exh. 12). Under the Boothe agreement with Perez, although Boothe owned rights to the

4

original recordings Perez delivered, Perez had "creative control" rights, allowing Perez, among other things, to select the materials to be recorded and the producers who would produce the recordings. (A-667-68, Exh. 3). Boothe concedes that Perez was not involved in selecting any of the artists, producers, or materials that were added to the original recordings to create the "new" recordings that are on the 305 Album. (A-123, 8/30/05 Transcript; Plaintiff/Counterdefendant's Motion for Summary Judgment, p. 4). Boothe assigned distribution rights in the 305 Album to Slip N Slide. (A-103-04, 8/30/05 Transcript; A-670, Exh. 4; A-674, Exh. 5; A-684, Exh. 6).

In early 2005, counterdefendant Slip N Slide began promoting the 305 Album and created advertisements for the 305 Album which prominently displayed the TVT Pitbull Logo. (A-749, Exh. 16; A-750, Exh. 17; A-121-22, 8/30/05 Transcript). The counterdefendants concede that they used the TVT Pitbull Logo because the public was familiar with the TVT Pitbull Logo. (A-120-22, 8/30/05 Transcript).

After seeing the advertisements containing the TVT Pitbull Logo, TVT's VP of Business and Legal Affairs, Jackie Sussman, sent out a cease and desist letter to Alternative Distribution Alliance ("ADA"), the entity listed in the advertisement as the distributor of the 305 Album, and retailers who TVT believed might distribute the 305 Album to the public. TVT informed ADA distributor that the marketing, promotion and distribution of the 305 Album violated TVT's Lanham Act rights. (A-197, 8/31/05 Transcript; A-666, Exh. 2). While Ms. Sussman has had some limited experience in filing trademark registrations, she does not have "substantial trademark expertise," as Plaintiff asserts. (A-254, A-256-57, 9/7/05 Transcript). Ms. Sussman did file a trademark application for the TVT Pitbull Logo, solely to protect the stylized logo. (A-

5

202, 8/31/05 Transcript).  The application did not assert that TVT owned the Pitbull mark itself. (A-202, 8/31/05 Transcript; A-267-68, 9/7/05 Transcript).

Contrary to Plaintiff's contention, TVT did not know the nature of the relationship between ADA and any of the counterdefendants, that is, TVT did not know – and still does not know – whether ADA and any of the counterdefendants had a written or oral contract for distribution of the 305 Album. (A-238, A-244-45, 9/7/05 Transcript).  Nor has plaintiff produced a written agreement of any kind with ADA.

TVT sent the cease and desist letters to protect against the likelihood of consumer confusion caused by SNS's unauthorized use of the TVT Pitbull Logo.  (A-197, A-227-28, 8/31/05 Transcript; A-269-70, 9/7/05 Transcript).  TVT reasonably believed that use of the TVT Pitbull Logo would likely confuse consumers into believing that the 305 Album was an album authorized by, or released by, TVT. (A-197, A-227-28, 8/31/05 Transcript).  In fact, there is evidence that consumers did believe that the 305 Album was the "sophomore" or "second" Pitbull album being released by TVT. (Declaration of Steven Gottlieb, dated July 14, 2005, submitted in support of TVT's Motion for a Preliminary Injunction and Opposition to Slip n' Slide's Motion for a Preliminary Injunction ("Gottlieb Decl."), ¶ 20, Exh. N).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  "A court must view the evidence in the light most favorable to the non-movant, resolving all reasonable doubts and drawing all reasonable inferences in that party's favor." Valley Drug Co. v. Geneva Pharms., 344 F.3d 1294, 1303 (11th Cir. 2003) (internal citations and

6

quotations omitted) (reversing district court's granting of motion for partial summary judgment for Sherman Act claims).

