**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

Case No. 05-21113-CIV-TORRES

CONSENT CASE

SLIP-N-SLIDE RECORDS, INC.,

    Plaintiff,

vs.

TVT RECORDS, LLC,

    Defendant.
_____/

TEEVEE TOONS, INC.,

    Counterclaimant,

vs.

SLIP-N-SLIDE RECORDS, INC., *et al.*,

    Counter-Defendants.
_____/

**<u>ORDER ON SUMMARY JUDGMENT MOTIONS</u>**

THIS cause came before the Court for a hearing on December 13, 2006, on the parties' cross motions for summary judgment.[1] Having considered the several motions and numerous responses, the oral and written arguments of counsel, the evidence presented in support of or opposition to summary judgment, and the entire record in this

---

[1] The Court has considered the following motions: Plaintiff/Counterdefendants' Motion for Summary Judgment seeking partial summary judgment on the issue of liability and summary judgment on the counterclaims [D.E. 72]; Defendant TVT Records LLC's Motion for Summary Judgment on all of Plaintiff's claims [D.E. 212]; Counterclaimant's Motion for Summary Judgment on its counterclaims [D.E. 216]; Counter-Defendants' Motion for Summary Judgment on the Amended Counterclaim [D.E. 280]; and all related pleadings and documents filed to date.

case, the Court finds there are disputed issues of material facts as to each of the claims asserted in this case. Accordingly, the Court denies each of the pending motions for summary judgment for the reasons set forth below.

## *I. INTRODUCTION*

This case involves Slip N' Slide Records, Inc.'s ("SNS") suit against TeeVee Toons, Inc. (hereinafter referred to as "TVT")[2] for tortious interference, declaratory relief, and temporary and permanent injunctive relief in connection with the sale, marketing, and distribution of an album entitled "Welcome to the 305" ("305 Album") which contained musical recordings by rap artist Armando Perez ("Perez"), known professionally as "Pitbull." TVT counterclaimed against SNS, Rudebwoy Entertainment ("Rudebwoy"), 305 Music ("305 Music"), and individuals Allen Waserstein ("Waserstein"), Robert Henderson ("Henderson"), and Theodore Lucas ("Lucas") for trademark infringement and Lanham Act claims under 15 U.S.C. 1125(a) in connection with TVT's "Pitbull" mark and logo.

The Court adopts and incorporates herein the factual recitation set forth in Magistrate Judge Stephen T. Brown's Report and Recommendation dated September 28, 2005 [D.E. 56] ("R&R") which District Judge Adalberto Jordan adopted by Order of January 4, 2006 [D.E. 98] ("Order"). Those findings of facts were, of course, preliminary as they were made in connection with SNS' motion for a preliminary injunction and prior to substantial discovery being conducted in this case. Those findings, as well as the conclusions of law previously made in this case, are not automatically binding on the Court now that the case is being evaluated on its merits. *See, e.g., University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely

---

[2] As discussed in the Court's Order granting SNS's motion to amend its complaint, the correct defendant in this case is TeeVee Toons, Inc., not TVT Records LLC. [D.E. 265 at 8-9].

to preserve the relative position of the parties until a trial on the merits can be held. Given this limited purpose . . . findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at a trial on the merits."). Additional facts submitted subsequent to the entry of the R&R and Order that bear on the issues presently before this Court have been considered and are discussed where appropriate.

While some of the additional discovery has buttressed the position of one side or the other with regard to a particular issue, the Court concludes, regrettably, it has not definitively resolved any of the issues in the case. We say regrettably only because all parties and the Court have an interest in narrowing the issues in a case for trial, if that is possible, through the summary judgment procedure. The parties presented compelling arguments in support of their relative positions, which is perhaps indicative of a situation where the trier of fact should be allowed to decide the merits of the case. The Court has nevertheless exhaustively reviewed the evidence and considered whether even partial rulings granting summary judgment and narrowing the issues for trial was permissible under Rule 56. After undertaking this analysis, however, the burden on each moving party was too difficult to bear. Because this case presents many facts that reasonable persons could interpret differently, and because the Court must draw all inferences from the record in favor of the non-moving party on each issue, judgment as a matter of law cannot be entered appropriately on any of the parties' claims in this case.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Imaging Bus. Mach., LLC. v. BancTec, Inc.,* 459 F.3d 1186, 1189 (11th Cir. 2006) (citing Fed. R. Civ. P. 56(c)). In deciding a summary judgment

