**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
− − − − − − − − − − − − − − − − − − − − − − − − − − − −X

| | |
|---|---|
| SLIP N' SLIDE RECORDS, INC., | ) |
| | ) Case No. 05-21113-Civ. (TORRES) |
| Plaintiff, | ) |
| | ) |
| -against- | ) |
| | ) |
| TEEVEE TOONS, INC., d/b/a TVT RECORDS, | ) |
| LLC, | ) |
| | ) |
| Defendants. | ) |
| − − − − − − − − − − − − − − − − − − − − − − − − − − − | ) |
| TEEVEE TOONS, INC., | ) |
| | ) |
| Counterclaimant, | ) |
| | ) |
| -against- | ) |
| | ) |
| SLIP N' SLIDE RECORDS, INC.; RUDEBWOY | ) |
| ENTERTAINMENT; 305 MUSIC; ALAN | ) |
| WASERSTEIN; ROBERT HENDERSON; and | ) |
| THEODORE LUCAS. | ) |
| | ) |
| Counterdefendants. | ) |

− − − − − − − − − − − − − − − − − − − − − − − − − − − −X


**TVT'S PRE-TRIAL BRIEF**



LABATON SUCHAROW &
RUDOFF LLP
100 Park Avenue
New York, New York  10017
(212) 907-0700

Counsel for Defendant and Counterclaimant

**TABLE OF CONTENTS**

I.      INTRODUCTION. ....................................................................................... 1

II.     FACTS TO BE PRESENTED AT TRIAL ................................................... 3

        A.     Pitbull Signs Exclusively to TVT ................................................... 3

        B.     TVT Releases Pitbull's Debut Album with TVT's Pitbull Logo ......... 5

        C.     Perez's Early Recordings and Counterdefendants' "Pitbull Welcome to the
               305" Album ..................................................................................... 6

        D.     Counterdefendants Wrongfully Seek to Capitalize on TVT's Goodwill in
               the Logo ......................................................................................... 9

        E.     Consumers Are Confused by the Infringing Album Advertisements ....... 12

III.    LEGAL ISSUES TO BE DETERMINED .................................................. 12

        A.     TVT's Lanham Act Counterclaims For Trademark Infringement and False
               Advertising ..................................................................................... 12

               1.     TVT has standing to bring its Lanham Act Claims ................... 13
               2.     Counterdefendants' Promotion of the 305 Album as a New
                      "Pitbull" Album Constitutes False Advertising in Violation of the
                      Lanham Act ..................................................................... 14
               3.     TVT Owns Valid and Enforceable Trademark Rights In the Pitbull
                      Logo ............................................................................... 17

        B.     Plaintiff Cannot Succeed on its Tortious Interference Claim ............... 21

               1.     Plaintiff's Tortious Interference Claim Fails Under Florida's
                      Tortious Interference Law Because TVT Was Justified in Sending
                      out the Cease-and-Desist Letters .......................................... 21
               2.     TVT's Letters Did Not Tortiously Interfere with SNS's
                      Relationship with ADA ....................................................... 25
               3.     Plaintiff Had Very Little Probability of Future Economic Benefit .......... 26
               4.     Plaintiff Did Not Have a Contractual Right to Release the
                      305 Album and An "Economic Relationship with a Third Party"
                      Based on its Deficient Rights Cannot Serve As the Grounds for a
                      Tortious Interference Claim ................................................. 27

        C.     Plaintiff Has Completely Failed to Mitigate Any Damages, Refusing to
               Release the Infringing Album Despite the Magistrate's Report and Despite
               TVT's Written Notification to ADA Withdrawing the March 2005 Letter .......... 29

IV.     CONCLUSION ......................................................................................... 30

# TABLE OF AUTHORITIES

## CASES

*Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*,
   432 F. Supp. 2d 1319 (S.D. Fla., 2006) ..................................................................21

*Am. Broad. Co. v. Maljack Prods.*,
   34 F. Supp. 2d 665 (N.D. Ill. 1998) ..........................................................22, 23, 24

*Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*,
   494 F.2d 3 (5th Cir. 1974) ......................................................................................21

*Audio Sys. of Florida, Inc. v. Simplexgrinnell LP*,
   68 U.S.P.Q. 2d 1681 (M.D.Fla.2003) .....................................................................21

*Banff, Ltd. v. Federated Dep't Stores, Inc.*,
   841 F.2d 486 (2d Cir. 1988).....................................................................................18

*Bauer Lamp Co. v. Shaffer*,
   941 F.2d 1165 (11th Cir. 1991) ........................................................................12, 20

*Benson v. Paul Winley Record Sales*,
   452 F. Supp. 516 (S.D.N.Y. 1978).........................................................................14

*Bernstein v. True*,
   636 So. 2d 1364 (Fla. 4th DCA 1994) ...................................................................28

*Boston Prof'l Hockey Assoc., Inc. v. Dallas Cap & Emblem Mfg., Inc.*,
   510 F.2d 1004 (5th Cir. 1975) ................................................................................17

*CBS, Inc. v. Garrod*,
   622 F. Supp. 532 (D.C. Fla., 1985).........................................................................22

*Columbus Rose Ltd. v. New Millennium Press*,
   No. 02 Civ. 2634, 2002 WL 1033560 (S.D.N.Y. May 20, 2002).........................13, 14

*Courtenay Commc'n. Corp. v. Hall*,
   334 F.3d 210 (2d Cir. 2003)...............................................................................17, 18

*Dieter v. B&H Indus.*,
   880 F.2d 322 (11th Cir. 1989) ................................................................................18

*Ethyl Corp. v. Balter*,
   386 So. 2d 1220 (Fla. 3d DCA 1980) ...............................................................20, 24

*Flexitized, Inc. v. Nat'l Flexitized Corp.,*
335 F.2d 774 (2d Cir.1964)..........................................................................22

*Follett v. New Am. Library,*
497 F. Supp. 304 (S.D.N.Y. 1980)..............................................................15

*Frehling Enters., Inc. v. Int'l Select Group, Inc.,*
192 F.3d 1330 (11th Cir. 1999) ..................................................................12

*IBP, Inc. v. Hady Enters., Inc.,*
267 F. Supp. 2d 1148 (N.D. Fla. 2002).......................................................21

*John H. Harland Co. v. Clarke Checks, Inc.,*
711 F.2d 966 (11th Cir. 1983) ....................................................................19

*KMS Rest. Corp. v. Wendy's Int'l, Inc.,*
361 F.3d 1321 (11th Cir. 2004) ..................................................................20

*Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,*
549 F.2d 368 (5th Cir. 1977) ......................................................................21

*Maison Lazard Et Compagnie v. Manfra, Tordella & Brooks, Inc.,*
585 F. Supp. 1286 (S.D.N.Y. 1984)............................................................22

*Marshak v. Sheppard,*
666 F. Supp. 590 (S.D.N.Y. 1987)........................................................22, 24

*McCurdy v. Collis,*
508 So. 2d 380 (Fla. 1st DCA 1987) ..........................................................20

*Metro. Opera Ass'n. v. Wagner-Nichols Recorder Corp.,*
199 Misc. 786 (Sup.Ct. N.Y. County 1950), aff'd 297 App. Div. 632, (1st
Dep't 1951)..................................................................................................22

*PPX Enter. Inc. v. Audiofidelity Enter. Inc.,*
818 F.2d 266 (2d Cir. 1987)..........................................................14, 16, 22

*Publications Int'l, Ltd. v. W. Publ'g Co.,*
No. 93 C 3074, 1994 U.S. Dist. LEXIS 558 (N.D. Ill., Jan. 25, 1994).......24

*Register v. Pierce,*
530 So. 2d 990 (Fla. 1st DCA 1988) ..........................................................27

*Rich v. RCA Corp.,*
390 F. Supp. 530 (S.D.N.Y 1975)...............................................................14

*Rockledge Mall Assocs., Ltd. v. Custom Fences of S. Brevard, Inc.*,
    779 So. 2d 554 (Fla. 5th DCA 2001) ........................................................................20

*Rostropovich v. Koch Int'l Corp.*,
    94 Civ. 2674, 1995 U.S. Dist. LEXIS 2785 (S.D.N.Y. Mar. 7, 1995) ........................14