## III.  ARGUMENT

A.      **Summary Judgment on TVT's Lanham Act Counterclaims Must Be Denied, Because Counterdefendant's Use of TVT's Stylized Pitbull Logo Is Likely to Cause Consumer Confusion.**

A party prevails on a trademark infringement claim where it shows: (1) that the defendant used the mark in interstate commerce without consent; and (2) that the unauthorized use was likely to deceive, cause confusion, or result in mistake. Davidoff & Cie, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1301 (11th Cir., 2001); Nassau v. Unimotorcyclists Soc'y of Am., Inc., 59 F. Supp. 2d 1233, 1239 (D. Fla., 1999).  A trademark licensee has standing to bring an infringement claim under Lanham Act § 43(a).  See 15 U.S.C. § 1125(a) (action may be brought "by any person who believes that he is or is likely to be damaged"); see also Murphy v. Provident Mutual Life Ins. Co. of Philadelphia, 756 F. Supp. 83, 86 (D. Conn. 1990) (noting that "[t]he question of ownership is immaterial to standing under § 43(a) of the Lanham Act, 15 U.S.C.S. §1125(a), since standing may lie with mere users of trademarks").

Under the terms of the recording agreement Perez signed with TVT in October of 2003, Perez granted to TVT exclusive rights to use the "Pitbull" mark for purposes of advertising and promotion of musical recordings released during the term of the recording Agreement.  (A-730, Exh. 13, § 5.04).  Moreover, under the recording agreement, TVT owns exclusive rights to the cover art TVT develops in connection with Perez's recordings.  (A-727, Exh.13, § 3.03; 11/29/05 Sussman Decl., ¶ 6, Exh.1).  The cover art for the M.I.A.M.I. album included the TVT/Pitbull Logo (A-790, Exh. 34).

Consistent with its rights, TVT developed the Logo, and produced, marketed and distributed recordings and otherwise promoted Perez under the Logo.  (A-192-93, 8/31/05

7

Transcript; A-739, Exh. 15; A-754, Exh. 19; A-790, Exh. 34).  TVT has widely advertised and

distributed these recordings, and the Logo has become an asset of substantial value to TVT.  (A-

194, A-198, A-227-28, 8/31/05 Transcript; Gottlieb Decl., ¶¶ 6-8).  Moreover, the music industry

and consumers associate the Logo with TVT's exclusive recording artist. (A-120-22, 8/30/05

Transcript).

        Not denying the association of the TVT Pitbull Logo with TVT, Counterdefendants urge

this Court to grant summary judgment based on citation to a single unpublished Eastern District

of Louisiana case.  Counterdefendants cite <u>United States Auto Club, Inc. v. United States Motor</u>

<u>Club Corporation</u>, 1979 U.S. Dist. LEXIS 13313 (E.D. La., April 2, 1979) for the proposition

that a trademark owner is an indispensable party to an infringement action (*See* S&S Brief at p.

13).  First of all, <u>United States Auto Club</u> is distinguishable in that the defendant there argued

that the plaintiff, the owner of the trademark at issue, failed to join a licensee as a party, a

contention that the court rejected.  <u>Id</u>. at *1-2.  Furthermore, the cases cited above clearly hold

that a licensee has standing to bring an infringement action.  Moreover, under Federal Rule of

Civil Procedure 19(a), even if Perez were an indispensable party – which he is not – the proper

remedy is an order to join him, not for summary judgment.  <u>See Focus on the Family v. Pinellas</u>

<u>Suncoast Transit Auth.</u>, 344 F.3d 1263, 1280 (11th Cir. 2003) (reversing grant of summary

judgment motion that was based, in part, on plaintiff's failure to join an indispensable party and

remanding with order to join that party).

        Counterdefendants also assert that the TVT/Pitbull Recording Agreement is not valid

because there was purportedly "no meeting of the minds" as to the terms of the long form.  (S&S

Brief at p. 11).  This bold assertion by a nonparty to the agreement is based on: (1) the terms of

8

the long form were purportedly not negotiated between TVT and Perez; and (2) that TVT's signature is not on the short form agreement.  Neither position has merit.