motion, the court must view all the evidence and make all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citing *Cruz v. Public Super Mkts., Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005)). A material fact is one that might affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hilburn v. Murata Elecs. North Am., Inc.*, 181 F.3d 1220, 1225 (11th Cir. 1999). Thus, the task is to determine whether, considering the evidence in the light most favorable to the plaintiff, there is evidence on which the trier of fact could reasonably find a verdict in their favor. *See Anderson,* 477 U.S. at 251; *Hilburn*, 181 F.3d at 1225.

### III.  ANALYSIS

#### A.  *SNS's Tortious Interference Claims*

Both parties seek summary judgment in their favor on SNS's claims for tortious interference with SNS's advantageous business relationship with Alternative Distribution, Alliance, Inc. ("ADA"), the intended distributor of the 305 Album, and tortious interference with its contractual relationship with ADA. The elements of these two claims are essentially the same. To succeed on either, SNS must demonstrate the (1) existence of a business relationship with ADA; (2) TVT's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by TVT; and (4) damage to SNS as a result of the breach of the interference. *Gossard v. Adia Services, Inc.*, 723 So. 2d 182, 184 (Fla. 1998) (tortious interference with an advantageous business relationship); *KMS Restaurant Corp. v. Wendy's Intern'l, Inc.* 361 F.3d 1321, 1325 (11th Cir. 2004) (tortious interference with a contract claim).

Because TVT's interference with the SNS relationship with ADA is at the heart of this case, the Court will focus on the third element necessary to prove a tortious interference claim. SNS asserts that when TVT's Jacqueline Sussman, Esq., TVT's Executive Vice President in charge of legal and business affairs, distributed cease and desist ("C&D") letters to ADA and other retailers, TVT wrongfully and without justification threatened ADA and others with meritless litigation if SNS released and distributed the 305 album, an album that SNS claims it had a legal right to sell. SNS complains that TVT undertook no due diligence to determine what legal rights SNS had to sell the 305 album or if such sales actually infringed on TVT's legal rights.

According to SNS, at the time the C&D letters were sent:

1) TVT was aware that Perez had recorded previously unreleased masters before he signed with TVT;

2) TVT relied solely on the ADA ad for information about the 305 Album and its content, and had not analyzed the contents or even listened to the album;

3) TVT had been advised by Perez's lawyer, Angela Martinez, and Allen Jacobi, a 305 Music investor, that Perez had a prior contractual relationship with Julian Boothe ("Boothe") pursuant to which Perez made 27 musical recordings ("Boothe Recordings");

4) TVT conducted no due diligence to determine what rights Perez had legally conveyed to Boothe and SNS, or how SNS obtained its rights to release the 305 Album;

5) TVT was aware that Perez had filed a prior trademark application to register the service mark "Pitbull;" and

> 6) TVT was aware that SNS had a written distribution agreement with ADA to distribute the 305 Album, and that TVT specifically targeted ADA to receive the C&D letter.

SNS contends that as a direct result of TVT sending the C&D letters, ADA's buyers cancelled pre-orders of the 305 Album, and ADA refused to distribute the 305 Album. SNS posits that TVT knew of the advantageous business relationship between it and ADA with regard to the 305 Album, and acted with the express intent to interfere with that relationship by causing ADA and its customers to cease buying the 305 Album.