*Scheller v. Am. Med. Int'l, Inc.*,
    583 So. 2d 1047 (Fla. 4th DCA 1991) ......................................................................28

*Select Portfolio Serv., Inc. v. Evaluation Solutions, L.L.C.*,
    No. 3:06-cv-582-J-33, 2006 WL 2691784 (M.D. Fla. Sep. 20, 2006) ........................13

*Seminole Tribe v. Times Publ'g Co.*,
    780 So. 2d 310 (Fla. 4th DCA 2001) ........................................................................20

*Southern Bell Tel. & Tel. Co. v. Roper*,
    482 So. 2d 538 (Fla. 3rd DCA 1986) ........................................................................21

*Spangler Candy Co. v. Crystal Pure Candy Co.*,
    235 F. Supp. 18 (N.D. Ill. 1964) ...............................................................................24

*St. Johns River Water Mgmt. Dist. v. Fernberg Geological Servs., Inc.*,
    784 So. 2d 500 (Fla. 5th DCA 2001) ...................................................................24, 26

*Swatch, S.A. v. New City, Inc.*,
    454 F. Supp. 2d 1245 (S.D. Fla. 2006) .....................................................................13

*Time, Inc. v. Petersen Publ'g. Co.*,
    173 F.3d 113 (2d Cir. 1999).......................................................................................16

*Treiber v. StorCOMM, Inc.*,
    No. 303CV1040J32, 2005 WL 2012275 (M.D. Fla., Aug. 16, 2005) ........................21

Varitronics Sys., Inc. v. Merlin Equip., Inc.,
    682 F. Supp. 1203 (S.D. Fla. 1988) ..........................................................................19

## STATUTES

11 U.S.C. § 1125(a)(1).....................................................................................................13

15 U.S.C. § 1125(a) .........................................................................................................12

I.    __INTRODUCTION.__

TeeVee Toons, Inc. d/b/a TVT Records ("TVT Records") faces an unmeritorious claim of tortious interference for having attempted to stop a competitor, Plaintiff Slip-N-Slide Records, Inc. ("SNS"), from unfairly competing with TVT and falsely advertising and marketing its product in a manner designed to trade on TVT's valuable rights.  Following the success of the debut album of TVT's exclusive artist "Pitbull," which was brought about in significant part by TVT's investment of millions of dollars in marketing and promotion, SNS purportedly acquired old master recordings recorded by Pitbull in 2001.[1]  Despite specific contractual provisions requiring Pitbull's approval over the content of and producers used to record his compositions, SNS used, modified, added to, and distorted portions of 10 of those recordings which had been created by Pitbull in 2001, by adding new lyrics and music through the use of new recording artists and producers.  Of the 16 tracks that are actually contained on the SNS created album, no more than 4 of them could be construed as being a Pitbull song, and none of them are in the original form recorded by Pitbull back in 2001.  In SNS's attempt to market its "Pitbull Welcome to the 305" album as a "Pitbull Album" and a follow-up album – SNS made prominent use of the stylized logo developed by TVT for promoting Pitbull and a contemporary photo of Pitbull.

TVT, after conducting a thorough investigation, determined that SNS had no right to release its album, and it was necessary to send letters to SNS, its distributor and several retailers regarding the unauthorized use.  SNS filed suit against TVT on the very day these letters were sent out claiming tortious interference.  As detailed below, TVT's actions in protecting its property rights did not cause the harm alleged.  Moreover, SNS took no available steps to

---

[1] As detailed herein, SNS did not acquire rights in the subject album until May 2006, some 14 months after it commenced this action.

mitigate its damages.  Finally, based on TVT's counterclaims for trademark infringement and false advertising under the Lanham Act, it is TVT, not Plaintiff, who is entitled to relief in this action.

With respect to Plaintiff's claim for tortious interference, Plaintiff will not be able to establish that TVT's cease-and-desist letters sent out on March 28, 2005 caused any interference with SNS's business relationship with its distributor, Alternative Distribution Alliance ("ADA"). In fact, the evidence shows that ADA *commenced manufacturing, continued to actively promote, and even distributed* the "Pitbull Welcome to the 305" album ("305 Album") well after it received TVT's cease-and-desist letter.  Indeed, none of ADA's customers cancelled any pre-orders for the "305 album." ADA also heard from certain retailers that TVT's letter would have no impact on their willingness to place the album on their shelves.  It was only after TVT filed its counterclaims against SNS and its collaborators (Rude Bwoy Entertainment and 305 Music, Inc.) that ADA, after its parent company's counsel reviewed the counterclaims, decided in late May 2005 against distribution of the album.

Plaintiff's claims are riddled with other errors as well.  For one, SNS when it commenced this action had no rights to distribute the subject album.  It was not until May 6, 2006 that an assignment of rights was made to SNS.  Moreover, SNS is not the proper plaintiff.  As the documents reveal in this litigation, SNS has relinquished the right to receive any proceeds from the sale of this album – including any monetary settlements – to 305 Music, Inc., which is controlled by Alan Waserstein.  In fact, Mr. Waserstein has paid all expenses in this litigation, and forced his partners, Ted Lucas and Robert Henderson, to execute promissory notes and has confirmed that no settlement can be approved without his personal authorization.

Beyond that, Plaintiff has failed to show that TVT did not act by proper and legal justified means when it sent out the cease-and-desist letters, which it must to prove liability for tortious interference. After conducting its investigation, TVT had a reasonable good faith basis to believe that SNS was unfairly competing with TVT by the manner in which it was marketing the "Pitbull Welcome to the 305" album. The evidence also shows that TVT was privileged to act in the manner it did because it was seeking to protect its financial interests and trademark rights in good faith.

Even if Plaintiff were to succeed on its tortious interference claim, Plaintiff's damages would be minimal, at best. Despite Plaintiff's touting of "victory" at the preliminary injunction phase of the case,[2] and TVT's voluntary notice to Plaintiff's distributor that TVT would not take legal action for distribution of the album, Plaintiff has not made any attempts to release the album, and has turned down at least one offer to distribute the album, and hence has failed to mitigate any damage it may have suffered. Furthermore, Plaintiff would have to demonstrate that there was some difference between the value of the 305 album at the time of trial and the value of the 305 album in March 2005 when the cease-and-desist letters were sent: a position that would be rooted in inadmissible speculation.

## II.   FACTS TO BE PRESENTED AT TRIAL

### A.   Pitbull Signs Exclusively to TVT

TVT Records is the largest independent record company in the United States. TVT is unique in that it produces and has success in many genres of music, including soundtracks, rock,

---

[2]    Based upon an undeveloped record early in the litigation (where TVT's president had not testified as to his own due diligence leading up to the dissemination of the March 28, 2005 letter) the court preliminarily concluded that plaintiff would be "likely to succeed" on its claim, and found that TVT's actions were motivated by "malice."

pop and hip hop.  Among the successful rap genre artists signed exclusively to TVT is Armando Perez, professionally known as "Pitbull."

As a result of negotiations with Pitbull's furnishing company, Diaz Brothers Music Group ("DBMG"), TVT signed Perez to an exclusive recording agreement effective October 23, 2003 ("the TVT Pitbull Recording Agreement").  The TVT Pitbull Recording Agreement consists of a letter agreement and two exhibits, Exhibits "A" and "B."  Under the letter agreement, DBMG and TVT agreed to negotiate the terms of the long form agreement based upon TVT's standard "long form" recording agreement, referenced and incorporated as Exhibit "A" to the letter agreement.  TVT provided its standard long form agreement to DBMG through its counsel, Monika Tashman, prior to DBMG's execution of the letter agreement.  Ms. Tashman distributed the long form agreement to DBMG and Pitbull's attorney prior to closing the deal.

Under the letter agreement, if at the end of six months after the date of the letter agreement the parties had not executed a long form agreement, the terms of the Exhibit "A" standard long form agreement were expressly incorporated into the letter agreement.  Plaintiff asserts that the parties agreed to arbitrate the terms of the agreement, but in fact, the right to arbitrate would only arise if one party asserted the other was not negotiating in good faith.  Neither TVT nor DBMG ever asserted a lack of good faith negotiations.  Accordingly, the long form agreement became binding on or about April 23, 2004, 6 months after the October 23, 2003 letter agreement became effective.