First, the short form agreement, fully negotiated between TVT and Perez's agent – DBMG -- specifically incorporates the terms of Exhibit "A" to the letter agreement, and expressly provides that, in the event, changes to the terms of Exhibit A are not negotiated within six months from the effective date of the letter agreement, all of the terms of Exhibit "A" are specifically incorporated by reference.  (A-724, Exh. 13).

Nor does the absence of TVT's signature on the letter agreement have any legal significance to this motion.  It is undisputed that TVT has paid DBMG and Perez under the contract and that Perez has delivered recordings to TVT under the agreement.  No party to the agreement has asserted that the terms of the agreement, including the long form, are ineffective or unenforceable.  (11/29/05 Sussman Decl., ¶ 7).  See Hunter v. Tartan Construction Co., 522 So.2d 77 (Fla. 4th DCA 1988) (holding that a contract not signed by all of the parties may be upheld against a signing party, unless nature or wording of contract indicates that his signature was conditioned upon all other parties signing the contract); James Register Construction Co. v. Bobby Hancock Acoustics, Inc., 525 So.2d 339, 340 (Fla. 1st DCA 1988) (where parties act as if the provisions of an unsigned contract are in force, then contract terms will be enforced, unless a signed contract is required by statute or parties intend that the contract is not binding until signed); Gay Enterprises, Inc. v. John Hall Electrical Contracting, 792 So.2d 580, 581 (Fla. 4th DCA 2001) (where one party fails to sign an agreement, but parties do their best to comply with the terms of the agreement, and signing party was paid according to the agreement, court found that parties agreed to be bound by the written but unsigned agreement).

9

In willful violation of TVT's rights, Counterdefendants have used the TVT Pitbull Logo in interstate commerce not in connection with Perez's prior recordings delivered to Boothe, but, rather, in connection with *new* recordings featuring other artists, splicing in Perez's vocals. (Gottlieb Decl., ¶ 14). Not only is Counterdefendants' use of the Logo likely to cause confusion with the public, it in fact has caused such confusion. Consumers have actually downloaded and listened to the 305 Album on Counterdefendants' website expecting to hear TVT's latest Pitbull release, but, rather, have indicated disappointment that the 305 Album is a poor quality "mixtape" type CD. (Gottlieb Decl., ¶ 20, Exh. K).

TVT is therefore likely to succeed on its trademark infringement counterclaim.

Separately, Counterdefendants' use of TVT's Pitbull Logo constitutes a false designation of origin under the Lanham Act. A party succeeds on a Lanham Act false designation of origin claim where it shows that the defendant used in commerce any word, term, name, symbol, or device which is likely to cause confusion as to the origin, sponsorship or approval of the goods in question. 15 U.S.C. § 1125(a); Smith v. Montoro, 648 F.2d 602, 604 (9th Cir. 1981) (false designation case).

The false designation of origin provisions of the Lanham Act are designed to protect plaintiffs – even in the absence of a protectible trademark – from a defendant's use of any name, symbol or other designation where that use is likely to cause confusion as to the origin, sponsorship or approval of the goods. See Metlife, Inc. v. Metropolitan National Bank, 388 F. Supp. 2d 223 (S.D.N.Y. 2005) (enjoining defendant under Lanham Act from using confusingly similar logo to plaintiff's); Generation X Int'l Corp. v. No Excuses Sportswear, Ltd., 1998 U.S. Dist. LEXIS 4693 (S.D.N.Y., Apr. 3, 1998) (enjoining defendant from using logo confusingly similar to plaintiff's unregistered logo); Christian Science Board of Directors v. Robinson, 2000

U.S. Dist. LEXIS 21309 (W.D.N.C., Mar. 29, 2000) (granting plaintiff's motion for summary judgment on 43(a) claim based on both unregistered logo and word mark).

Counterdefendants' use of the TVT Pitbull Logo constitutes a false and/or misleading representation that creates the impression that TVT is associated with, has sponsored, or approved the 305 Album.  Indeed, Counterdefendants admit that they used TVT's Logo because people were familiar with the Logo.  (A-120-22, 8/30/05 Transcript).