TVT counters that it had a qualified privilege to send the C&D letters in order to legitimately protect its rights in the TVT Pitbull logo. TVT claims its contractual rights in the logo stem from its own agreement with Perez, which included the exclusive right to exploit trademarks that it developed to market and promote Pitbull's recordings. TVT also asserts it acquired rights in the logo pursuant to the Lanham Act: the logo portraying the name "Pitbull" uses lettering distinctive enough to convey protectible trademark rights in the logo, and the logo acquired secondary meaning in the marketplace sufficient to warrant trademark protection. As the holder of exclusive rights and the valid trademark owner, TVT says, it was entitled to bar others from using its mark. TVT claims it sent the C&D letters because of a good-faith belief that Counterdefendants' use of the TVT Pitbull logo in connection with the 305 Album would cause consumers to be confused about the source of the album and about whether it was a follow-up to the M.I.A.M.I. Album previously released by TVT. Finally, TVT posits that ADA and other recipients of the C&D cancelled pre-orders of the 305 Album after SNS commenced this litigation and after TVT filed its countersuit, not as a result of receiving the C&D letter.

As discussed below, the Court finds there are disputed issues of material fact which preclude entry of summary judgment for either party on these tortious interference

claims.³  Certainly the central questions in this case, whether TVT was legally justified in sending out the C&D letters, or whether TVT knowingly and intentionally misstated its legal rights in Pitbull's music, must be decided by a jury, not this Court.

### *1. Qualified Privilege to Interfere*

In ruling on SNS's request for a preliminary injunction at the outset of this case, Magistrate Brown determined, and Judge Jordan agreed, that TVT had acted without justification when it interfered with the SNS-ADA relationship, by intentionally and knowingly misrepresenting its legal rights and by threatening meritless claims. *See* R&R at 18; Order at 1-2. Under Florida law, a tortious interference claim is actionable where malice is the sole basis for interference. *Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1225-26 (Fla. 3d DCA 1980); *KMS Rest. Corp. v. Wendy's Int'l., Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004). At the preliminary injunction stage, Judge Jordan found there was sufficient evidence then in the record from which a jury would likely find that TVT had acted with malice in sending out the C&D letters. *See* Order at 2. In so ruling, Judge Jordan found significant Ms. Sussman's deposition testimony that "she acted with the intent of causing ADA and its customers to not buy or cease buying the 305 Album," as well as other evidence. *Id.* None of the evidence placed in the record since Judge Jordan's ruling contradicts his determination that *a jury reasonably might find* that TVT, through its agent Ms. Sussman, acted with malice in sending out the C&C letters.

But SNS need not prove TVT acted with actual malice to prevail here. TVT has asserted it had a qualified privilege to interfere, a shield from liability which is unavailable to TVT if it employed improper means to interfere with the SNS-ADA relationship. SNS need only show that the harm caused by TVT's C&D letters was inflicted without

---

³ Given this conclusion, it is unnecessary to discuss the other elements of the tort claims.

justification or excuse.  As Magistrate Judge Brown explained in his R&R at 17, TVT had a qualified privilege to interfere with SNS's relationship with ADA to safeguard its own financial interests, so long as it did not do so solely by "improper" means.  *KMS Rest. Corp.*, 361 F.3d at 1327 (concluding that even where the defendant's motive was not purely malicious, a tortious interference claim might succeed if improper means were used; "[t]he significant inquiry to determine the privilege of justification is whether the means employed are not improper."); *Ethyl*, 386 So.2d at 1225 ("[S]o long as improper means are not employed, activities taken to safeguard or promote one's own financial, and contractual interests are entirely non-actionable.").

Judge Brown's analysis is consistent with other Florida cases considering similar issues:

> The question of whether appellants' admittedly intentional interference was unjustifiable depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances among which the methods and means used and the relation of the parties are important.  Restatement 2d, Torts § 767 and comments.