Exhibit B to the letter agreement, entitled "Artist Inducement Agreement," and dated as of October 23, 2003, is the document in which Perez, among other things, acknowledged DBMG's authority to enter into the letter agreement on his behalf, agreed to be bound by its terms, and guaranteed DBMG's performance of all of its obligations under the agreement.  The

Artist Inducement Agreement expressly defines the letter agreement to include the long form agreement:

> "To induce TeeVee Toons, Inc. ("TVT") to enter into the foregoing agreement with the Diaz Brothers Music Group, Inc. (the "Furnishing Party") dated as of October 23, 2003 (including the standard exclusive recording agreement annexed thereto and made a part thereof) (the 'Agreement') . . . I hereby (a) represent to TVT that I have read the Agreement and have had the legal effect of each of its provisions explained to me by a lawyer chosen by me; (b) assent to the execution of the Agreement and agree to be bound by all grants, restrictions, and other provisions of it relating to me . . . ."

As is standard in the recording industry, DBMG licensed to TVT the exclusive right, during the term of the agreement, to use Perez's professional name, likeness and biographical materials in connection with the making and exploitation of records released during the term of the agreement. Under the recording agreement, TVT also owns exclusive rights to any cover art that TVT develops in connection with Perez's recordings. The agreement prohibits the use or authorization of the use of any artwork or other materials created or furnished by TVT in connection with any merchandise of any kind.

### B.   TVT Releases Pitbull's Debut Album with TVT's Pitbull Logo

TVT began developing Pitbull immediately after concluding its deal by featuring him on a TV-advertised Southern Hip Hop compilation entitled "Crunk and Disorderly" (released on December 9, 2003) that included every major up-and-coming artist from the South. After months of aggressive national promotion, TVT's debut Pitbull album entitled "M.I.A.M.I." was released on August 24, 2004 ("the M.I.A.M.I. album"). Popular tracks on the M.I.A.M.I. album include *305 Anthem*, *Culo*, *That's Nasty*, *Back Up,* and *Toma*. TVT has released promotional "singles" for those tracks to major radio stations and has released videos for two of them to television outlets. To date, the M.I.A.M.I. album has sold in excess of 600,000 copies in the United States, entitling it to "gold" status. TVT has also released multiple singles and videos in Canada, Australia, the UK, France, Germany, Italy, Spain, and elsewhere with great success.

TVT has invested substantial time, effort, and resources to develop Pitbull as an artist and to develop, market and release his recordings on a worldwide basis so as to establish a receptive fan base for his next album release for TVT, the option for which was exercised on May 13, 2005. So far, TVT has spent in excess of $3 million for marketing and promoting Perez.  As a result, the public has come to know Pitbull as an exclusive TVT artist.

One of the keys to developing a new artist is branding of that artist.  As part of its branding of "Pitbull," TVT developed a logo showing the "Pitbull" mark in distinct style and lettering ("the Logo").  TVT has consistently used the Logo in connection with its promotion and advertising of Perez's recordings as a TVT artist.  TVT prominently featured the Logo in advertisements and promotional materials for M.I.A.M.I. and on the album cover.  TVT properly registered the M.I.A.M.I. album, including the cover art containing the Logo, with the U.S. Copyright Office.  As a result of TVT's substantial investment in Perez's recording career, Perez is now known nationally and internationally as a TVT recording artist under the "Pitbull" mark and Logo.

C.   **Perez's Early Recordings and Counterdefendants' "Pitbull Welcome to the 305" Album**

Prior to signing to TVT, Perez entered into a recording agreement with Jullian Boothe ("Boothe") dated September 1, 2001 (the "2001 Recording Agreement").  Pursuant to the 2001 Recording Agreement, (1) Selection of individual producers and the selection of the material to be recorded had to be mutually approved by Pitbull and Boothe (¶¶ 5a and 5b of 2001 Recording Agreement); and (2) Neither Boothe nor Pitbull had the right to assign the agreement without the express written consent of the other party (¶ 11 of 2001 Recording Agreement).

Under this agreement, Perez made several recordings (most of which were not completed) for Jullian Boothe (the "2001 Recordings".  None of these recordings were ever

released in the form that they were provided to Boothe.  On March 1, 2002, the parties entered into an agreement whereby Perez was released from his contract with Boothe.  Perez did, however, maintain certain rights, including certain "creative control" rights should an album of his recordings be released.  Two years after Perez was released from that contract, Boothe assigned his rights to Rude Bwoy Entertainment, Inc. ("Rude Bwoy"), a music production company he created.

It was only after Pitbull's successful debut album that Boothe took the unfinished Pitbull recordings and started to work on adding new vocalists, producers, and music and lyrics to the 2001 recordings  to capitalize on Pitbull's newfound success.  It was also at that point that Boothe began to seek out investment for what would become the album entitled "Pitbull Welcome to the 305" (the "305 Album").

In an agreement dated November 15, 2004 between 305 Music and Boothe, 305 Music agreed to finance the distribution of the 305 Album.  Significantly, this agreement was signed by Boothe in his personal capacity and did not purport to convey rights owned by Rude Bwoy – the company to whom Boothe conveyed his rights in the Pitbull recordings.  Shortly thereafter, SNS and 305 Music entered into a contract dated February 1, 2005, the purpose of which was to capitalize on SNS's contract with its distributor, ADA.  This fact dooms SNS's claim to ownership of the 305 Album.  Indeed, it was Rude Bwoy, not Jullian Boothe, that entered into agreements related to the recordings on the 305 Album, such as the producer agreements and side artist agreements.  It was Rude Bwoy that sought to clear publishing rights.  (To date, the publishing rights have yet to be cleared.)  And, it was Rude Bwoy whose name appears on the 305 Album.

In addition, the contractual arrangements among the parties involved in the 305 Album provide for little financial gain to SNS.  All profits from the exploitation of the 305 Album in the first year were to go to 305 Music, who has not asserted any claims against TVT, and who is a separate entity from SNS.  In the year that the 305 Album would be released, SNS would not receive any percentage of gross receipts and in the second and third year after the release of the 305 Album, SNS was to receive a distribution fee of 3 percent and 5 percent of gross receipts, respectively.  Furthermore, in April, 2005, in a letter to Alan Waserstein, president of 305 Music, Ted Lucas of SNS indicated that SNS assigned all settlement authority in this action to 305 Music as of April 2005.  The letter also states that 305 Music is entitled to any proceeds that SNS gets from any settlement.

Under the Boothe agreement with Pitbull, although Boothe owned rights to the original recordings Pitbull delivered, Pitbull had 'creative control' rights, allowing Perez, among other things, to select the materials to be recorded and the producers who would produce the recordings.  Boothe concedes that Pitbull was not involved in selecting any of the artists, producers, or the new music and lyrics that were added to the original unfinished recordings to create the recordings that are on the 305 Album.  In fact, Pitbull had nothing whatsoever to do with the creation, marketing and promotion of the 305 Album – he did not even know about the project until seeing an ad for it.