Moreover, Counterdefendants are marketing and distributing the 305 Album as if it is TVT's and Pitbull's new follow up to the *M.I.A.M.I.* album.  TVT's Pitbull Logo is prominently featured on the CD jacket and marketing materials, and recent photographs of Pitbull – including from photo and video shoots done in connection with *M.I.A.M.I.*  – are on the cover and in all of the marketing materials and advertisements for the 305 Album.  (A-700-03, Exh. 7; A-749, Exh. 16; A-750, Exh. 17; A-754, Exh.19; A-790-97, Exh. 34).

The 305 Album advertisements prominently feature details about *M.I.A.M.I.*, and, tout the success of that record, further deceiving the public that the 305 Album is a follow up album.  See Rich v. RCA Corp., 390 F. Supp 530 (S.D.N.Y 1975) (granting an injunction against defendant record sellers, the court held that consumers were likely to be deceived and confused as to the true contents of an album where the artist's performances were recorded a decade prior but the record jacket contained a recent picture of the artist with no dates or other notations); Rostropovich v. Koch International Corp., 1995 U.S. Dist. LEXIS 2785, at *11 (S.D.N.Y., Mar. 7, 1995) (in ruling against summary judgment, the court held that despite the fact that the labeling on compact disc covers were truthful, a reasonable juror could be confused by the overall effect of the packaging and the Lanham Act is designed to prevent confusion).

Counterdefendants have deliberately designed the advertising campaign, CD cover, and liner notes for the 305 Album in a manner intended to mislead consumers into believing that the album is Pitbull's latest TVT release.  And, consumers have in fact been deceived.  For example, on an Internet message board hosted by TVT, the following comment was posted:

> I'm really not liking this sh** . . . People are swearing this is [Pitbull's] second release, slip-n-slide should be ashamed of themselves to pump this up like his sophomore album.  Pit has to come out with his second album soon that will trump this album.

(Gottlieb Decl., ¶ 20, Exh. N).

In sum, TVT has proffered substantial undisputed evidence of Counterdefendants' violation of TVT's Lanham Act rights, and Counterdefendants' motion for summary judgment should therefore be denied.

**B.      Summary Judgment on Plaintiff's Tortious Interference Claim Must Be Denied As TVT Was Justified in Sending out the Cease and Desist Letters.**

To prevail on a claim of tortious interference with a business relationship, a plaintiff must prove, among other things, *intentional and unjustified* interference by the defendant.  Seminole Tribe of Florida v. Times Publishing Co., 780 So. 2d 310, 315 (Fla. 4th DCA 2001).  A person has a qualified privilege to interfere with another's business relationships to safeguard its own financial interests.  Ethyl Corp. v. Balter, 386 So. 2d 1220, 1225 (Fla. 3d DCA 1980).  A party who is so privileged can be held liable for tortious interference only if the party: (a) acted solely with malice, or (b) acted partly with malice and utilized "improper methods," such as physical violence, misrepresentations, illegal conduct or threats of illegal conduct.  See KMS Rest. Corp. v. Keitel, 361 F.3d 1321, 1326-27 (11th Cir. 2004); Ethyl Corp, 386 So. 2d at 1225; McCurdy v. Collis, 508 So. 2d 380, 382 (Fla. 1st DCA 1987); Florida Standard Jury Instruction (Civil) MI 7.2.  Malice is therefore always an element of a tortious interference with business relationships

12

claim. <u>Rockledge Mall Assoc., Ltd. v. Custom Fences of S. Brevard, Inc.</u>, 779 So.2d 554, 557 (Fla. 5th DCA 2001) (reversing a verdict that defendants had committed tortious interference due in part to an absence of a proper showing of malice by defendants).[2]  Plaintiff have not and cannot meet this burden of showing malice here, and at a minimum, TVT has raised a genuine issue of material fact as to its qualified privilege in sending out the cease and desist letters.