*Insurance Field Servs., Inc. v. White & White Inspection and Audit Serv., Inc.*, 384 So. 2d 303, 306-307 (Fla. 5th DCA 1980).  Fraudulent misrepresentations are ordinarily a wrongful means of interference and make interference improper.  *See* Restatement (Second) of Torts § 767, cmt. c. (1979).  "A representation is fraudulent when, to the knowledge or belief of its utterer, it is false in the sense in which it is intended to be understood by its recipient. . . ."  *Id.*

Magistrate Judge Brown concluded, and Judge Jordan agreed, that TVT's statement that SNS's actions in promoting and distributing the 305 Album were a violation of TVT's rights "was a misrepresentation which was made with knowledge (or was at least reckless), and which was clearly intended to cause the recipients of the

letters to not purchase [the 305 Album]." *See* R&R at 18. This conclusion was based on the preliminary factual finding that TVT knew at the time the C&D letters were sent that the subject recordings were made for Boothe prior to TVT's agreement with Pitbull. *Id.* at 17-18. Magistrate Judge Brown considered it significant that Ms. Sussman's experience in the music industry and her knowledge of how "the system" worked at least raised a question of what rights Boothe had in the recordings. *Id.* at 18. Moreover, the Court cited Ms. Sussman's letter to attorneys for Pitbull Productions, Inc., and Pitbull's agent demanding an assignment of the previously unreleased masters, as evidencing some recognition of previously existing rights by an entity other than TVT. *Id.*

Notwithstanding this knowledge, Magistrate Judge Brown noted, TVT made no effort to find out the extent of previously existing rights before issuing the C&D letter. *Id.* Thus, he concluded that statements in the C&D letters that the 305 Album "currently being advertised for release by Slip-N-Slide Records . . . is in violation of TVT's rights," and that "[t]he sale, placement, distribution, marketing, advertisement and/or promotion of [305] violates TVT's rights and constitutes, without limitation, violation of the Lanham Act", were misrepresentations made with knowledge, or at least recklessly, and with the intent to cause the recipients of the letters not to purchase the 305 Album. *Id.*

Now, at the summary judgment stage, whether TVT's interference with SNS's relationship with ADA was justified, or more precisely stated, whether TVT (through Ms. Sussman) knowingly and intentionally misrepresented TVT's legal rights in Pitbull's music to ADA and others, remain ultimate questions the jury must resolve. *See, e.g.*, *International Sales & Serv. Inc. v. Austral Insulated Products, Inc.*, 262 F.3d 1152, 1159 (11th Cir. 2001) (determination of whether interference in a business relationship was justified based on the privilege of competition, i.e., whether the interference was improper or not, is ordinarily left to the jury) (quoting with approval *Manufacturing Research Corp.*

*v. Greenlee Tool Co.*, 693 F.2d 1037, 1040 (11th Cir. 1982) ("question of justification [for interfering with advantageous business relationships] involves a balancing of the interests of the parties and of society as well as consideration of all the circumstances including the methods and means used and the relation of the parties" and is ordinarily a jury question).

For instance, TVT acknowledges at the very least that approximately four weeks before the C&D letters were sent, Pitbull's attorney, Ms. Martinez, informed TVT of the existence of the Boothe Recordings, and provided TVT with a copy of Pitbull's agreement with Boothe. A week before the C&D letters were sent, TVT was contacted by Alan Jacobi on behalf of Counterdefendant Waserstein about concerns TVT might have regarding the release of the 305 Album. A jury must nevertheless determine whether or not TVT knowingly and intentionally misstated TVT's rights in the Boothe Recordings. Intent is at issue here, and none of the evidence submitted since the preliminary injunction rulings were made convinces us now that either party is entitled to judgment as a matter of law on SNS's tortious interference claims.

### 2. *Noerr-Pennington Doctrine*

TVT also asserts that the *Noerr-Penington* doctrine shields it is a matter of law from SNS's tortious interference claims. This is so, TVT argues, because the allegations of infringement contained in the C&D letters were not "objectively baseless" as it believed it had "valid, enforceable rights in the TVT Pitbull logo and that consumer confusion was likely. . . ." SNS disputes the applicability of the *Noerr-Pennington* doctrine, given its position that TVT did not possess valid protectible rights in the TVT Pitbull logo.