In fact an analysis of the 16 tracks on the purported "Pitbull Album" reflects the breaches by Boothe (and his successors) of the 2001 Recording Agreement and the falsity in calling "Pitbull Welcome to the 305" a "Pitbull" album.

| Tracks from "305"/Explicit | New Artists | New Producers or New Production work | Total Track Time | Total Vocals | Total Pitbull Vocals |
|---|---|---|---|---|---|
| 1. Spoken Word Intro (Skit) | Teddy T | Ju-Boy and Roc | 2:17 | 1:12 | 0:00 |
| 2. Crank Up The Dunk | Lost Tribe | Jus Bome | 3:19 | 2:42 | 0:14 |
| 3. Down South | Deuce Poppi | Jim Johnson & Big D | 4:25 | 3:55 | 0:37 |
| 4. Playa Haters | Jean Rodriguez, Cubo and Salazar | Carlos Hernandez | 3:57 | 3:44 | 0:40 |
| 5. Dear Mama | | Steve Obas | 4:04 | 3:44 | 2:14 |
| 6. Here They Come | Brian Bizz | Steve Obas | 3:20 | 2:52 | 1:30 |
| 7. Back Stage Skit | unknown | Ju-boy and Roc | 2:47 | 2:24 | 0:00 |
| 8. Love Me Or Hate Me | | Steve Obas | 3:02 | 2:58 | 2:09 |
| 9. Hustler | Cubo and Feezy | Steve Obas | 3:02 | 3:01 | 1:50 |
| 10. Breakfast Skit | unknown | Ju-boy and Roc | 2:38 | 2:36 | 0:00 |
| 11. It's Alright | NUK, Cubo and Jackie | Carlos Hernandez | 4:15 | 3:53 | 1:15 |
| 12. Get Your Mind Right | Cubo and Nuk | Carlos Hernandez | 4:03 | 3:30 | 0:44 |
| 13. To The Floor | Deuce Poppi and Trina | Taz Williams | 4:42 | 4:40 | 0:36 |
| 14. Playa Haters (Remix) | Trivales and Jean Rodriguez | Carlos Hernandez | 4:16 | 4:10 | 0:40 |
| 15. Outro ("Mi Corillo Activao") | New Artist | new producers | 4:08 | 3:50 | 0:00 |
| 16. Outro (skit) not on label | Teddy T | Ju-Boy and Roc | 1:43 | 1:22 | 0:00 |
| "Mi Corillo Activao" | | | 56:02* | 50:33* | 12:29* |

\*    % of Pitbull Voc. to Total Album Time = 23%
     % of Pitbull Voc to Total Vocal Time = 26%

## D.    Counterdefendants Wrongfully Seek to Capitalize on TVT's Goodwill in the Logo

At or about the time that sales of TVT's M.I.A.M.I. album approached "gold" status, Counterdefendants began advertising and promoting the 305 Album. In commercials (prepared but not aired), advertisements and promotional materials for the 305 Album, the Counterdefendants used the Logo that TVT created and used for the M.I.A.M.I. album and a contemporary photo of Pitbull rather than a photo of Pitbull from 2001 when he created the 2001 recordings. The use of TVT's Logo and the contemporary photo of Pitbull gives the false impression among consumers that the 305 Album is a follow-up release to the M.I.A.M.I. album. Indeed, the Counterdefendants concede that they used the TVT Logo because the public is familiar with the Logo.

9

Counterdefendants also promoted and advertised the 305 Album by specifically referring to the M.I.A.M.I. album and its success, further evidencing their intent to convey an association with TVT's products, and exacerbating the likelihood of consumer confusion.  For example, a promotional "one sheet" for the 305 Album (a "one sheet" is used for marketing and promotion to distributors and retailers), which also displays the Logo without authorization, uses a current photograph of Pitbull and includes the following "Selling Points":

- Top Selling independent Artist of 2004, with his current album still selling strong weekly.

- Album sales for Pitbull's debut album "*M.I.A.M.I.*" surpass 300,000 copies as Pitbull prepares Video for next bilingual single *Toma*, the follow-up to his breakthrough hit "*Culo*."  (See Exhibit 11).

At no time did TVT authorize any promotion, use of its Logo, or agree to waive its exclusive rights with respect to Mr. Perez's recorded performances.

In late February, TVT's President Steve Gottlieb saw an advertisement for "Pitbull Welcome to the 305."  This advertisement, which incorporated TVT's Pitbull Logo, indicated that "Pitbull Welcome to the 305" would be available in stores April 12, 2005, and indicated that more than 6 additional recording artists performed with Pitbull on the recordings slated for release.  TVT thereafter obtained a "one sheet" which further confirmed this information.

Thereafter TVT obtained the 2001 Recording Agreement (and the 2002 Release related thereto) and confirmed that Pitbull's approval was needed with respect to the selection of material and producers to be used on his recordings.  On or about March 2, 2005, Pitbull advised Gottlieb that he did not know anything about the production or release of the 305 Album, that he did not have any involvement in the recording, re-mixing or selection of producers for the tracks on the 305 Album, that the tracks he had provided to Boothe were "lame unfinished demos," and that he did not authorize or want the 305 Album to be released. Based upon the foregoing, TVT

had a reasonable basis to believe that SNS was unfairly competing with it, falsely advertising the contents of the album and wrongfully using TVT's logo.

TVT's Senior VP of Business and Legal Affairs, Jackie Sussman, sent out a letter on or about March 28, 2005 to SNS, to ADA, the entity listed in the advertisement as the distributor of the 305 Album, and retailers who TVT believed might distribute the 305 Album to the public. TVT informed ADA of TVT's position that the marketing, promotion and distribution of the 305 Album violated TVT's rights, including, but not limited to, rights under the Lanham Act. Coincidentally, on that same day, Boothe, in apparent recognition that it was improper to call the "Welcome to the 305 album" a "Pitbull" album, sent out a letter to Pitbull's attorney offering to re-designate the 305 album as a compilation album rather than a "Pitbull" album.

Counterdefendants also created commercial spots to promote the 305 Album. Counterdefendants' intent to market the album as a new Pitbull album, despite the fact that only a sprinkling of Pitbull's 2001 recordings are contained on the album, will be demonstrated. The announcer on the commercial says "with all new music from Pitbull" and the words "New Album" appear in large block letters on the screen. Nowhere does the commercial state that Pitbull recorded his songs in 2001, or that more than two-thirds of the album is the work of other artists. Furthermore, the commercials feature a still shot of Pitbull taken during a video shoot for a single on TVT's "M.I.A.M.I." album, paid for by TVT. No other artist's image appears in the commercial. (In act no other artist's image appears on any of the promotional and marketing material prepared for the 305 Album). Counterdefendants' use of TVT's logo and current photos of Pitbull, combined with their heavy promotion of the 305 Album as a new Pitbull album, will be shown to have been intended to mislead consumers to believe that the 305 Album is a recent album of Pitbull's, released by TVT.

### E.      Consumers Are Confused by the Infringing Album Advertisements

Statements from consumers will be introduced to demonstrate both the confusion caused by the Counterdefendants, and the irreparable harm being caused to TVT.  Consumer reviews posted on amazon.com opine about the 305 Album: "Not The Follow Up to M.I.A.M.I."; "Not that good"; and "This is not Pit's second album this is really old, unreleased [sic] stuff."  On TVT's website, consumers have posted the following reviews about the Infringing Album: "It's wack"; "not as good as MIAMI"; "not an official album, Pit just hosted it . . . like a mixtape." One consumer is even more descriptive: "I'm really not liking this sh** . . . People are swearing this is [Pitbull's] second release, slip-n-slide should be ashamed of themselves to pump this up like his sophomore album.  Pit has to come out with his second album soon that will trump this album."  TVT will present further evidence of consumer confusion at trial.

TVT sent the March 28 letters to protect against the likelihood of consumer confusion caused by Plaintiff's unauthorized use of the Logo and false representations.  TVT reasonably believed that use of the Logo, the current images and other misleading elements of the marketing and promotion would likely confuse consumers into believing that the 305 Album was a Pitbull Album, and was an album authorized by, or released by, TVT, which was Counterdefendants' intent as described above.

## III.     LEGAL ISSUES TO BE DETERMINED

### A.      TVT's Lanham Act Counterclaims For Trademark Infringement and False Advertising

As the Eleventh Circuit has held, to prevail in a trademark infringement or false designation of origin action under the Lanham Act, a plaintiff must demonstrate (1) that its mark is valid and has priority over defendant's mark, and (2) that defendant's mark is likely to cause

consumer confusion.[3]  15 U.S.C. § 1125(a) (2006); *Frehling Enters., Inc. v. Int'l Select Group,*

*Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).

        1.    **TVT has standing to bring its Lanham Act Claims**

A federal trademark registration is not a prerequisite to bringing  an action under the

Lanham Act.  *See, Bauer Lamp Co. v. Shaffer*, 941 F.2d 1165, 1171 (11th Cir. 1991) (trademark

registration is not necessary to assert Lanham Act claim, as trademark protection accrues with

use, not registration).  To establish a claim for false advertising, a plaintiff must establish that:

> (1) defendant's advertisements were false and misleading; (2) the
> advertisements deceived, or had the capacity to deceive,
> consumers; (3) the deception has a material effect on purchasing
> decisions; (4) the misrepresented product or service affects
> interstate commerce; and (5) Plaintiffs have been injured, or are
> likely to be injured, as a result of the false advertising.