Courts have routinely held that a "trademark holder has [the] right to defend against infringement by sending trademark policing letters" and that such conduct is "privileged" because the trademark holder is merely acting to protect its interest. <u>ABC v. Maljack Productions</u>, 34 F. Supp. 2d 665, 675 (N.D. Ill. 1998) (internal quotations and citations omitted) ("Maljack").  Second, courts have consistently held that the party need only have a "good faith belief" in its intellectual property interest in order to establish a privilege. <u>Id</u>.; <u>see also</u> <u>Publications Int'l, Ltd. v. Western Publishing Co., Inc.</u>, No. 93-C-3074, 1994 U.S. Dist. LEXIS 558, at *2 (N.D. Ill. Jan. 25, 1994) ("The right of the holder of a trademark [or patent] to warn others of infringement suits does not depend upon the validity of the trademark [or patent] so long as the holder believes his claims are valid.") (quoting <u>Heinz v. Frank Lloyd Wright Found.</u>, 762 F. Supp. 804, 808 (N.D. Ill. 1991)); <u>Daesang Corp. v. Rhee Bros., Inc.</u>, 2005 U.S. Dist. LEXIS 9066, at *38-39 (D. Md. May 13, 2005);  <u>SNF Enterprises v. Paramount Pictures Corp.</u>, No. 82 Civ. 6638, 1983 U.S. Dist. LEXIS 19692 (S.D.N.Y. Jan. 28, 1983).  Thus, even if a court finds no Lanham Act violation, the privilege still extends to one who acted in good faith to

---

[2]  <u>See also</u> <u>IBP, Inc. v. Hady Enterprises, Inc.</u>, 267 F. Supp. 2d 1148, 1164 (N.D. Fla. 2002) ("In order to establish the third element of the prima facie case for tortious interference, [plaintiff] must show that [defendant] acted with malice or ill will"); <u>Southern Bell Tel. & Tel. Co. v. Roper</u>, 482 So. 538, 539 (Fla. 3rd DCA 1986) (". . . the complained-of evidence went directly to the issue of malice, which was an element of the claim for tortious interference with the business relationship").

protect its business. <u>Spangler Candy Co. v. Crystal Pure Candy Co.</u>, 235 F. Supp. 18, 33 (N.D. Ill. 1964).

In <u>Maljack</u>, the court granted summary judgment in favor of defendant on plaintiff's claims for intentional interference of both contract and prospective business advantage, finding that defendant's issuance of cease-and-desist letters to potential customers of plaintiff were privileged because they were made in good faith. 34 F. Supp. 2d at 675. Defendant sent a cease-and-desist letter to the American Broadcasting Company ("ABC") who had granted a license to plaintiff to use video footage of Princess Diana's funeral which plaintiff had intended to sell and distribute as a home video. <u>Id</u>. at 669-70, 672. Defendant also sent a cease-and-desist letter to Reader's Digest who had discussed with plaintiff the possibility of producing a custom video of the funeral. <u>Id</u>. at 672. In the letters, defendant asserted its copyright ownership in the video coverage of Princess Diana's funeral and stated that the "unauthorized reproduction of that footage 'constitutes an infringement of [defendant's] exclusive rights therein.'" <u>Id</u>.

The court noted that in both of the claims for tortious interference with contract and for tortious interference with prospective economic advantage, a "[p]rivilege exists if the defendant acted in good faith to protect an interest or uphold a duty." <u>Id</u>. at 675 (internal quotations and citations omitted). The court rejected plaintiff's argument that defendant's conduct was not privileged because it did not have a valid copyright in the funeral footage and held that defendant's "good faith belief in its copyright interest [was] sufficient." <u>Id</u>. The court then held that plaintiff did not meet its burden of proving that defendant's privileged conduct was unjustified and malicious, i.e., carried out in bad faith. <u>Id</u>. at 675-76. The court noted that plaintiff provided no evidence that defendant used illegal means to induce ABC's breach of

14

contract or to interfere with plaintiff's prospective economic relationship with Reader's Digest. Id. at 676.  *

At the time it sent out the cease-and-desist letters, TVT had a good faith belief that Slip N Slide was violating the Lanham Act by its use of the TVT Pitbull Logo in its advertisements.  See Heinz, 762 F. Supp. at 808 (plaintiff "ma[d]e no showing that [defendant] did not believe that the facts contained in the infringement letters were true.")  Ms. Sussman's testimony establishes that TVT's cease-and-desist letters were motivated by its good faith belief that the 305 Album was being marketed and distributed in violation of the Lanham Act.