The Eleventh Circuit has interpreted the doctrine as follows:

> the *Noerr-Pennington* doctrine protects private efforts to influence government officials in creating or implementing legislation that has anticompetitive effects. This so-called political action doctrine protects First Amendment rights to assemble and petition government. It springs less from the traditional power of the sovereign than from the rights of individuals to petition the sovereign.

*TEC Cogeneration Inc. v. Fla. Power & Light Co.*, 76 F.3d 1560, 1570 (11th Cir. 1996). The doctrine shields from anticompetitive laws "a concerted effort to influence public officials regardless of intent or purpose." *Id.* at 1571 (citing *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965), which in turn cited *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961)). The doctrine results "where the restraint upon trade or monopolization is the result of valid governmental action as opposed to private action." *Id.* at 1572. *Noerr-Pennington* antitrust immunity does not, however, shield from liability a company's efforts that are essentially commercial in nature with only secondary political aspects. *Id.* (citing *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) (where anticompetitive restraint upon trade results directly from private action, independent of any governmental action, the restraint is essentially commercial in nature and cannot form the basis for antitrust liability; the lobbying of a private standard-setting organization, which was not a governmental entity or legislative body, did not trigger immunity from liability)).

TVT asserts that this Circuit has extended *Noerr-Pennington* immunity to state-law torts, including tortious interference claims arising under Florida law. *See* TVT's Amended Reply [D.E. 313] at 7. It cites *TEC* for support, but that case does not stand for the asserted proposition. It is, moreover, factually inapposite.

*TEC* involved an antitrust claim and the lobbying of public and quasi-public officials, neither of which is present in the instant case. Defendant public electric utility

lobbied county commissioners against construction of a transmission line from a cogeneration facility to a county hospital. Plaintiffs, the cogenerators of electrical power, contended they suffered economic losses due to the utility's anti-competitive conduct, and sued for antitrust violations and tortious interference with contractual relations. The trial court denied the utility's motion for summary judgment, concluding the utility was not entitled to immunity from antitrust sanctions because its legislative lobbying was for economic rather than political reasons, and that its conduct fell within the commercial exception to the *Noerr-Pennington* doctrine. The Eleventh Circuit reversed, concluding that the utility's intent or motivation for lobbying was irrelevant, and that the utility had First Amendment rights under *Noerr-Pennington* to petition its governing legislative body. 76 F.3d at 1573.

*TEC* falls squarely within the ambit of the *Noerr-Pennington* doctrine; the pending case clearly does not. Indeed, by and large the cases cited by TVT involve antitrust claims or the petitioning of governmental officials. Neither of those crucial elements is present in the case here. Significantly, TVT has cited no case from this Circuit that holds that the federal antitrust doctrine works to bar state tort claims wholly unrelated to an antitrust claim, and this Court will not extend the *Noerr-Pennington* doctrine to bar the traditional state-law tort claims asserted here by SNS. Frankly, the doctrine has likely been extended far beyond what the exercise of judicial restraint should allow. Accordingly, this doctrine does not shield TVT from any liability it may have for interfering with SNS's relationship with ADA.

### B. *TVT's Lanham Act Claims*

TVT has raised two Lanham Act claims, one for trademark infringement and one for false advertising/false designation of origin. These counts stem from TVT's assertion that it has trademark rights in the stylized "Pitbull" logo and, as holder of those rights,

it is entitled to bar others from infringing uses. TVT's trademark rights are allegedly based on its creation and use of the TVT Pitbull logo in conformity with industry practice. TVT asserts its Pitbull logo uses distinctive lettering, not common in the rap/hip-hop marketplace, and this is enough to convey protectible trademark rights in the logo. TVT also claims rights in the logo by virtue of its contract with Pitbull, which allegedly granted TVT exclusive rights to use Pitbull's name and likeness for promoting Pitbull albums and the exclusive rights to any cover art TVT developed in connection with Perez's recordings. TVT contends that Counterdefendants purposefully copied the TVT Pitbull logo for use on the 305 Album and in advertisements for that album, selecting that logo especially because it was well-known and associated with Pitbull. TVT asserts that Counterdefendant's use of the TVT Pitbull logo resulted in consumer confusion over the sponsorship or approval of the 305 Album. Additionally, TVT complains that Counterdefendants falsely advertised and promoted their 305 Album as if it were Pitbull's next official release of new recordings when, in fact, the album contained older, previously unreleased works.