*Swatch, S.A. v. New City, Inc.*, 454 F. Supp.2d 1245, 1251 (S.D.Fla 2006); *See Columbus Rose*

*Ltd. v. New Millennium Press*, No.02 civ 2634, 2002 WL 1033560 (S.D.N.Y. May 20,

2002)(JGK) (granting preliminary injunction in action where defendant's advertisements

prominently displayed the name of author David Balducci, conveying that the book was a David

Balducci work, when in fact the book contained numerous stories by other authors in addition to

one by David Balducci).

The Lanham Act, among other things, prohibits anyone from "misrepresenting the nature,

characteristics qualities or geographic origin" of its goods "in commercial advertising or

promotion," and confers standing upon "any person who believes that he or she is likely to be

damaged by such act."  11 U.S.C. § 1125(a)(1).  Trademark registration is not required, and

---

[3]       TVT solely seeks injunctive relief on its counterclaims, i.e., an order enjoining
defendants from marketing the 305 Album as a Pitbull Album, or otherwise falsely
describing its contents.  TVT does not seek monetary relief, other than an award of its
attorneys' fees pursuant to the Lanham Act.

direct competitors can bring such a claim.  *Select Portfolio Serv. Inc. v. Evaluation Solutions, L.L.C.*, 2006 WL 2691784 at * 3 (M.D. Fla. Sep. 20, 2006).

Accordingly, irrespective of any denied trademark application, or perceived deficiencies in the paper trail of TVT's contractual rights to the name and likeness of Pitbull, TVT, a competing record company engaged in the business of selling Pitbull albums, has standing to assert its claims since TVT, rightly, believes that it would have been damaged by SNS' misleading and false marketing and packaging efforts.

> 2.      Counterdefendants' Promotion of the 305 Album as a New "Pitbull"
>          Album Constitutes False Advertising in Violation of the Lanham Act

Counterdefendants' blatant promotion of the 305 Album as a new Pitbull album misleads the public as to the contents and origin of the album, in violation of the Lanham Act.  The 305 Album Cover and the advertisements make use of a recent image of Pitbull, notwithstanding that the recordings are four years old, and the 305 Album advertisements prominently feature details about the M.I.A.M.I. album, and, tout the success of that record, further deceiving the public that the 305 Album is a follow up album.  *See PPX Enter. Inc. v. Audiofidelity Enter. Inc.*, 818 F.2d 266 (2d Cir. 1987).  Further, the Album Cover and advertisements contain no images of any other artist that appears on the album – even though Pitbull's voice is hardly present at all on most of the tracks on the Album. This is similar to the case involving jazz guitarist George Benson, *Benson v. Paul Winley Record Sales*, 452 F. Supp. 516, 517-518 (S.D.N.Y. 1978), in which false advertising was found where defendants' record release contained altered content from the artist's original recorded performances, with the Court holding that, "[t]he prominent use of Benson's name and picture on the album and in the advertisements created the false impression that Benson was responsible for the contents of defendant's album."  *Id.* at 518; *See Rich v. RCA Corp.,* 390 F. Supp. 530, 531 (S.D.N.Y 1975) (granting an injunction against

defendant record sellers, the court held that consumers were likely to be deceived and confused as to the true contents of an album where the artist's performances were recorded a decade prior but the record jacket contained a recent picture of the artist with no dates or other notations); *Rostropovich v. Koch Int'l Corp.,* 94 Civ. 2674, 1995 U.S. Dist. LEXIS 2785, at *11 (S.D.N.Y. Mar. 7, 1995) (in ruling against summary judgment, the court held that despite the fact that the labeling on compact disc covers were truthful, a reasonable juror could be confused by the overall effect of the packaging and the Lanham Act is designed to prevent confusion).

In addition to misleading album covers, the same reasoning has been applied in finding the Book Covers prominently, but falsely, displaying an author's name as the primary author of the book constitutes false advertising. *Columbus Rose Ltd. v. New Millennium Press*, 2002 WL 1033560 (S.D.N.Y. May 20, 2002)(JGK) (granting preliminary injunction in action where defendant's advertisements prominently displayed the name of author David Balducci, conveying that the book was a David Balducci work, when in fact the book contained numerous stories by other authors in addition to one by David Balducci); *Follett v. New Am. Library*, 497 F. Supp. 304, 312-313 (S.D.N.Y. 1980)(Judgment granted to Author and his Publishing Co. in action where defendant's book cover and advertisements contained unambiguous representation that Follett was the principal author of the book, when in fact he had only made editorial revisions to an existing work).

Consistent with the deceptive intent of their advertising campaign, the commercials created for the 305 Album also are designed to mislead the public as to the actual contents of the 305 Album.  The commercials do not indicate that the Pitbull recordings were from several years ago.  In fact, the announcer on the commercial says "with all new music from Pitbull" and the words "New Album" appear in large block letters on the screen.  These words, combined with

the use of a still shot of Pitbull from a video he shot for a song on TVT's "M.I.A.M.I." album (which is copyrighted by TVT), and the heavy promotion of the 305 Album as a new album in other advertisements, are intended to mislead consumers into believing that the 305 Album is a recent album of Pitbull's, released by TVT.  Again, no other artist is depicted in the commercial, notwithstanding that the 305 Album's contents is in fact a compilation of recordings of other artists, with very little Pitbull content included.

Indeed, the original release of the 305 Album was scheduled around the dates of Pitbull's participation in the nationwide tour in which he promoted TVT's M.I.A.M.I. album.  What is more, although Pitbull maintained creative control rights as to any recordings he made while he was signed with Boothe, Counterdefendants admit, and Pitbull confirms, that he was not involved at all in the creation of the 305 Album.

The facts herein related to SNS's attempted marketing and sale of the 305 Album are remarkably similar to a case involving a record company's release of a "Jimi Hendrix" album containing only background or session performances by the famed guitarist.  In *PPX Enter. Inc. v. Audiofidelity Enter. Inc.*, 818 F.2d 266 (2d Cir. 1987), the Second Circuit affirmed a jury finding of false advertising, in which the, "jury found, and Judge Stanton agreed, that Audiofidelity's recordings through their design, labeling and album covers, purported to contain feature performances of Jimi Hendrix, when in fact they did not," and that "Audiofidelity misrepresented the nature and quality of its recordings through the 'representations associated with [Audiofidelity's] recordings." *Id.* at 271.  Based upon these findings, the Second Circuit held:

> In sum, we hold that, under the circumstances of this case, PPX
> should not have been required to provide evidence of actual
> consumer confusion by resort to witness testimony, consumer
> surveys, or other such evidence in order to establish entitlement to

> damages under the Lanham Act.  Audiofidelity's products were
> patently fraudulent, and the advertising accompanying those
> products was the vehicle employed to perpetrate the fraud.

*PPX Enter. Inc. v. Audiofidelity Enter. Inc.,* 818 F.2d 266, 73 (2d Cir. 1987). In sum, the facts

that will be established at trial will support a finding in TVT's  favor on its false advertising

claim.

        3.      *TVT Owns Valid and Enforceable Trademark Rights In the Pitbull Logo*

             a.     The TVT Pitbull Logo is Protectable Even Though TVT Does Not
                   Own the Rights to the Underlying Name

There can be no dispute that TVT owns the rights to the Pitbull Logo that it developed.  It

is well-settled law that "trademark rights in the stylized appearance of a word are distinct from

trademark rights in the word itself." *Time, Inc. v. Petersen Publ'g. Co.*, 173 F.3d 113, 119 (2d

Cir. 1999).  Words that are otherwise unprotectable can be "legally protected marks" if they are

combined with "distinctive lettering, coloring, or other design elements." *Courtenay Communs.*

*Corp. v. Hall,* 334 F.3d 210, 211, 216 (2d Cir. 2003).  Moreover, courts have consistently held

that, in order to be protectable, a trademark need not be very creative; rather, it must come to

symbolize a product or business in the public mind.  *Boston Prof'l Hockey Assoc., Inc. v. Dallas*

*Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1014 (5th Cir. 1975).