The fact that Ms. Sussman had not *heard* the 305 Album before she sent out the cease-and-desist letters, a fact Plaintiff points to, is irrelevant.  As Ms. Sussman testified, TVT concluded, based on the two advertisements it had seen that depicted its identical logo used in connection with its *M.I.A.M.I.* album and photos from an article that promoted its *M.I.A.M.I.* album, that the 305 Album violated its rights under the Lanham Act.

> Q:    Ms. Sussman, in the first numbered paragraph you say the sale, placement, distribution, et cetera, of the Welcome to the 305 album violates TVT's rights and constitutes without limitation a violation of the [Lanham Act] . . . What was the basis for you including that statement in your letter to various third parties?
>
> A:    Well, the advertisement for that album used our logo, it was our brand that we had developed in connection with a TVT – albums everywhere.  This created, would have created confusion in some sense that TVT and/or Pit Bull were involved in this Welcome to the 305 album based on them using the logo."

(Appx., A-198, 8/31/05 Transcript).

TVT sent its letters based on a good faith belief that its logo was being misused. Evidence that TVT acted in good faith is sufficient to defeat Plaintiff's motion for summary judgment on its tortious interference claim.  See, e.g., Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1261-62 (11th Cir. 2004).  At a minimum, TVT has raised genuine issues of

fact as to its qualified privilege—issues that should be resolved by the trier of fact.  See McCurdy v. Collis, 508 So.2d 380, 385 (Fla. 1st DCA 1987) (reversing summary judgment on tortious interference claim on ground that "qualified privilege issue should be resolved by the trier of fact.").

**C.**    **Under FRCP 56(f), Plaintiff's Motion Should Be Denied.**

This matter is not set for trial, and no scheduling order has yet been entered.  Although a few third party depositions were taken to prepare for the injunction hearing, the bulk of discovery was anticipated to occur following resolution of the injunction proceedings - which have not yet concluded.  TVT respectfully submits that the Court should either deny the motion for summary judgment as premature or delay ruling on the motion until the close of discovery. See Fed. R. Civ. P. 56(f)(court "may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."); see also, Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986) ("Any potential problems with [] premature motions can be adequately dealt with under Rule 56(f), which allows a summary judgment motion to be denied, or the hearing on the motion continued, if the nonmoving party has not had an opportunity to make full discovery."); Snook v. Trust Co., 859 F. 2d 865, 870 (11th Cir. 1988) ("Generally summary judgment is inappropriate when the party opposing the motion has been unable to obtain responses to his discovery requests.").

On November 8, 2005, prior to Slip N Slide filing its Motion for Summary Judgment, TVT served its First Set of Requests for Production of Documents and Things to Slip N Slide; its First Set of Requests for Production of Documents and Things to Rudebwoy Entertainment; and its First Set of Requests for Production of Documents and Things to 305 Music, Inc.  Copies of these discovery requests are attached to the Declaration of Manuel Kushner as Exhibits 1-3.  No

responses to the discovery requests will come due until December 8, 2005, nor have any of the counterdefendants yet served their responses to these outstanding discovery requests.