Counterdefendants have moved for summary judgment on these claims, arguing that TVT does not have any protectible rights in the stylized "Pitbull" logo because the mark "Pitbull" belongs to Pitbull Productions, Inc.; Perez only granted TVT a "limited" license to use the Pitbull name, and only in connection with records made by Perez for TVT; the so-called "Pitbull logo" is nothing more than the name "Pitbull" written in standard Old English font and is not distinguishable from Pitbull Productions' mark; and TVT cannot own a stylized trademark belonging to someone else.[4] Furthermore,

---

[4] TVT acknowledges that it does not own or possess trademark rights in the name "Pitbull," a trade name owned by and registered to Perez's company, Pitbull Productions, Inc.

Counterdefendants argue, Perez previously granted them a valid license to use the Pitbull name in connection with recordings made by them (under the Boothe contract), and that license has not been extinguished. Without demonstrating valid trademark rights in the TVT Pitbull logo, Counterdefendants argue, TVT's claims of consumer confusion are meaningless.

### 1. *Trademark Infringement*

Both TVT and the Counterdefendants have moved for summary judgment on TVT's trademark infringement claim. To prevail on this claim, TVT must demonstrate ownership of a valid mark that Counterdefendants used in commerce without TVT's consent, and that Counterdefendants' use of that mark is likely to deceive or cause consumer confusion. *Nitro Leisure Products, L.L.C. v. Acushnet Co.*, 341 F.3d 1356, 1359 (11Cir. 2003) (*quoting McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1307 (11th Cir. 1998)). "The determination generally boils down to the existence of 'likelihood of confusion'." *Id.*; *see also John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 972 (11th Cir. 1983) (the critical question in most trademark infringement actions is whether there is a likelihood of confusion between the registered mark and the allegedly infringing mark).

The parties have a substantial obstacle to overcome in support of their dueling summary judgment motions. "Due to the factual nature of likelihood of confusion, determining whether a likelihood of confusion exists at the summary judgment stage is generally disfavored because a full record is usually required to fully assess the facts." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 608 (9th Cir. 2005). This is especially the case under Rule 56 because the Court must draw all reasonable inferences in favor of the non-moving party. In reviewing the record using this lens, summary judgment here cannot be granted.

At the preliminary injunction stage, Magistrate Judge Brown rejected TVT's argument that it had protectible trademark rights in the TVT Pitbull logo. In reaching this conclusion, the Court determined that TVT had only a *limited* right to use Pitbull's trade name, and only in connection with the promotion and sale of recordings delivered under the contract or recorded by Pitbull during the term of the contract with TVT. *See* R&R at 20. Magistrate Judge Brown also recognized that Counterdefendants had their own contractual rights to use the Pitbull name in connection with advertising and promotion of the Boothe Recordings under the Boothe contract. As for likelihood of confusion, Magistrate Judge Brown concluded there was a lack of evidence of confusion between TVT's Pitbull logo and the mark used by Counterdefendants in connection with their 305 Album. *Id.* at 21-22. He found that the Pitbull logo on the cover of the 305 Album and advertising or promotional material which included the logo was "discernibly different from the TVT Pitbull logo due to the different type used for the prominent 'P'." *Id.* at 22. At the time, Judge Brown noted, TVT had not presented any evidence as to the strength of the TVT Pitbull logo, so there was no evidence in that preliminary record that the music industry or buying public associated that logo with TVT, as opposed to any other music label or producer, or Pitbull himself. *Id.* Accordingly, Magistrate Judge Brown concluded that TVT had failed to show a likelihood of success on its trademark infringement claim.