Plaintiff argues that TVT has no ownership interest in Perez's mark because it incorrectly

states that TVT seeks to assert trademark rights in the name "Pitbull" itself (not the Logo that it

developed) and that rights in the name "Pitbull" were not conveyed to TVT because the long

form agreement, which purportedly conveyed those rights, is not valid.  First, contrary to

Plaintiff's assertions, TVT's Lanham Act claims are based on its trademark rights in the Pitbull

Logo that it developed and not on any purported ownership in the underlying name.  Second, the

long form agreement is valid and TVT, as the holder of the exclusive rights to all cover art

developed for the Pitbull albums and name and likeness rights, and as the valid trademark owner of the Pitbull Logo, can bar others from using the mark.

Under the terms of the recording agreement Perez signed with TVT in October of 2003, Perez granted to TVT exclusive rights to use the "Pitbull" mark for purposes of advertising and promotion of musical recordings released during the term of the recording Agreement.  (See Exhibit 1, § 5.04).  Under the recording agreement, TVT owns exclusive rights to any cover art that TVT develops in connection with Perez's recordings.  (See Exhibit 1, at § 3.03).  Consistent with its rights, TVT developed the TVT/Pitbull Logo that it used as cover art for the M.I.A.M.I. album, which consisted of the name "Pitbull" in a stylistic font, and produced, marketed and distributed recordings and otherwise promoted Perez under the Logo.  TVT's Logo portrays the word "Pitbull" in distinctive lettering.  This is enough to convey protectable trademark rights in the Logo even though TVT may not claim trademark rights in the word "Pitbull" by itself.  *See Courtenay Communs. Corp.,* 334 F.3d at 211, 216 (unprotectable words can be "legally protected marks" if they are combined with "distinctive lettering, coloring, or other design elements").

> *b.*  Counterdefendants' Use of TVT's Stylized Pitbull Logo Is Likely to Cause, and Has Caused, Confusion

Counterdefendants' use of the Logo constitutes a false and/or misleading representation that creates the impression that TVT is associated with, has sponsored, or approved the 305 Album.  Indeed, Counterdefendants admit that they used Logo because consumers were familiar with the Logo.

The relevant factors to a determination of whether Counterdefendants' use of the TVT Pitbull Logo is likely to cause confusion are: (1) type of mark; (2) similarity of design between plaintiff's marks and those used by the defendant; (3) the similarity of the products; (4) the identity of retail outlets and purchasers; (5) the similarity of advertising media used;

(6) defendant's intent; and (7) actual confusion.  *Dieter v. B&H Indus.,* 880 F.2d 322, 326 (11th Cir. 1989).  All seven factors weigh in favor of a finding of a likelihood of confusion.

First, TVT's Logo is valid and strong.  The Logo has been prominently featured in advertisements and promotional materials for Pitbull's albums and consumers have come to associate it with the artist Pitbull who is known as an exclusive TVT artist famous for his M.I.A.M.I. album that was released by TVT.  Second, the logo used on the 305 Album is virtually identical to TVT's.  Where, as here, an infringer merely alters the style of the first letter of the trademark, courts have found a likelihood of confusion.  *See Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 493 (2d Cir. 1988) ("Recognizing the duty to view the marks overall impressions," the court was "unconvinced that simply altering the [first letters] involved . . . changes the outcome under [the likelihood of confusion analysis]").

Third, "[t]he greater the similarity between the products and services, the greater the likelihood of confusion."  *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 976 (11th Cir. 1983) (internal quotations and citations omitted).  Here, the marks identify similar products in that both purport to identify Pitbull's musical recordings.  Indeed, Counterdefendants have promoted the 305 Album as the follow-up album to TVT's M.I.A.M.I. album, which is intended to cause consumers to believe the 305 Album was released by TVT.  The commercials for the 305 Album market the album as a "new album" "with all new music from Pitbull" and nowhere do they indicate that Pitbull recorded his songs in 2001.  Furthermore, the commercials feature a still shot of Pitbull from a video he shot for a single on TVT's "M.I.A.M.I." album.  The promotional "one sheet" also is designed to promote the 305 Album as the next TVT album by specifically referring to the M.I.A.M.I. album and its success.

With regard to the fourth and fifth factors, Counterdefendants plan to sell and advertise the 305 Album through channels identical to those which TVT currently markets its Pitbull albums, including retail music stores, the Internet, television, radio and magazines .

Sixth, while proof of intentional infringement is not required to establish liability under the Lanham Act, such proof "is sufficient of itself for [the] Court to base a finding of 'likelihood of confusion.'" *Varitronics Sys., Inc. v. Merlin Equip., Inc.*, 682 F. Supp. 1203, 1207 (S.D. Fla. 1988).  There can be no question but that Counterdefendants' unauthorized use of the TVT Pitbull Logo was intentional.  Counterdefendant, Jullian Boothe, conceded that TVT's Pitbull Logo was intentionally copied when he stated that "everybody knows [TVT's Pitbull] logo" when he described how he and his graphic designer came up with 305 Album cover art. Counterdefendants cannot claim that they lacked intent to improperly use the TVT Pitbull Logo given the nearly identical marks.

Finally, "[A]ctual confusion . . . is not essential to a recovery.  What is necessary is the proof of the *likelihood* of confusion." *Bauer Lamp Co. v. Shaffer*, 941 F.2d 1165, 1171-72 (11th Cir. 1991) (emphasis by the Court).  However, here, despite the fact that the 305 Album has not been released yet, it has been made available for digital download.  That limited release already gave rise to actual consumer confusion, as demonstrated by the following comment, posted on an Internet message board hosted by TVT:

> I'm really not liking this sh** . . . People are swearing this is
> [Pitbull's] second release, slip-n-slide should be ashamed of
> themselves to pump this up like his sophomore album.  Pit has to
> come out with his second album soon that will trump this album.

**B.**   **Plaintiff Cannot Succeed on its Tortious Interference Claim**

      1.   *Plaintiff's Tortious Interference Claim Fails Under Florida's Tortious Interference Law Because TVT Was Justified in Sending out the Cease-and-Desist Letters*

To prevail on a claim of tortious interference with a business relationship, a plaintiff must prove, among other things, *intentional and unjustified* interference by the defendant. *Seminole Tribe v. Times Publ'g Co.*, 780 So. 2d 310, 315 (Fla. 4th DCA 2001). A person has a qualified privilege to interfere with another's business relationships to safeguard its own financial interests. *Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1225 (Fla. 3d DCA 1980). A party who is so privileged can be held liable for tortious interference only if the party: (a) acted solely with malice, or (b) acted partly with malice *and* utilized "improper methods," such as physical violence, misrepresentations, illegal conduct or threats of illegal conduct. *See KMS Rest. Corp. v. Wendy's Int'l, Inc.,* 361 F.3d 1321, 1326-27 (11th Cir. 2004); *Ethyl Corp.,* 386 So. 2d at 1225; *McCurdy v. Collis*, 508 So. 2d 380, 382 (Fla. 1st DCA 1987); Florida Standard Jury Instruction (Civil) MI 7.2. Malice is therefore always an element of a tortious interference with business relationships claim. *Rockledge Mall Assocs., Ltd. v. Custom Fences of S. Brevard, Inc.*, 779 So. 2d 554, 557 (Fla. 5th DCA 2001) (reversing a verdict that defendants had committed tortious interference due in part to an absence of a proper showing of malice by defendants).[4]

TVT had a reasonable basis after its investigation to believe that SNS was unfairly competing with it. "The law of unfair competition is the umbrella for all statutory and

---

[4]   *See also IBP, Inc. v. Hady Enters., Inc.*, 267 F. Supp. 2d 1148, 1164 (N.D. Fla. 2002) ("In order to establish the third element of the prima facie case for tortious interference, [plaintiff] must show that [defendant] acted with malice or ill will"); *Southern Bell Tel. & Tel. Co. v. Roper*, 482 So. 2d 538, 539 (Fla. 3rd DCA 1986) (". . . the complained-of evidence went directly to the issue of malice, which was an element of the claim for tortious interference with the business relationship").

nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir.1974); *see also Audio Sys. of Florida, Inc. v. Simplexgrinnell LP*, 68 U.S.P.Q.2d 1681, (M.D.Fla.2003) (recognizing "unfair competition acts as an 'umbrella for all statutory and non-statutory causes of action arising out of business conduct which is contrary to honest practices in industrial or commercial matters"). Unfair competition in Florida is an "elastic" cause of action and the precise elements of the claim are elusive. Courts apply elements appropriate to the underlying acts of the unfair competition on a case by case basis. *Alphamed Pharm. Corp. v. Arriva Pharm., Inc.* 432 F. Supp. 2d 1319, (S.D. Fla., 2006). "The likelihood of confusion necessary to support an unfair competition claim 'need not be confusion with respect to the seller's identity;' but can be 'confusion with respect to whether the product's source has been approved.'" *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 385 (5th Cir. 1977). Thus, Counterdefendant's contractually prohibited conduct to the detriment of TVT is actionable. *Treiber v. StorCOMM, Inc.*, 2005 WL 2012275 (M.D. Fla., 2005). (Plaintiff alleged the unauthorized use of copyrighted material and the creation of derivative works in violation of Copyright Act and license agreement, and that these wrongful acts, in conjunction with the marketing of these products, caused customer confusion and damage to plaintiff.) As noted in *CBS, Inc. v. Garrod*, 622 F. Supp. 532, (D.C. Fla., 1985), in a case dealing with defendant's unauthorized use of phono-records:

> Unfair competition is a broader area than trademark infringement. In the area of unfair competition the use of a similar mark may be probative of intent, of the defendant's state of mind. Intent has no relevance to trademark infringement, because customer confusion is the sine qua non. As in trademark infringement, intent is neither necessary to nor conclusive of unfair competition, but, unlike in trademark infringement, intent is probative of unfair competition…. The gist of unfair competition is more a question of defendant's intent which can be proved in other ways besides palming off.

*See also Maison Lazard Et Compagnie v. Manfra, Tordella & Brooks, Inc.*, 585 F. Supp. 1286 (S.D.N.Y. 1984) (Defendants' sale of Olympic commemorative coins in violation of plaintiffs' exclusive rights to market and sell such coins outside the United States constituted unfair competition under New York law); *Metro. Opera Ass'n. v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786 (Sup.Ct. N.Y. County 1950), *aff'd* 297 App. Div. 632, (1st Dep't 1951); *Flexitized, Inc. v. National Flexitized Corp.*, 335 F.2d 774 (2d Cir.1964); *see also PPX Enter. Inc., supra.*

Courts have routinely held that a "trademark holder has [the] right to defend against infringement by sending trademark policing letters" and that such conduct is "privileged" because the trademark holder is merely acting to protect its interest. *Am. Broad. Co. v. Maljack Prods.*, 34 F. Supp. 2d 665, 675 (N.D. Ill. 1998) (internal quotations and citations omitted) ("Maljack"). Where an owner of a valid, enforceable trademark is sued such that the cause of action is based on the trademark owner's enforcement of his trademark, the claim will fail. *Marshak v. Sheppard,* 666 F. Supp. 590, 603 (S.D.N.Y. 1987).

In *Maljack,* the court granted summary judgment in favor of defendant on plaintiff's claims for intentional interference of both contract and prospective business advantage, finding that defendant's issuance of cease-and-desist letters to potential customers of plaintiff were privileged because they were made in good faith. 34 F. Supp. 2d at 675. Defendant sent a cease-and-desist letter to the American Broadcasting Company ("ABC") who had granted a license to plaintiff to use video footage of Princess Diana's funeral which plaintiff had intended to sell and distribute as a home video. *Id.* at 669-70, 672. Defendant also sent a cease-and-desist letter to Reader's Digest who had discussed with plaintiff the possibility of producing a custom video of the funeral. *Id.* at 672. In the letters, defendant asserted its copyright ownership in the video

coverage of Princess Diana's funeral and stated that the "unauthorized reproduction of that footage 'constitutes an infringement of [defendant's] exclusive rights therein.'"  *Id.*

The court noted that in both of the claims for tortious interference with contract and for tortious interference with prospective economic advantage, a "[p]rivilege exists if the defendant acted in good faith to protect an interest or uphold a duty."  *Id.* at 675 (internal quotations and citations omitted).  The court rejected plaintiff's argument that defendant's conduct was not privileged because it did not have a valid copyright in the funeral footage and held that defendant's "good faith belief in its copyright interest [was] sufficient."  *Id.*  The court then held that plaintiff did not meet its burden of proving that defendant's privileged conduct was unjustified and malicious, i.e., carried out in bad faith.  *Id.* at 675-76.  The court noted that plaintiff provided no evidence that defendant used illegal means to induce ABC's breach of contract or to interfere with plaintiff's prospective economic relationship with Reader's Digest. *Id.* at 676.

TVT has valid and enforceable trademark rights in the Pitbull Logo.  However, as in *Maljack,* all that is required of TVT to establish that it was privileged when sending out the cease-and-desist letters protecting its Lanham Act rights is a "good faith belief" in its intellectual property interest.  *Maljack,* 34 F. Supp. 2d at 675; *see Marshak,* 666 F. Supp. at 603; *Publications Int'l, Ltd. v. W. Publ'g Co.,* No. 93 C 3074, 1994 U.S. Dist. LEXIS 558, at *2 (N.D. Ill., Jan. 25, 1994) ("The right of the holder of a trademark [or patent] to warn others of infringement suits does not depend upon the validity of the trademark [or patent] so long as the holder believes his claims are valid.") (*quoting Heinz v. Frank Lloyd Wright Found.*, 762 F. Supp. 804, 808 (N.D. Ill. 1991)).  Thus, even if a court finds no Lanham Act violation, the

privilege still extends to one who acted in good faith to protect its business.  *Spangler Candy Co. v. Crystal Pure Candy Co.*, 235 F. Supp. 18, 32-33 (N.D. Ill. 1964).

At the time it sent out the March 28 letters, TVT had a good faith belief that SNS was violating the Lanham Act by its use of the TVT Pitbull Logo in its advertisements.  *See Heinz*, 762 F. Supp. at 808 (plaintiff "ma[d]e no showing that [defendant] did not believe that the facts contained in the infringement letters were true").

2.     *TVT's Letters Did Not Tortiously Interfere with SNS's Relationship with ADA*

To prevail on a claim of tortious interference with a business relationship, a plaintiff must prove, among other things, intentional and unjustified interference by the defendant.  *Ethyl Corp.*, 386 So. 2d at 1223.  "As with most other torts, embedded within the essential elements of the tort of intentional interference with a business relationship is the legal requirement that the plaintiff prove causation."  *St. Johns River Water Mgmt. Dist. v. Fernberg Geological Servs., Inc.*, 784 So. 2d 500, 504 (Fla. 5th DCA 2001).  Plaintiff will not be able to establish at trial that TVT's March 28 letters caused ADA to halt distribution of the Album.  To the contrary the evidence will show that ADA was *willing* to distribute the album even after the letters were sent out.  In fact, Michael Black of ADA will testify that after ADA received the letter, ADA was "still moving forward" with plans to release the album.  Indeed, Black will testify that it was TVT's counterclaims interposed in the lawsuit, not the letters, that caused ADA to eventually stop its plans to distribute the 305 Album.[5]  A party's assertion of claims against another in a lawsuit may not serve as the underlying grounds for a claim for tortious interference.

---

[5]     There is evidence that SNS's relationship with ADA was strained as early as the fall of 2004.  In an email dated September 9, 2004, Jullian Boothe wrote Michael Black of the ADA stating that everything was "cool" and that he "would rather keep [the] relationship with [ADA] than move to another person."  Similarly, Ted Lucas' testimony corroborates

(continued...)