The foregoing requests for production seek documents that are relevant to issues of material fact that are the subject of Slip N Slide's motion for summary judgment, including, without limitation, the following:

• What agreement, if any, Slip N Slide has with ADA Distribution, Inc., that Slip N Slide claims was the subject of intentional interference, and whether that agreement would have been completed if TVT had not sent out the cease and desist letters. (Requests for Production to Slip N Slide, Rudebwoy and 305 Music, Inc. at ¶33);

• What advantageous business relationships, if any, Slip N Slide had with parties other than ADA Distribution, Inc. that it claims were the subject of intentional interference. (Request for Production to Slip N Slide, Rudebwoy and 305 Music, Inc. at ¶¶ 7 and 17);

• What changes were made to the original master recordings.  These documents relate to the issue of whether the Welcome to the 305 album constitutes "new recordings" for which TVT has exclusive distribution rights. (Request for Production to Slip N Slide, Rudebwoy and 305 Music, Inc. at ¶¶ 1-6, 21 - 23, and 26);

• What attempts the counterdefendants made to confuse consumers into believing that the Welcome to the 305 album is TVT's follow up to the M.I.A.M.I. album.  These documents are directly relevant to the reasonableness of TVT's actions in sending out the cease and desist letters. (Request for Production to Slip N Slide, Rudebwoy and 305 Music, Inc. at ¶¶ 8 - 11, 15, 16, 18, 19, 24, 25, 27 and 28);

• What terms were negotiated with MediaPal for the distribution of the Welcome to the 305 album, and the quantity of sales that occurred through MediaPal.  These documents are

relevant to the issue of whether Slip N Slide suffered any damages as a result of the cease and desist letters.  (Request for Production to Slip N Slide, Rudebwoy and 305 Music, Inc. at ¶ ¶ 12 and 13);

     • What complaints were made by consumers about the Welcome to the 305 album.  These documents are relevant to TVT's counterclaim for trademark infringement and violation of the Lanham Act.  (Request for Production to Slip N Slide,  Rudebwoy and 305 Music, Inc. at ¶ 29);

     • What licensing releases and approvals were obtained for the distribution of the Welcome to the 305 album.  These documents are relevant to Slip N Slide's claim that it had a clear contractual right, and that it was ready willing and able to market and sell the Welcome to the 305 album.  (Request for Production to Slip N Slide, Rudebwoy and 305 Music, Inc. at ¶ ¶ 14, 31 and 32).

     Assuming timely production of the requested documents, TVT intends to take depositions of various individuals, including Armando Perez, whose testimony is necessary to refute Slip N Slide's claims that Mr. Perez and TVT never reached a meeting of the minds on the terms of the agreement for Perez to provide recording services, and to refute Slip N Slide's claims that Mr. Perez concurs in Slip N Slide's conduct.  To date, it has been difficult to coordinate any such deposition of Mr. Perez due to his concert schedule.  In addition, TVT intends to depose ADA Distribution, Inc., to determine whether that company entered into a written, non-terminable distribution agreement with Slip N Slide, since no such agreement has yet been produced.  ADA Distribution, Inc.'s testimony about what efforts it made to address the Lanham Act concerns referenced in TVT's cease and desist letters is also relevant to the tortious interference claim that is being asserted by Slip N Slide.  Finally, the sufficiency and type of documents produced by the counterdefendants will guide TVT in determining whether it will engage an expert to create a

18

survey and how that survey will be structured to evidence the likelihood of confusion among

consumers as to the affiliation between TVT and Slip N Slide based on the use of identical logos.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's and Counterdefendants' motion for summary

judgment should be denied.

Dated:  November 29, 2005

Respectfully submitted,

KAYE SCHOLER, LLP

Manuel Kushner
Florida Bar: 330957
Phillips Point, West Tower, Suite 900
777 South Flagler Drive
West Palm Beach, FL  33401
Telephone:  (561) 802-3230
Facsimile:  (561) 802-3217

KAYE SCHOLER
1999 Avenue of the Stars, Suite 1700
Los Angeles, California  90067
Telephone:  (310) 788-1000
Facsimile:  (310) 788-1200

Rhonda R. Trotter
Admitted *pro hac vice*
Mark Godler
Admitted *pro hac vice*

19

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent via U.S. mail this 29th day of November, 2005, to:  Richard C. Wolfe, Esq., Wolfe & Goldstein, P.A., 100 S.E. 2nd Street, Suite 3300, Miami, Florida 33131 and David M. Rogero, David M. Rogero, P.A., 2600 Douglas Road, Suite 600, Coral Gables, FL 33134.

By: _____

20