Judge Jordan agreed with Magistrate Judge Brown's conclusion that "TVT did not have trademark rights in Pitbull's mark (a mark it did not own and for which it was not an exclusive licensee), and so Ms. Sussman's [C&D] letter contained at least some misrepresentations." *See* Order at 2. Judge Jordan continued by finding, again preliminarily, that given the evidence in the record at that time with regard to legal rights to the cover art in the TVT-released "M.I.A.M.I." album, TVT did not send its C&D letters based on a good-faith belief that its logo was being misused. *Id.*

Notwithstanding the findings and conclusions made at the preliminary injunction stage of this case, upon review of the record at the summary judgment stage we find that there are material issues of fact that must be resolved by the trier of fact. *See Camenisch*, 451 U.S. at 395 (findings and conclusions made at preliminary injunction stage are not binding on court when it considers the merits of the case). For instance, the parties have presented colorable arguments concerning whether the TVT Pitbull logo is sufficiently stylized and distinct enough to be susceptible to trademark protection. When the record is examined with an eye toward drawing reasonable inferences in favor of TVT's position, the Court can see, at least for now, that TVT may be able to convince a reasonable jury that its logo merited trademark protection. If, on the other hand, one looks at this record from the movant's perspective and draws inferences in favor of SNS, one can see how a reasonable jury could agree with Magistrate Judge Brown. That inference, however, cannot be drawn at the summary judgment stage. Therefore, the factual question as to whether TVT had protectible legal rights in the logo must be left for the trier of fact.

Even if TVT were able to demonstrate it did have protectible rights in the stylized Pitbull logo, TVT also must show that Counterdefendants's use of the logo is likely to cause confusion. The following factors are used to analyze the likelihood of consumer confusion: (1) the type or strength of mark, (2) the similarity between the marks, (3) the similarity between the products, (4) the similarity of the parties' retail outlets and sales channels, (5) the similarity of advertising, (6) Counterdefendants' intent, and (7) actual confusion. *Harland*, 711 F.2d at 972. Again, the Court finds there are disputed issues of material fact here. *See, e.g., Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1216 (11th Cir. 2000) (whether photographs were "substantially similar" was a question of fact; although jury might ultimately conclude that the similarities between two photographs were not "substantial," the similarities were significant enough to preclude summary

judgment). And as previously noted, determining likelihood of confusion is often a jury issue. *KP Permanent Make-Up,* 408 F.3d at 608. The Court therefore denies summary judgment for either party on TVT's trademark infringement counterclaims.

### *2. False Advertising/False Designation of Origin Claim*

TVT also alleges that Counterdefendants violated the Lanham Act by promoting the 305 Album as a Pitbull album containing "new" works. TVT suggests that Counterdefendants engaged in false advertising because the 305 Album contained older recordings but was marketed in such a way as to deceive and confuse customers as to its contents and origin. TVT claims the following evidence shows that Counterdefendants intended to mislead consumers into believing the 305 Album was Pitbull's "next" album and that it contained recently-recorded songs: the use of recent photographs of Pitbull in connection with the promotion of the album, even though the recordings were made several years earlier; the album cover did not contain a disclaimer advising there were older, unreleased recordings; and advertisements stressed that the album had "new music from Pitbull."

#### *(a) False Designation of Origin*

The parties ask that summary judgment be granted in their respective favors on this claim. To prevail on a false designation of origin claim, TVT must establish that Counterdefendants adopted a mark confusingly similar to the TVT Pitbull logo such that there was a likelihood of confusion as to the origin of the goods. *Ross Bicycles, Inc. v. Cycles USA, Inc.,* 765 F.2d 1502, 1503 (11th Cir. 1985). The same "likelihood of confusion" analysis used in a trademark infringement claim is applicable to establish the false designation claim. *Id.* at 1503-04. As the Court previously determined with regard to TVT's trademark infringement claim, the issue of the likelihood of consumer confusion must be left to the jury for determination. In addition, the issue of Counterdefendants'

intent, i.e. intending to mislead or deceive consumers, is a question necessarily left for resolution by the trier of fact, which in this case must be the jury after a full analysis of the evidence adduced at trial.