As further evidence that the letters failed to cause ADA and its customers to cease buying the 305 Album, testimony will establish that orders for the 305 Album were still coming in after March 28, 2005, the date TVT sent the letters, and ADA was accepting such offers. And not surprisingly, the 305 Album was pressed *after* March 28, 2005. Such a flurry of activity seems unlikely from a company who has allegedly refused to distribute the 305 Album. Finally, Plaintiff will not establish that any actual orders for the 305 Album was cancelled as a result of the March 28 letter. Thus, Plaintiff will fail to establish an essential element of its claim that TVT's letters disrupted the business relationship between SNS and ADA.[6]

3.    *Plaintiff Had Very Little Probability of Future Economic Benefit*

To recover for interference with an advantageous business relationship, a plaintiff must prove the existence of an economic relationship with a third party and a probability of future economic benefit. *St. Johns River Water Mgmt. Dist.*, 784 So. 2d at 505. Although there is evidence that SNS had an agreement with ADA to distribute the 305 Album, plaintiff has significantly inflated its probability of future economic benefit. In fact, the evidence will show that SNS stood to recoup nothing from the sales of the 305 Album in the first year, and only 3

---

the existence of problems between ADA and SNS as early as 2004. In an email dated January 21, 2005, Lucas wrote to Andy Allen, president of ADA, stating that Allen was "unhappy with the way the year started out." At his deposition, Lucas explained that Allen's unhappiness was based on events that occurred in 2004. Given that the ADA/SNS relationship was strained prior to March 28, 2005 - the date TVT sent its cease-and-desist letters – it cannot be assumed that TVT's cease-and-desist letters were the reason why ADA decided to cease distribution of the 305 Album, particularly because ADA was still willing to distribute the album even after the letters were sent.

[6]    In addition to SNS's misrepresentation of ADA's willingness to distribute the 305 Album after the cease-and-desist letters were sent, it is disputed as to how many pre-orders for the 305 Album SNS had were allegedly cancelled as a result of the letters. Although SNS claims it had pre-orders of 103,000 units, Black testified that ADA, SNS's only distributor, had approximately 51,000 pre-orders.

percent and 5 percent of total sales in the second and third years, respectively.  Furthermore, although one of its main contentions is that TVT caused significant monetary loss to SNS, SNS will not present any evidence that it has expended any amount of money for the creation, promotion and manufacture of the 305 Album, and, therefore, has not shown any evidence of any injury or loss suffered by it, relying instead on expenses of its Co-Counterdefendant who is not a plaintiff in the current action.  None of the checks produced in this litigation that were allegedly written for expenses related to the 305 Album were from SNS.  The evidence shows that 305 Music, Inc. was the entity behind the 305 Album; 305 Music, Inc. bore all the expenses and stood to gain the most from any sales of the album.  305 Music, Inc. is also entitled to any proceeds from the current litigation and has all settlement authority in this action.  Thus, it is 305 Music, not SNS, who is the proper plaintiff in this action.

Because SNS cannot establish that it would have economically benefited from the exploitation of the 305 Album and cannot prove that it was damaged having had no real financial stake in the album's creation and planned release, SNS fails to prove a vital element of its tortious interference claim.

> 4.    *Plaintiff Did Not Have a Contractual Right to Release the 305 Album and An "Economic Relationship with a Third Party" Based on its Deficient Rights Cannot Serve As the Grounds for a Tortious Interference Claim*

Contrary to Plaintiff's assertion, the evidence shows that plaintiff did not have a contractual right to sell the 305 Album.  To state a claim for tortious interference with a business relationship "[o]f course, the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights."  *Register v. Pierce*, 530 So. 2d 990, 993 (Fla. 1st DCA 1988) (holding that because plaintiff had no enforceable rights, complaint failed to state a cause of action for tortious interference).  The testimony and documentary evidence shows that the holder of the rights to Perez's recordings created under contract with Boothe in 2001 and 2002 is

Jullian Boothe.  Although a June 17, 2004 agreement inartfully suggests that Pitbull Productions, Inc. consented to Boothe's assignment of his rights in the October 1, 2001 and March 1, 2002 agreements to Rude Bwoy, there was no actual assignment of rights from Boothe to Rude Bwoy. The agreement dated November 15, 2004 between 305 Music and Jullian Boothe (and not Rude Bwoy) establishes 305 Music's agreement to finance the distribution of the 305 Album.  In a contract dated February 1, 2005 between SNS and 305 Music, plaintiff asserts that 305 Music and Boothe licensed to SNS the rights to release the Boothe recordings, yet nowhere in that agreement is Boothe's name even mentioned.

Despite the fact that Rude Bwoy did not have any rights to any of Perez's recordings at any time, several of the agreements and correspondence relating to the recordings on the 305 Album, such as the producer agreements and side artist agreements, are on Rude Bwoy letterhead and bind Rude Bwoy, the entity, not Boothe.  The very letter sent to BMG Music Publishing, the administrator of Perez's copyright interests in musical compositions , that seeks "permission to use the derivative works of songs written by Perez" and included on the 305 Album, was written on behalf of Rude Bwoy and on Rude Bwoy letterhead.  Any licenses that were granted by BMG Music Publishing and The Harry Fox Agency were granted to Rude Bwoy, and not Boothe.  Therefore, the evidence is clear that SNS could not have obtained all the rights to release the recordings because, to the extent any licenses or approvals for Perez's recordings were granted, they were improperly obtained by Rude Bwoy, who had no contractual right to the Perez recordings in the first place.

Moreover, even if Rude Bwoy was authorized to get the necessary licenses for the recordings, the evidence does not show that all the required licenses and approvals were secured. Plaintiff has only produced a few pages that purportedly convey to Rude Bwoy licenses in the

305 Album recordings.  Thus, plaintiff seeks to release an album that is not fully licensed.  Given the contractual gaps relating to the recordings on the 305 Album and the failure to prove full licensure of all the recordings, SNS does not have a clear contractual right to sell the 305 Album. Thus, plaintiff cannot rely on its "economic relationship" with ADA as grounds for its tortious interference claim because that relationship involved plans to distribute an album which neither party had any legal right to do.  *Scheller v. Am. Med. Int'l, Inc.*, 583 So. 2d 1047, 1050 (Fla. 4th DCA 1991) ("[S]ince [plaintiff] lacks an enforceable contractual right to be appointed director of the pathology laboratory by the Hospital, no cause of action can lie against [defendant] for interfering with this unenforceable contractual right"); *Bernstein v. True*, 636 So. 2d 1364, 1367 (Fla. 4th DCA 1994) ("Even though a valid contract is not necessary for a claim of tortious interference, [plaintiff] failed to prove that he had any legal rights").

C.     **Plaintiff Has Completely Failed to Mitigate Any Damages, Refusing to Release the Infringing Album Despite the Magistrate's Report and Despite TVT's Written Notification to ADA Withdrawing the March 2005 Letter.**

Plaintiff's alleged damages are speculative at best.  Plaintiff must demonstrate that there was some loss in value in the 305 Album between March 2005 and now.  Moreover, although Plaintiff makes much of the preliminary findings reached by the Magistrate Judge on Plaintiff's preliminary injunction motion, and ADA's notice to Plaintiff that it was prepared to distribute the 305 Album based on the Magistrate Judge's findings, Plaintiff has done absolutely nothing to proceed with distribution and sale of the album. In fact, the evidence will show that another distributor did in fact offer to distribute the 305 Album, and pay to SNS an advance in connection with that distribution, but SNS voluntarily turned it down.  Plaintiff's complete failure to mitigate eviscerates any damages Plaintiff might otherwise recover.

## IV.     <u>CONCLUSION</u>

TVT believes that TVT will succeed on its Lanham Act counterclaims, and will, at a minimum, establish that it acted in good faith in sending out the March 28, 2005 letters, defeating Plaintiff's claims in their entirety.  Moreover, assuming *arguendo* that Plaintiff is successful as to liability on the tortious interference claim, Plaintiff's provable damages will be negligible.

Dated:  February 19, 2007

LABATON SUCHAROW & RUDOFF LLP

By:   /s/ Brian D. Caplan

Brian D. Caplan (BC 1713)
Jonathan J. Ross (JR 0581)
100 Park Avenue
New York, New York  10017
(212) 907-0700

Counsel for Defendant and Counterclaimant

Steven E. Eisenberg
Richard Guerra
Feldman Gale, P.A.
Miami Center, 19th Floor
201 S. Biscayne Blvd., 19th Floor
Miami, Florida  33131
(305) 358-5001

Co-Counsel for Defendant and Counterclaimant