### (b) False Advertising

To prevail on the false advertising claim, TVT must establish that

> (1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been - or is likely to be - injured as a result of the false advertising.

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contracts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). Magistrate Judge Brown rejected TVT's claims at the preliminary injunction stage that advertising for the 305 Album was false or misleading. *See* R&R at 23-25. He found no evidence in the record that Counterdefendants advertised the album as "new" or a "follow-up" to the M.I.A.M.I. album, or anything other than previously unreleased recordings. *Id.* at 23-24. He also determined that the photographs of Pitbull displayed on the 305 Album cover and included in the promotional materials did not constitute false advertising because TVT had no rights in the photographs themselves; there was no evidence that the public associated those photographs specifically with the M.I.A.M.I. album or with TVT; or that Pitbull's "look" or "style" had changed in such a manner that it could be related to any particular "period" in his career. *Id.* at 24. Finally, Magistrate Judge Brown found that, even if the public would be confused into thinking the 305 Album was a new Pitbull or TVT album when it was not, there was insufficient evidence that TVT had been or was likely to be harmed as a result of such confusion. *Id.* at 25.

Frankly, our review of the summary judgment record would point in the same direction. The problem is that notwithstanding our agreement with Judge Brown on the likely outcome at trial, reaching a finding as a matter of law on these questions proved

impossible, again without discounting the inference that Rule 56 requires be drawn in TVT's favor. We, therefore, conclude that we must let the jury address this issue at trial, and reserve the possible implications of Rule 50 for a later day depending upon how the evidence is presented and admitted at trial.

For instance, Pitbull testified it would be detrimental to his career if his fans confused the 305 Album as the follow-up studio album to his M.I.A.M.I. album. Whether TVT, the party in this case, would also have been injured, and to what extent, are arguably unresolved questions. Whether previously unreleased recordings are properly termed "new," and if not, whether such representations had a material effect on the purchasing decisions of consumers, are additional questions for the jury to resolve. Accordingly, the cross motions for summary judgment on the false designation of origin and false advertising must be denied.

### C.   *Individual Shareholder Liability*

Finally, Waserstein, Henderson, and Lucas, the individual Counterdefendants in the case, assert there is no basis for individual liability against them as shareholders of 305 Music. They assert that Florida law does not permit actions against corporate shareholders absent evidence that the corporation was used to perpetrate a fraud or formed for an improper purpose. SNS suggests that TVT has presented no such evidence here. Waserstein argues he is not even a shareholder or officer of 305 Music. The Counterdefendants therefore urge that summary judgment be granted in their favor.

TVT counters that, under Florida law, corporate officers and shareholders may be held personally liable irrespective of whether liability attaches to the corporation. TVT is technically correct: each of the individual Counterdefendants could be held personally liable for his actions in authorizing the release of an album that violated TVT's Lanham Act rights. *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1183 (11th Cir. 1994) ("If

an individual actively and knowingly caused the trademark infringement, he is personally responsible."). TVT cites evidence in the record which a jury could reasonably find shows that these individuals directed, controlled, ratified, participated in, or were moving forces behind 305 Music's allegedly infringing activity. Evaluating Waserstein's, Henderson's, and Lucas's roles in the release of the 305 Album is a task for the jury, precluding the entry of summary judgment on the issue of these Counterdefendants' individual liability.

### IV. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED AND ADJUDGED** that

1. Plaintiff/Counterdefendants' Motion for Summary Judgment [D.E. 72] is **DENIED**.

2. Defendant TVT Records LLC's Motion for Summary Judgment [D.E. 212] is **DENIED**.

3. Counterclaimant's Motion for Summary Judgment [D.E. 216] is **DENIED**.

4. Counter-Defendants' Motion for Summary Judgment [D.E. 280] is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 8th day of February, 2007.

_____
EDWIN G. TORRES
United States Magistrate Judge