**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 05-21113-CIV-TORRES

CONSENT CASE

SLIP-N-SLIDE RECORDS, INC.,

      Plaintiff,

vs.

TVT RECORDS, LLC,

      Defendant.

_____/

TEEVEE TOONS, INC.,

      Counterclaimant,

vs.

SLIP-N-SLIDE RECORDS, INC., *et al.*,

      Counter-Defendants.

_____/

**ORDER ON DEFENDANT TEEVEE TOONS, INC.'S**
**MOTION FOR A NEW TRIAL OR REMITTITUR**

      This matter is before the Court on Defendant Teevee Toons, Inc.'s ("TVT") Motion for a New Trial or Remittitur [**D.E. 452**], Plaintiff Slip-N-Slide Records, Inc. ("SNS") Response in opposition thereto [**D.E. 471**], and TVT's Reply thereto [**D.E. 487**]. After due consideration of the motion and related filings, the Court will grant in part and deny in part TVT's motion for a new trial and alternative motion for remittitur, for the reasons discussed below.

## I.   BACKGROUND

SNS sued TVT for tortious interference, declaratory relief, and temporary and permanent injunctive relief in connection with the sale, marketing, and distribution of an album entitled "Welcome to the 305" ("305 Album") that contained musical recordings by rap artist Armando Perez ("Perez"), known professionally as "Pitbull." TVT counterclaimed against SNS, Rudebwoy Entertainment ("Rudebwoy"), 305 Music ("305 Music"), and individuals Allen Waserstein ("Waserstein"), Robert Henderson ("Henderson"), and Theodore Lucas ("Lucas") for trademark infringement and Lanham Act claims under 15 U.S.C. 1125(a) in connection with TVT's "Pitbull" mark and logo.

After a two-week jury trial, the jury returned a verdict for SNS on the tortious interference claims.   *See* Special Verdict Form [D.E. 430].   Specifically, the jury determined that:

- •      TVT intentionally and unjustifiably interfered with SNS's contract with Alternative Distribution Alliance, Inc. ("ADA") that was known to TVT, and TVT intentionally and unjustifiably interfered with SNS's business relationship with ADA and ADA's retailers;

- •      TVT acted partly out of malice and also through improper methods;

- •      TVT's interference was the cause of damages to SNS;

- •      SNS suffered compensatory damages in the gross amount of $2,279,200.00;

- •      SNS did not fail to mitigate damages;

- •      TVT engaged in intentional misconduct or gross negligence in interfering with SNS's contract with ADA or with SNS's business relationships with ADA and ADA's retailers; and

- •      a total amount of $6,837,600.00 in punitive damages was awarded to SNS against TVT.

The jury also rejected TVT's counterclaims for trademark infringement of TVT's stylized "Pitbull" logo and false advertising.

TVT has moved for a new trial pursuant to Federal Rule of Civil Procedure 59(e), claiming that the evidence adduced at trial does not support the jury's findings on either liability or damages. TVT also asserts that this Court abused its discretion with regard to many of the evidentiary rulings made before and during trial, as well as with regard to certain jury instructions and the verdict form. In the alternative, TVT seeks a remittitur of the damage awards on the grounds that both the compensatory and punitive damages awards are unsupported by the record and punitive in nature.

## II.   ANALYSIS

### A.   Standard of Review for Motion for New Trial under Rule 59

Rule 59 does not enumerate all the grounds for a new trial but speaks instead in broad terms. 11 Wright & Miller, *Federal Practice and Procedure* § 2805 (2d ed. 1995). Pursuant to Rule 59(a), "[a] new trial may be granted to all or any of the parties and on all or part of the issues . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States. . . ." *See, e.g., George v. GTE Directories Corp.*, 195 F.R.D. 696, 701 (M.D. Fla. 2000) (new trial may be granted "for any reason recognized at common law, even where there is substantial evidence supporting the verdict.").

A party may seek a new trial by arguing that "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *see also Weisgram v. Marley Co.,* 528 U.S. 440, 452 (2000). However, a motion brought pursuant to Rule 59 may not "relitigate old

matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Linet, Inc. v. Village of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005) (motion to amend or alter judgment was essentially a motion to reconsider the district court's prior summary judgment order).

The decision to alter or amend a judgment is committed to the sound discretion of the trial judge. *E.g., American Home Assur. Co. v. Glenn Estess & Assocs., Inc.*, 763 F.2d 1237, 1238-39 (11th Cir. 1985). When ruling on a Rule 59(e) motion for new trial, the judge must determine "if in his opinion, 'the verdict is against the clear weight of the evidence . . . or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.'" *Insurance Co. of N. America v. Valente*, 933 F.2d 921, 922-23 (11th Cir. 1991) (quoting *Hewitt v. B.F. Goodrich Co.,* 732 F.2d 1554, 1556 (11th Cir. 1984)). "[T]o assure that the judge does not simply substitute his judgment for that of the jury, . . . we have noted that new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great – not merely the greater – weight of the evidence." *Id.* at 923 (quoting *Hewitt*). "The trial judge's discretion to set aside a jury verdict based on the great weight of the evidence is very narrow." *Hewitt*, 732 F.2d at 1559. The judge must protect against manifest injustice in the jury's verdict, but it is not his role to assess credibility where conflicting testimony has been presented during the trial. *Id.* at 1558-59. Instead, the judge must defer to the jury on the weight to be given to each witness's testimony. *Id.* at 1558-59.

**B.** **_Liability for Tortious Interference_**

The jury found that TVT tortiously interfered with SNS's advantageous business relationship with ADA, the intended distributor of the 305 Album, as well as SNS's contractual relationship with ADA. TVT contends that the jury's finding of liability on these claims is against the great weight of the evidence.

To prevail on its tortious interference claims at trial, SNS was required to prove (1) the existence of a business relationship with ADA; (2) TVT's knowledge of the relationship; (3) TVT intentionally and unjustifiably interfered with the relationship; and (4) that SNS suffered damages as a result. *Gossard v. Adia Serve., Inc.*, 723 So. 2d 182, 184 (Fla. 1998); *KMS Rest. Corp. v. Wendy's Int'l, Inc.* 361 F.3d 1321, 1325 (11th Cir. 2004).

### 1.  *Malice*

The jury determined that TVT intentionally and unjustifiably interfered with SNS's relationship with ADA, acting partly with malice and through improper methods, when Jacqueline Sussman, Esq., TVT's Executive Vice President in charge of legal and business affairs, sent the March 28, 2005, Cease and Desist ("C&D") letters to ADA and its retailers. *See* Special Verdict Form 1b. [D.E. 430 at 2].  Those letters threatened litigation against the recipients if SNS released and distributed the 305 Album.  TVT argues that the evidence does not support a finding of malice.

Malice may be shown indirectly "by proving a series of acts which, in their context or in light of the totality of the circumstances, are inconsistent with the premise of a reasonable man pursuing a lawful objective, but rather indicate a plan or course of conduct motivated by spite, ill-will or other bad motive." *Gregg v. U.S. Indus., Inc.*, 887 F.2d 1462, 1476 (11th Cir. 1989); *see also McCurdy v. Collis*, 508 So. 2d 380, 382 (Fla. 1st DCA 1987) (citing *Southern Bell Tel. & Tel. Co. v. Roper*, 482 So. 2d 538, 539 (Fla. 3d DCA 1986)).

Here, TVT posits that the evidence does not suggest malice; rather, it shows that TVT had a good-faith basis to send the C&D letters, given its reasonable belief that SNS was competing with its contractual grant of exclusivity to Pitbull's recordings without legal authority, and that SNS was engaged in false advertising.  TVT points to the testimony of its president, Steve Gottlieb, who stated that TVT conducted an investigation

into SNS's legal rights to release the 305 Album and determined, among other things, that SNS had no right to release at least 6 of the 16 tracks on the 305 Album.  Gottlieb also testified that Pitbull advised him in a private meeting that he (Pitbull) did not want the 305 Album released.  TVT's music industry expert, Elliot Goldman, testified that TVT acted reasonably in sending out the C&D letters.  Even if, TVT asserts, its belief as to its legal rights vis-a-vis the 305 Album was incorrect, the evidence does not show it acted with malice in sending out the C&D letters.

The jury clearly rejected SNS's testimony and evidence.  From where we sit, the jury's decision was quite justified by the evidence.  The jury was presented with compelling evidence from which it could find that SNS's marketing and distribution of the 305 Album did not violate any of TVT's legal rights, that TVT's belief that it had protectible legal rights to Pitbull's music and the TVT "Pitbull" logo was unreasonable, and that TVT did not act reasonably in sending out the C&D letters.  The evidence thus supports the jury's finding that TVT was motivated at least in part by malice when it distributed almost a hundred letters to third persons up and down the distribution chain.

The jury heard from several witnesses that the purpose of sending out the C&D letters was to stop distribution of the 305 Album.[1]  In addition, Ted Lucas, the president of SNS, testified that not only did Steve Gottlieb say he sent the letters to stop SNS from selling the 305 Album, Gottlieb also told Lucas that he intended to own all of SNS's master recordings.  Meanwhile, Julian Boothe and Angela Martinez, Pitbull's lawyer and manager, testified that the recording artist himself, Pitbull, never expressed any opposition to SNS's release of the 305 Album.

---

[1]     TVT acknowledges this point.  *See* TVT's Motion for a New Trial or Remittitur ("TVT's Mot.") at 7.  However, TVT argues it was eminently reasonable to send out the C&D letter, because this act was predicated (TVT asserts) upon its good-faith belief that SNS had no right to release the 305 Album.  *Id.*

The jury also heard evidence that TVT did not have a good-faith basis to send the C&D letters. The jury heard that the only rights TVT possessed were obtained from the Diaz Brothers Music Group, Inc. ("DBMG"); that DBMG acquired no rights to the 305 Album; that TVT acquired only DBMG's present and future rights to Pitbull's recordings; and that DBMG had no objection to SNS's release of the album.

In addition, the jury was aware that before sending the C&D letters, TVT had in its possession the September 1, 2001, recording contract between Julian Boothe and Pitbull granting Boothe the rights to Pitbull's musical recordings made under the agreement. The jury also heard that TVT was told by Angela Martinez, Pitbull's lawyer, and other witnesses that SNS had a contractual right to release the 305 Album. Thus, the jury heard testimony that SNS had valid and legal rights to release the 305 Album.

However, despite this information, TVT sent 90 C&D letters to most of SNS's distribution chain threatening the recipients with legal action in order to stop the distribution of SNS's album. TVT claimed in the C&D letter that its contractual rights were being violated by the distribution, marketing, and sale of the 305 Album, even though the record company had information to the contrary. There was evidence before the jury that this type of threatening conduct was not the norm in the industry. Music industry attorneys Rick Joseph and Angela Martinez, and SNS's music industry expert Gregory McBowman, testified that they had never seen C&D letters sent to an entire chain of distribution, as TVT did in this case. Although TVT's expert Elliot Goldman testified that TVT had acted reasonably in sending out the C&D letters, he acknowledged on cross-examination that a reasonable alternative approach to the situation TVT found itself in late February/early March 2005 would have been for TVT to call SNS to inquire about its contractual rights to the 305 Album, something the jury heard TVT did *not* do. Meanwhile, Angela Martinez testified that Pitbull had hired a trademark lawyer to send

his own C&D letter to TVT, advising the record company that Pitbull owned all rights to the name "Pitbull" and that any attempt by TVT to trademark his name was improper, infringing and illegal.

Examining the record as a whole, the Court finds that the weight of the evidence supports the jury's findings that TVT sent the C&D letter to block distribution of the 305 Album and harm SNS, without having a good-faith basis to do so. The jury weighed the evidence, evaluated credibility, and ultimately believed SNS's witnesses far more than TVT's witnesses. Absent a finding of manifest injustice, which the Court does not find on this record, the Court will not overturn the jury's determination that TVT was motivated at least in part by malice when it sent out the C&D letters. *Hewitt*, 732 F.2d at 1558-59 (the trial judge should not weigh conflicting testimony or judge credibility of witnesses).

## 2. *Improper Means*

As this Court discussed in its Order on Summary Judgment Motions [D.E. 378] at 7-8, TVT had a qualified privilege to interfere with SNS's relationship with ADA, in order to safeguard its own financial interests, *if* TVT did not employ improper methods in doing so. *See KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d at 1327 (concluding that even where the defendant's motive was not purely malicious, a tortious interference claim might succeed if improper means were used; "[t]he significant inquiry to determine the privilege of justification is whether the means employed are not improper."); *Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1225 (Fla. 3d DCA 1980) ("[S]o long as improper means are not employed, activities taken to safeguard or promote one's own financial, and contractual interests are entirely non-actionable."). TVT argues that the record is devoid of evidence that it employed any of the improper methods identified in the jury instruction on this

issue, *see* D.E. 427at 6 (definition of "improper methods")[2], when it sent the March 28th C&D letter. TVT suggests that a jury finding that its March 28th letter contained knowing misstatements would be against the great weight of the evidence, because each statement in the letter was accurate.

The Court rejects this contention. The jury heard evidence that TVT misrepresented its rights vis-a-vis the 305 Album, overstated its rights in the underlying "Pitbull" trademark, and threatened recipients of the C&D letters with Lanham Act and other legal claims. The jury heard that it was not TVT's custom and practice to trademark its artists' names, but that TVT attempted to do so - for Pitbull only - *after* sending out the C&D letters. More importantly, the jury heard from Rick Joseph, Angela Martinez, Al Levine, and Robert Fernandez that TVT's contracts with Pitbull failed to grant TVT protectible legal rights in the "Pitbull" mark. Yet, TVT's C&D letters continued to claim that TVT had rights in the Pitbull mark.

These facts support the jury's verdict. But the most compelling fact before the jury was the reckless manner in which TVT exercised rights that it claimed it was protecting. A "Cease and Desist" could have, appropriately, been sent to SNS and SNS's representatives. That could have been deemed privileged under Florida law. When TVT distributed the letters, however, to the entire distribution chain, for the admitted purpose of stopping distribution of the album, TVT crossed the line. TVT's actions at that point were intentional and reckless. TVT, the jury found, could no longer claim a privilege when it used these improper methods to accomplish its purposes.

Another fact that the jury heard which supports SNS's position is that TVT knew how to properly exercise its legal rights by seeking judicial relief. If TVT truly believed

---

[2]    "Improper methods" was defined in the Jury Instructions to mean "that one uses defamation, bribery, physical violence, misrepresentations, unfounded threats or intimidation, or other wrongful conduct to interfere."

that SNS's release of the 305 Album was contrary to TVT's lawful rights, TVT could have pursued litigation as they had done in the past in other cases. TVT's first response, however, was not in the courtroom, but instead through over-the-top means that forever injured SNS's ability to timely market its album. The jury, faced with this evidence, had a sufficient basis to conclude that TVT committed tortious interference that caused damage to SNS. The Court finds that the weight of the evidence supported the jury's finding that TVT employed improper methods when it sent the C&D letter and interfered with SNS's relationship with ADA and its retailers. *See, e.g.*, *International Sales & Serv. Inc. v. Austral Insulated Products, Inc.*, 262 F.3d 1152, 1159 (11th Cir. 2001) (determination of whether interference in a business relationship was justified based on the privilege of competition, i.e., whether the interference was improper or not, is ordinarily left to the jury) (quoting with approval *Manufacturing Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1040 (11th Cir. 1982) ("question of justification [for interfering with advantageous business relationships] involves a balancing of the interests of the parties and of society as well as consideration of all the circumstances including the methods and means used and the relation of the parties" and is ordinarily a jury question)).

### 3. *Breach of Contract by ADA*

TVT asserts that it was incumbent upon SNS to prove, as an essential element of its tortious interference claims, that ADA breached its contract with SNS, and that such breach was caused by TVT's interference. The Court rejects this argument at least for purposes of SNS's tortious interference with a business relationship claim.[3] Florida law

---

[3]   SNS is not entitled to any additional damages based upon the jury's finding that TVT interfered with SNS's contract with ADA. The compensatory damages awarded applied to either the contract claim or the business relationship claim. Thus, even if TVT is correct that the interference with contract claim cannot stand, the jury's alternative finding that TVT interfered with SNS's business relationship can support the

does not require that a party show an actual breach of contract occurred in order to succeed on that tortious interference claim. *Ethan Allen, Inc. v. Georgetown Manor, Inc.,* 647 So. 2d 812, 814 (Fla. 1994). SNS was required to prove the existence of a contractual or business relationship with ADA; that TVT knew of the relationship; that TVT intentionally and unjustifiably interfered with the relationship; and that SNS suffered damages as a result. *Gossard,* 723 So. 2d at 184; *KMS,* 361 F.3d at 1325. To meet these elements, SNS only had to show that the business relationship provided it with "existing or prospective legal or contractual rights." *Ethan Allen,* 647 So. 2d at 814 (quoting *Register v. Pierce,* 530 So. 2d 990, 993 (Fla. 1st DCA 1988)).

The Court finds that the great weight of the evidence supported the jury's findings that each of these elements was met. This is not a case where SNS had some anticipation that it could locate future customers to purchase its Pitbull album. To the contrary, by the date the C&D letters were distributed, SNS had already marketed the album, arranged for its distributors to distribute the album, and established a customer base that would purchase the album, at least at the wholesale level. This evidence was sufficient with which the jury could find that business relationships had already been established and that SNS had a reasonable basis to expect that it could market its album based upon those existing arrangements. *See Ethan Allen,* 647 So. 2d at 815 (citing *Charles Wallace Co. v. Alternative Copier Concepts, Inc.,* 583 So. 2d 396, 397 (Fla. 2d DCA 1991) ("an action for intentional interference . . . will lie if the parties' understanding would have been completed if the defendant had not interfered."); *United Yacht Brokers v. Gillespie,* 377 So. 2d 668 (Fla. 1979) (claim for tortious interference can be maintained even though business relationship is based on a contract which is void and unenforceable)).

---

compensatory and punitive damages awards.

### 4.   *Causation*

TVT contends that SNS failed to prove that its March 28th C&D letters caused ADA to stop distribution of the 305 Album.  TVT attempted to show at trial that ADA stopped distribution of the album not as a result of the C&D letters, but only after Warner Music Group's in-house counsel and ADA's outside trademark counsel conducted a thorough investigation into the bases for and validity of TVT's Counterclaim against SNS.  For instance, in support of this argument TVT presented as Defendant's Exhibit 138 an email from ADA's president, Andy Allen, in which he explained that ADA would not release the 305 Album "given the current litigation in connection with the Pitbull album and the nature of TVT's claims in connection therewith."

The Court finds a great deal of compelling evidence was presented to the jury to support its finding that ADA stopped distribution as a result of the C&D letter.  Rick Joseph, Ted Lucas and Julian Boothe testified that ADA was obligated to release the 305 Album under the terms of its written agreement with SNS and that it did not do so as a result of the C&D letters sent by TVT.  By way of the deposition testimony of Michael Black, ADA's corporate representative, the jury heard there were several reasons for ADA's decision not to distribute the 305 Album, all directly stemming from TVT's C&D letter. SNS also presented evidence that the C&D letters caused 95% of ADA's accounts to not buy the 305 Album.  Ted Lucas testified that on 30 prior albums released by SNS, every one of the 85 retailers purchased each of SNS's records.  However, none of the recipients of the C&D letter purchased the 305 Album; the sole purchaser was an entity that did not receive a copy of the C&D letter.

Furthermore, the Court instructed the jury properly that it had to find that TVT's C&D letters were the cause of SNS's damages through a natural and continuous sequence.  *Gossard,* 723 So. 2d at 184 (citing Restatement (Second) of Torts § 766 (1979)).

Had the jury found that other events intervened to break that chain, the jury was instructed to find for TVT. Instead, however, the jury found that SNS had proved that the effects of the C&D letters were continuous and led directly to the refusal of SNS's distributors to market or distribute the album any further.

Accordingly, the jury was permitted to draw the logical inference from all this evidence that TVT's C&D letter was the primary cause of ADA's refusal to distribute SNS's album. The jury considered, and rejected, TVT's argument that reasons other than the C&D letters caused the distribution of the album to fail. Importantly, TVT did not depose or call as witnesses anyone who squarely rebutted the deposition testimony of ADA's representative Michael Black.

TVT blurs over that fact and simply claims that Black lacked competent personal knowledge to testify in a manner that was contrary to DX 138 – the Andy Allen email. Yet, TVT forgets that ADA named Black as their corporate representative on the issues relevant to this litigation. His deposition testimony, therefore, is not simply as some incidental witness. For purposes of this case, he *was* ADA. *See, e.g., Stone v. Morton Int'l, Inc.,* 170 F.R.D. 498, 500 (D. Utah. 1997) (statements by the designated representative of a corporation are treated as a statement of the corporation); *Sprint Comms. Co. LP v. Theglobe.com, Inc.,* 236 F.R.D. 524 (D. Kan. 2006) (same); *United States v. M&T Mortgage Corp.,* 235 F.R.D. 11, 22 (D.D.C. 2006) ("the agents' testimony is generally admissible as a statement of the corporation.").

Moreover, although TVT highlighted in its motion statements that Black made in his deposition that could discount the strength of his testimony, TVT ignored other statements Black testified to that greatly supported SNS's version of events. Black testified that there were several reasons for ADA's decision not to distribute the "Welcome to the 305" album. (Black Dep. at 238). These reasons centered around the problems

created by the 90 Cease and Desist Letters sent by TVT to 95% of ADA's customers.  (*Id.* at 238).  ADA's customers ("the Accounts") failed to buy the album because of TVT's threats to sue them.  (*Id.* at 241).  TVT's Cease and Desist Letters "hurt the market" for the "Welcome to the 305" album such that it made no economic sense for ADA to distribute the album.  (*Id.* at 225).  He also testified that ADA believed that if it released the album, it would be sued by TVT.  (*Id.* at 262-263).  Like its Accounts, ADA took TVT's threats very seriously because TVT had a industry-wide reputation for being litigious. (*Id.* at 264).

Likewise, ADA did not distribute the 305 album for digital downloads because of the 90 Cease and Desist Letters (*Id.* at 348).  The Cease and Desist Letters sent to the Accounts also negatively affected SNS's overall business relationship with ADA.  (*Id.* at 363-364).  Finally, Mr. Black testified that ADA's four biggest accounts (Anderson, AEC, Transworld & Tower Records) did not buy any "Welcome to the 305" albums after they received the Cease and Desist Letters from TVT.  (*Id.* at 225).

In short, TVT's inferences from ADA's testimony starkly contrast with the inferences that SNS draws from that testimony.  That is a "fact issue."  Fact issues are for the jury, not the Court, to determine.  And, significantly, nothing stopped TVT from timely deposing and/or calling as a witness someone else from ADA, like Andy Allen, who would rebut ADA's own corporate representative's testimony.  That could have been done.  But TVT failed to do so.  TVT, therefore, is stuck with the record that we have in this case.  That record presents a compelling factual dispute that supports either side's case.

The Court finds that a great deal of evidence supported the jury's verdict in favor of SNS's side of the case.  That case is simply stated.  The Cease and Desist letters hurt SNS's relationship with ADA, soured ADA on the idea of distributing this album, "hurt the market" even if ADA had wanted to distribute the album, and forever poisoned SNS's

ability to release the album.  These were all directly and proximately caused by TVT's tortious interference.  *See, e.g., St. John's River Water Mgmt. Dist. v. Fernberg Geological Svs., Inc.,* 784 So. 2d 500, 505 (Fla. 5th DCA 2001) ("'Induce' means to cause on party 'to choose one course of conduct over another. . . . The inducement may be by persuasion or intimidation so long as the party induced is free to choose one course over another if he or she is willing to suffer the consequences.  The term 'otherwise causing' refers to the situation where the party is left no choice because he or she is rendered incapable of carrying on the business relationship.").

Moreover, the jury could also find that SNS had proved its burden of demonstrating causation based on SNS's fourteen-year track record of successfully creating and marketing hip-hop albums with gold and platinum selling artists Trick Daddy, Trina and Rick Ross.  In this regard, SNS presented compelling testimony from Booth and Lucas that: 1) SNS had made susbstantial efforts in creating, marketing and promoting the 'Welcome to the 305" album prior to its release date; 2) there were no contingencies that would have prevented the distribution of the album by ADA; 3) but for the interference by TVT, the album would have been distributed by ADA to the Accounts, some of which had placed more than 100,000 preorders; and 4) except for an account named AFFESS (a distributor of records for the armed services) no Account submitted an order for the album after receiving the cease and desist letter.

For these reasons, the jury's causation finding was adequately supported by ample evidence in the record.  There is no basis to upset that finding or grant TVT a new trial under Rule 59.

### C.    *Compensatory Damage Award*

TVT argues that the great weight of the evidence shows that SNS did not prove to a reasonable degree of certainty that SNS sustained $2,227,200 in compensatory

damages.  TVT therefore concludes that the award must have been the product of speculation and conjecture, lacked evidentiary foundation, and was otherwise excessive. There is no dispute that the jury's compensatory damage award was based upon the lost profit calculation the jury made pursuant to SNS's expert testimony.  SNS presented at trial additional evidence of out-of-pocket damages that it suffered due to the failure to market and distribute the SNS Pitbull album, but the jury's verdict appears to reflect a lost profit calculation instead, which is consistent with SNS's primary argument for damages at trial.

In this diversity case, Florida law determines whether a jury award is excessive, while federal law governs the procedural question of whether a new trial is warranted if the damages are found to be excessive.  *Roboserve, Ltd. v. Tom's Foods, Inc.,* 940 F.2d 1441, 1446 (11th Cir. 1991); *Hipp v. Liberty Nat. Life Ins. Co.*, 65 F. Supp. 2d 1314, 1344 (M.D. Fla. 1999).  A jury award is not excessive if it is not "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate."  *Bould v. Touchette*, 349 So.2d 1181, 1186 (Fla. 1977).  In other words:

> Although a verdict may be for considerably more or less than in the judgment of the court it ought to have been, still the court should decline to interfere, unless the amount is so great or small as to indicate that the jury must have found it while under the influence of passion, prejudice, or gross mistake.  In order to shock the sense of justice of the judicial mind the verdict must be so excessive or so inadequate so as to at least imply an inference that the verdict evinces or carries an implication of passion or prejudice, corruption, partiality, improper influences, or the like.

*Hipp*, 65 F. Supp. 2d at 1344.

TVT cites *Alphamed Pharms. Corp. v. Arriva Pharms. Inc.*, 432 F. Supp. 2d 1319, 1339 (S.D. Fla. 2006), for the general rule in Florida that "anticipated profits of a commercial business are too speculative and dependent upon changing circumstances to warrant a judgment for their loss."  However, as TVT acknowledges, this rule is not

absolute:  a plaintiff may obtain a damage award for lost profits "by presenting sufficient evidence 'to determine damages for lost profits with a reasonable degree of certainty, rather than by means of speculation and conjecture.'"  *Id.*

Recently, in *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1213-16 (11th Cir. 2006), the Eleventh Circuit addressed the issue of proving lost profits in Florida. "Florida courts have often noted that proving lost profits damages is difficult, but [it is] by no means impossible."  *Id.* at 1213.  To prove lost profits, a party must show "1) that the defendant's action caused the damage and 2) there is some standard by which the amount of damages may be adequately determined."  *Id.* at 1214 (citing *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348, 1350-51 (Fla. 1989) ("if there is a 'yardstick' by which prospective profits can be measured, they will be allowed if proven")); *see also Quantum Communications Corp. v. Star Broad., Inc.*, 491 F. Supp. 2d 1123, 1130 (S.D. Fla. 2007) (same); *Alphamed*, 432 F. Supp. 2d at 1340 (same); *Montage Group, Ltd. v. Athle-Tech Computer Systems, Inc.*, 889 So. 2d 180, 195 (Fla. 2d DCA 2004) (to recover lost profits, a business must prove that the defendant's action caused the damage and that there is some standard or "yardstick" by which the amount of damages may be adequately determined); *In re Jet 1 Center, Inc.*, 335 B.R. 771, 788 (M.D. Fla. 2005) ("Uncertainty as to the amount of damages or difficulty in proving the damages will not prevent recovery if it is clear that substantial damages were suffered as a result of the wrong.").

The burden of proof is more rigorous with respect to the *fact* of damage than to the *amount* of damage.  A plaintiff must show to a reasonable degree of certainty that some damage occurred, while a "relaxed burden of proof [applies] to ascertainment of the *amount* of damage."  *Alphamed*, 432 F. Supp. 2d at 1342 (emphasis in original).  Years ago, in *Story Parchment Co. v. Patterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931),

the Supreme Court distinguished between the burdens of proof necessary to recover lost profits:

> [T]here is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount.  The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.

In *Alphamed*, Judge Altonaga set aside the jury's award of lost profits because Alphamed, a new bio-pharmaceutical company, had failed to prove to a reasonable certainty that it would have earned a profit (of some amount) from the sale of a new unapproved drug but for the defendant's conduct.  432 F. Supp. 2d at 1344.  Judge Altonaga noted that only a "minuscule percentage of drugs in development ever reaches the commercial market – and of those, only a subset ever prove profitable for their manufacturer." *Id.*  Thus, a party attempting to value the prospective profitability of new pharmaceutical products must necessarily rely on a multitude of assumptions, which is inherently uncertain.  *Id.* at 1345-46.  Judge Altonaga concluded that the evidence introduced at trial in her case "demonstrated conclusively that many of [the assumptions upon which Alphamed rested its causation argument] were demonstrably false, prohibited by law or, at the very least, speculative." *Id.* at 1347.  Such assumptions could not constitute sufficient evidence to establish that the defendant's conduct caused Alphamed's alleged damages.  *Id.* at 1352.  Without proof of causation, Alphamed's lost profits award could not be sustained.  *Id.*

This case is factually distinguishable from *Alphamed*.  Here, the *fact* of damage, or causation, which was unproven in *Alphamed*, is not materially at issue.  The Court has already determined *supra* that the great weight of the evidence supports the jury's finding

that TVT caused SNS to sustain *some* lost profit damage as a result of its tortious interference.  The jury had sufficient evidence before it from SNS's own witnesses, SNS's expert witness, and even TVT's own expert, that SNS's Pitbull album would have sold to some extent in the marketplace.  No evidence was provided to the jury that SNS, given its relatively small investment to obtain the Pitbull recordings, would have lost money in marketing its Pitbull album.  The only question, frankly, was how much or how little money SNS would have made.

Once causation is proven with reasonable certainty, as has been done here, uncertainty as to the precise amount of SNS's lost profits will not defeat recovery so long as SNS presents a reasonable "yardstick" by which to estimate its damages.  As the *Nebula* court explained, citing *W.W. Gay,* 545 So. 2d at 1350-51:

> If from proximate estimates of witnesses a satisfactory conclusion can be reached, it is sufficient if there is such certainty as satisfies the mind of a prudent and impartial person.  Thus, lost profit damages are recoverable if there is some standard by which the amount of damages may be adequately determined.

454 F.3d at 1217 (internal citations omitted).  "[I]t would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts."  *Story Parchment,* 282 U.S. at 563.

Therefore, although damages may not be proven by mere speculation or guesswork, "it will be enough if the evidence shows  the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."  *Id.   Accord Alphamed*, 432 F. Supp. 2d at 1344 (a "non-speculative estimation, grounded in economic realities," would have been sufficient to justify the amount of a lost profits award, had the plaintiff been able in the first instance to prove to a reasonable certainty that it would have earned a profit of some amount but for the defendant's conduct); *In re Jet 1 Center*, 335 B.R. at 788 (inability of the party seeking damages to give the exact or precise amount of lost

profits does not preclude recovery; an award is proper if there is a reasonable basis in the evidence to support the amount); *cf. Montage Group,* 889 So.2d at 195 (award of lost profits could not be sustained where sports film editing company failed to offer any projections or estimates of the sales it might have made had it been able to enter the digital market but for digital film editing company's conduct; using digital company's sales history and gross profit margins as a "yardstick" was inappropriate given substantial dissimilarities between the two businesses, making conclusions about lost profits far too uncertain and speculative to support an award of lost profits).

Indeed, it would be incongruous and inequitable, and contrary to Florida law, were the Court to sustain the jury's finding that TVT was liable for tortiously interfering with SNS's business, yet allow TVT to avoid the consequences of its actions because SNS's damages cannot be calculated with precision.   In Florida the damages rule must be flexibly applied so as to provide fair compensation under the circumstances of the specific case.   *See, e.g., Christopher Adver. Group, Inc. v. R & B Holding Co. Inc.,* 883 So. 2d 867, 871 (Fla. 3rd DCA 2004) (law does not contemplate that damages must be calculated with mathematical exactness); *G.M. Brod & Co., Inc. v. U.S. Home Corp.,* 759 F.2d 1526, 1538 (11th Cir. 1985) (proof of damages may be indirect and based upon assumptions and estimates, as long as the assumptions rest on adequate data).

Thus, a Florida plaintiff's proof of damages will be sufficient if it provides some evidence from which the amount of damages may be satisfactorily ascertained.   Proof of the amount of damages need not conform to any particular methodology, and exact proof of the amount of damages is not required.   *Id.*   The risk of uncertainty falls to the wrongdoer, not the injured party.   *Story Parchment*, 282 U.S. at 563. "The wrongdoer is not entitled to complain that [damages] cannot be measured with the exactness and

precision that would be possible if the case, which he alone is responsible for making, were otherwise." *Id.* Additionally:

> Juries are allowed to act upon probable and inferential as well as direct and positive proof. And when, from the nature of the case, the amount of the damages can not be estimated with certainty, or only a part of them can be so estimated, we can see no objection to placing before the jury all the facts and circumstances of the case, having any tendency to show damages, or their probable amount; so as to enable them to make the most intelligible and probable estimate which the nature of the case will permit.

*Id.* at 564.

Awards of lost profits are often overturned in the entertainment industry in cases involving undeveloped products because it is difficult to determine with certainty whether the products would have eventually been successful. *See Alphamed*, 432 F. Supp. 2d at 1341 n.37 ("Some courts apply heightened scrutiny to lost profits claims from untested entertainment ventures because such claims are, by nature, subject 'to the changing whims and artistic tastes of the general public.'") (citation omitted). For instance, in *Dorchester Publ'g Co. v. Lanier*, No. 01-Civ. 8792 (DAB), 2006 WL 4388035, at *9-12 (S.D.N.Y. Mar. 19, 2006), the court determined that the amount of profits that the plaintiff lost as a result of a novelist's failure to write and deliver any of the books promised in a three-part series was entirely too speculative as a matter of law.[4] The court distinguished the facts in that case from those in *Lexington Products Ltd. v. B.D. Communications, Inc.*, 677 F.2d 251 (2d Cir. 1982). None of the books in the case before it had been written, much less sold, whereas the product in *Lexington* (a dusting brush and liquid) actually existed, had been sold on the market already, and had a track record of success.

---

[4] Similarly, in *J.B. Lippincott Co. v. Lasher*, 430 F. Supp. 993, 995 (S.D.N.Y. 1977), the court concluded that the lost profits that would have been realized on a book that had yet to be written, promoted, or published were "far too speculative to be ruled upon and is entirely rejected." *See also Hewlett v. Caplin*, 88 N.Y.S.2d 428 (N.Y. 1949) (lost profits on prospective sale of an unwritten book could not be established).

*Dorchester,* 2006 WL 4388035 at *12. That provided a reasonable foundation for the *Lexington* court to hold that "records of past sales provide a sufficiently certain basis for calculating future profits." *Id.*

Notwithstanding the difficulty of proving the precise amount of lost profits in entertainment cases, in Florida the measure is a "reasonable yardstick by which to estimate the damages." *Nebula*, 454 F.3d at 1217.  *See also ABC-Paramount Records, Inc. v. Topps Record Distrib. Co.*, 374 F.2d 455, 461-62 (5th Cir. 1967) (lost profits award was supported by evidence of, among other things, expected sales of an album recorded but not yet released or sold, which would have been promoted by a young, eager record company with several hits to its credit).

The case before this Court is distinguishable from those cases involving new businesses or undeveloped products.  The evidence of record here is that SNS is a well-established and successful recording company.  The 305 Album was in the pipeline for pressing and imminent distribution by a known distribution company.  The album was slated for distribution in April or May of 2005, less than one year after the release in August 2004 of Pitbull's debut album, M.I.A.M.I.," which had enjoyed success in the marketplace.  As discussed in more detail below, SNS's expert witness, Gregory McBowman, compared the 305 Album to the "M.I.A.M.I." and remix "M.I.A.M.I." albums, and to albums by artists in the same genre (Dirty South) that SNS previously had successfully marketed and released.  Given that the 305 Album would have been released in close temporal proximity to the release of Pitbull's successful earlier albums, and given that the 305 Album was in the same genre as other successful SNS albums, there was a track record upon which an expert could base projections of sales of the 305 Album.  That the sales history for Pitbull albums was not lengthy, or that there may have been differences in the music of Pitbull and comparable artists, goes to the weight, not

reliability, of McBowman's methodology.  The jury found, and this Court agrees, that there was a reasonable basis upon which to project future profits for the 305 Album as McBowman testified.

TVT challenges the factual basis for McBowman's methodology and argues that his sales projections for the 305 Album, which ranged from 500,000 units ("worst case" scenario) to 700,000 units ("most likely" scenario) to 1,100,000 units ("best case" scenario), were clearly outside the scope of any reasonable degree of certainty.  TVT claims these ranges were merely theoretical ranges and no methodology was given to the jury to select between them.  TVT challenges McBowman's comparison with the sales of other supposedly-comparable albums[5]; his failure to consider certain marketing expenses incurred and marketing techniques utilized with respect to the comparable albums; his failure to consider the estimates of Boothe and the ADA representative, both of whom projected lower unit sales for the 305 Album than McBowman did; and his calculation of profits which failed to include numerous line items for expenses including marketing and promotion expenses, advertising, and royalties.

Again, the Court concludes that these are issues that go to the weight of McBowman's testimony, not to its legal admissibility or reliability.  TVT identifies what it perceives as deficiencies in McBowman's testimony, but those were matters for the jury to consider.  To estimate SNS's lost profits, McBowman compared sales of eight other

---

[5]     TVT claims that McBowman's "inability" to make a sales projection for a Trick Daddy album that had been released three months earlier was evidence that this expert was unable to project sales of the 305 Album with any reasonable degree of certainty.  *See* TVT's Mot. at 30-31.  TVT notes that despite McBowman's being provided with twelve weeks of complete actual sales data (data not available to him with respect to his 305 Album projections), he stated it was still too early to project sales.  The Court agrees with SNS that McBowman's refusal to give an "off-the-cuff" projection for an album not at issue in this case, based on information provided to him during his cross-examination at trial, does not render his overall methodology and opinions too speculative and unreliable.  Rather, this information was part and parcel of the evidence that the jury could consider in evaluating McBowman's testimony and reaching its verdict.

albums marketed and released by SNS of similar genre artist, as well as the sales by TVT of two other Pitbull records, to arrive at an estimate of the likely sales of the 305 Album that SNS would have generated, taking into account both the business experience of SNS and the sales ability of Pitbull.  McBowman then calculated estimated sales of the 305 Album for "worst case," "most likely," and "best case" scenarios.  He then calculated the net profits that SNS would generate under each scenario.  Though obviously not experts, both Julian Boothe and Ted Lucas found McBowman's opinions as to projected sales plausible.  Testimony by the ADA representative suggesting that album sales would have been lower created at best a conflict in the testimony, but did not render McBowman's methodology unreliable.

McBowman testified that since the ultimate issue was the lost profits to be earned by SNS, sales generated from albums by SNS's other artists were more germane to his analysis than sales of albums by TVT or any other record label.  Despite TVT's arguments that certain marketing techniques (videos, songs, and radio spins) were more relevant, McBowman provided reasoned testimony why his opinion of SNS's track record of marketing was more relevant to his analysis.  TVT could have presented rebutting evidence directly challenging the methodology underlying McBowman's opinions, but it did not.  Instead, TVT's expert provided an alternative methodology for calculating damages in this case.  This undermines TVT's post-trial challenge to McBowman's methodology as to either admissibility or reliability.  The fact that the jury also rejected in part McBowman's profits calculations, either because it found his analysis exaggerated and/or because it agreed in part with TVT's profits expert, shows that the jury gave McBowman's testimony the weight that it reasonably deemed appropriate given the facts of the case.  This all points against TVT's position here that a new trial is required on the compensatory damage issue.

It is also instructive to review the rulings made by Judge Marrero in the context of a challenge to lost profits calculations similar to the one made here, in *TVT Records v. Island Def Jam Music Group*, 279 F.Supp.2d 366, 387-390 (S.D.N.Y. 2003), *rev'd on other grounds*, 412 F.3d 82, 88 n.3 (2d Cir. 2005) (reversing judgment because TVT's tortious interference and fraudulent concealment claims lacked a legally sufficient evidentiary basis and because TVT was not entitled to assert as a matter of law a copyright claim; court expressly declined to reach the issue of the damages awarded on those claims).  The losing party in that case, Island Def Jam Music Group ("IDJ"), challenged the reliability of profit projections made by TVT's expert, and attempted to cast the album project at issue in that case as a "new business enterprise" which required greater precision in the calculation of lost profits than was demonstrated to the jury.  *Id.*  Judge Marrero discussed New York law on lost profits as interpreted by the Second Circuit:

> The Circuit Court's explanation reflects the view articulated by the New York Court of Appeals that "[d]amages resulting from the loss of future profits are often an approximation.  The law does not require that they be determined with mathematical precision.  It requires only that damages be capable of measurement based upon known reliable factors without undue speculation."

*Id.* at 388 (internal citations omitted).  Judge Marrero proceeded to note that, although in the Second Circuit a stricter standard of showing lost profits was imposed for new businesses,

> the test remains the same, i.e., whether future profits can be calculated with reasonable certainty . . . . [T]he new business rule is not a per se rule forbidding the award of lost profits damages to new business, but rather an evidentiary rule that creates a higher level of proof needed to achieve reasonable certainty as to the amount of damages.

*Id.* (internal citations omitted).

As shown above, this test adopted in New York is materially the same as the one utilized in Florida.  Courts in both states recognize the difficulty in proving the amount

of lost profits with exactitude and embrace the prevailing view that even though damages may not be susceptible of precise calculation, doubts should be resolved against the wrongdoer.

Applying this analysis, Judge Marrero concluded that the expert's opinions about the future market performance of the album at issue in the case were reliable. *Id.* at 388-90. The expert's projections were based on the past market performance of solo albums by two of the three members of CMC, the band whose album TVT was trying to release, and the fact that TVT had a lengthy track record of successful album releases in various genres, as well as some experience exploiting urban or hip hop albums (the genre of the album at issue in the case). As the Judge explained:

> [W]hatever the distinction between CMC, a trio including Ja Rule, and Ja Rule as a solo artist, and its implications regarding the extent to which Ja Rule's solo performance (and [Ja Rule's producer] Gotti's involvement) can predict the market performance of the group are *factual and credibility matters within the province of the jury* that the Court cannot reassess in connection with Rule 50(b) motions.

*Id.* at 390 (emphasis supplied). Judge Marrero concluded that the profits award, which was "consistent with, and indeed arguably conservative in light of" the record evidence regarding market performance, was supported by the record and not unduly speculative. *Id.* at 389-90.

The same reasoning applies here, and this Court reaches the same conclusion about McBowman's projections of lost profits in this case. The strengths and weaknesses in his opinions were for the jury to evaluate. McBowman was subjected to rigorous cross-examination. TVT did not present evidence that specifically contradicted his methodology. TVT's music industry economist, Barry Massarsky, presented an alternative estimate of lost profits based on his comparison of sales of "old" and "new' albums, in an amount of $29,000.00, but his opinion did not specifically rebut McBowman's methodology. TVT is,

in essence, asking the Court to reweigh the evidence on lost profits that was presented to the jury through the two sides' experts. *Id.* at 387 (defendant's arguments addressed the evidentiary weight, not sufficiency, and were therefore beyond the purview of the court on post-trial motions).   It is the province of the jury to weigh the evidence, assess credibility, and consider conflicting expert testimony. *J & H Auto Trim Co., Inc. v. Bellefonte Ins. Co.*, 677  F.2d 1365, 1373 n.12 (11th Cir. 1982) ("The very essence of [the jury's] function is to select from among conflicting inferences and conclusions that which it considers most reasonable.  That conclusion . . . cannot be ignored.").

The jury had before it the two experts' methodologies for calculating lost profits. The jury was properly instructed, without objection from TVT, as to SNS's burden on proving lost profits and the manner in which lost profits are calculated under the law. It is fair to say that the jury conducted its own analysis of the evidence on damages. Exhibit P-13A is a schedule that was made a part of the record at trial and contains in table form McBowman's estimate of the damages SNS sustained as a result of the 305 Album not being released and sold.  McBowman predicted damages in the amount of $8,183,003 (best case scenario); $5,162,396 (most likely scenario), and $3,597,577 (worst case scenario).  The jury's compensatory damages award of $2,227,200 was less than that projected by McBowman under the worst case scenario.  Obviously the Court cannot say which costs the jury deducted, but it is clear from the amount of the damages award that this jury did not blindly accept McBowman's (or Massarsky's) testimony.  Rather, the jury carefully weighed the evidence and reached an independent conclusion as to damages based on all the evidence before it.  Based on this record, and absent evidence to the contrary, the Court presumes the jury followed the Court's instructions. *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F3d 557, 569 (7th Cir. 2003) ("Even if we cannot know for certain which pieces of evidence the jury relied on in making each of its

calculations, the instructions were proper as a matter of law and we must assume that the jury followed them."). The Court finds the weight of the evidence supports the jury's compensatory damages award. There is no basis here on which to grant TVT's request for a new trial.

TVT also argues that the great weight of the evidence shows that SNS failed to mitigate its damages. TVT had the burden of showing at trial that SNS breached its duty to mitigate its damages if it were reasonably able to do so. *Messer v. E.F. Hutton & Co.*, 833 F.2d 909, 921 (11th Cir. 1987) ("It is well established under Florida law that a party cannot recover damages he could have prevented through the exercise of reasonable care and diligence."). SNS presented evidence explaining why the offers to which TVT refers were commercially unreasonable and unaccountable. The jury reasonably could have concluded from this evidence that once ADA was no longer willing to distribute the 305 Album, SNS had no other means of distributing it so as to mitigate damages. A new trial is not warranted on this issue either.

### D.   *Punitive Damage Award*

TVT contends that SNS failed to meet its heavy burden of entitlement to punitive damages. It claims the record is devoid of any evidence of malice, or at least wanton or wilful conduct on TVT's part upon which the jury could predicate a punitive damages award. It also asserts that the amount of the award was excessive, far exceeding any possible characterization of wrongdoing, and clearly the product of the inflamed passion and prejudice of the jury.

### 1. *Finding of Liability for Punitive Damages*

In this case, the jury heard evidence that TVT understood the legal consequence of sending 90 C&D letters to ADA and its retailers.  The letters were authored by TVT's lawyer, Jacqueline Sussman, and sent at the personal direction of TVT's President, Steve Gottlieb, who also happens to be a well-educated lawyer.  At the same time TVT was interfering with SNS's release of the 305 Album, it was a plaintiff in a tortious interference case, suing a larger record company for doing essentially the same thing SNS was suing TVT for.  Thus, TVT fully understood the consequences of its interference with SNS's relationship with ADA.  The record contains evidence from which the jury could find malice, intentional disregard for SNS's legal rights, and use of improper means.  TVT ignored the opinions of Pitbull's lawyer and others and maintained it had contractual rights in 305 Album.  It asserted rights based on contracts that were not signed.  TVT used threats of litigation on claims TVT knew were unsustainable and in part due to its own reputation for litigiousness was able to convince all 85 of ADA's accounts to withhold purchasing the album.  This evidence supports a jury finding that TVT acted in a willful and egregious manner.

Faced with this evidence, the jury made two key findings of fact.  First, questions 1.a. and 1.b/2.a. and 2.b. of the Special Verdict Form reflect that the jury found that TVT was liable for tortious interference with contract and with an advantageous business relationship partly with malice and improper methods (rather than solely with malice).  Second, in question 5 of the verdict form the jury then found by clear and convincing evidence that TVT's tortious interference was a product of intentional misconduct or gross negligence (as those terms were defined for the jury in the jury instructions).  Therefore, the record reveals that the jury found that TVT had actual knowledge of the wrongfulness

of its conduct or otherwise acted so recklessly and wantonly that it consciously disregarded SNS's property rights.

These findings are clearly supported by the record. The Court properly instructed the jury (without objection) on the elevated level of proof that they had to measure the request for punitive damages. The Court's verdict form properly required the jury to specifically make the findings necessary under Florida law to award punitive damages (again without objection). Therefore, the jury's findings are factually sustainable based on the evidence and legally supportable based on Florida law. *See* Fla. Stat. §§ 768.72, 73.

The Court sees no basis on this record to grant TVT a new trial on the liability finding of the punitive damages award. The Court notes here that a jury of seven reasonable men and women concluded that TVT's conduct was based in part on malice as well as intentional or reckless conduct. That factual finding was based largely on TVT's own witnesses (especially Steve Gottlieb) and that of third-party witnesses who testified forcefully that they warned TVT well ahead of time as to the wrongfulness of its position with regard to the rights to Pitbull's recordings. TVT's principal witness, Steve Gottlieb, testified in a manner that, ironically, recreated for the jury the way in which he may have conducted himself prior to the cease and desist letters being distributed. His testimony personified the very type of "intentional" and "wanton" and "reckless" conduct that the jury was asked to find from the evidence. It came as no surprise to the Court, after Mr. Gottlieb testified, that the jury was prepared to find that his and his company's actions warranted punitive damages.

Clearly recognizing the effect that Mr. Gottlieb's testimony had on the jury, TVT now argues that the jury's verdict must be set aside because the jury simply disliked Mr. Gottlieb and rendered its decision based on the passion of that moment. That argument

gives this jury, wrongly, very little credit. The Court finds that it was not the jurors' dislike of Mr. Gottlieb that resulted in the verdict. Instead, it was the jury's rejection of his incredible testimony that had far more to do with the result. Mr. Gottlieb's testimony was pivotal in a case where intent, malice, and state of mind was at issue. The answers that he provided and the manner in which he provided them gave reason for the jury to discount his testimony and conclude that his claims of good faith were self-serving.

In other words, the jury was free to believe the other witnesses' testimony and reject Mr. Gottlieb's. Indeed, TVT forgets that there was a clear factual dispute between his testimony and that of his own general counsel as to what the purpose was behind the cease and desist letters. The jury had the right to discount his testimony, in part based upon the jury's personal evaluation of his credibility and good faith, and credit the deposition testimony of someone with personal knowledge of how the cease and desist letters were distributed. That is exactly what the jury's function is and why the Court carefully instructed the jury on all the appropriate standards to consider in making that evaluation. It bears repeating once again: "Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Narcisse v. Illinois Cent. Gulf R. Co.,* 620 F.2d 544, 548 (5th Cir. 1980) (quoting *Tennant v. Peoria & Pekin Union Railway Co.,* 321 U.S. 29, 35 (1944)). "[I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Boeing Co. v. Shipman,* 411 F.2d 365, 375 (5th Cir. 1969) (en banc).

TVT also argues that the jury's verdict – where it found that TVT acted only partly with malice – shows that there was no malice here sufficient to sustain a punitive award. Additionally, TVT argues that it at all times had a good faith basis to act. The record,

however, shows that the jury did find some degree of malice and that TVT also acted recklessly by engaging in improper methods to pursue whatever good faith objectives the company may have had.  Thus, the jury could have found that, even if TVT did have some good faith reason to try and prevent the sale of SNS's Pitbull album, the manner in which TVT tried to accomplish that was reckless and wanton and deserving of punitive damages.  The Court will not upset that finding, especially where the great weight of the evidence supports the jury's verdict and cuts against TVT's position.

Most importantly, we must remember that the Court's discretion to grant a new trial on the weight of the evidence is highly limited in cases, like this one, where there are hotly disputed factual issues at play.  The Eleventh Circuit has explained this rationale as follows:

> Courts fairly agree, however, that in certain situations a trial court should grant greater deference to a jury verdict.  Thus, when the trial involves simple issues, highly disputed facts, and there is an absence of "pernicious occurrences," trial courts should be considerably less inclined to disturb a jury verdict.  Accordingly, review of motions that have been granted in such cases will be more rigorous.  On the other hand, in cases involving complex issues, facts not highly disputed, and events arguably marred by error, trial courts have more freedom to evaluate independently the verdict.  *See Conway v. Chemical Leaman Tank Lines, Inc.,* [610 F.2d 360, 367 (5th Cir. 1980)]; *O'Neil v. W. R. Grace & Co.,* 410 F.2d 908, 913-14 (5th Cir. 1969); *Lind v. Schenley Industries, Inc.,* [278 F.2d 79, 90-91 (3rd Cir. 1960)]; 11 Wright and Miller, *Federal Practice and Procedure* § 2806, at 44.

*Williams v. City of Valdosta,* 689 F.2d 964, 974 (11th Cir. 1982).

The Court finds that there has been no miscarriage of justice here.  The jury's verdict is not seriously in error based upon the evidence presented.  The issues were hotly disputed and presented to the jury through able counsel on both sides.  And, there was no error, or at least no prejudicial or harmful error, that marred or tainted the jury's verdict.  Accordingly, the Court sees no basis to grant the motion for new trial with

respect to the jury's finding, based on clear and convincing evidence, that TVT is liable for punitive damages in this case.  *See also Conway v. Chemical Leaman Tank Lines, Inc.,* 610 F.2d 360, 367 (5th Cir. 1980) ("To conclude, the evidence was profuse, somewhat fragmentary, and conflicting in critical areas.  Given a jury's undoubted power to sift the evidence before it and to believe or disbelieve portions of the testimony of various witnesses (or even of the same witness) in constructing its own view of what most probably happened, this jury could have reached a number of different conclusions, all of which would have sufficient support in this evidence to be upheld. . . . Therefore, because the trial court's order, viewed in the most favorable light, holds to the contrary, it was entered in an abuse of discretion.").

### 2.   *Excessiveness of Punitive Award Under Florida Law*

We turn then to the next issue raised by TVT's motion for new trial: that the amount of the jury's punitive damage award was grossly excessive.  TVT argues that this case involves a fairly routine economic tort that does not involve the life and safety of others that may warrant punitive damages.   An award of $6.8 million far exceeds, according to TVT, the maximum award that could reasonably have been awarded in this case.

SNS's response to this argument immediately turns to an analysis of the currently stated due process test for the "the imposition of grossly excessive or arbitrary punishments on a tortfeasor":

> (1) the degree of reprehensibility of a defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 418 (2003) (citing *BMW of N. America, Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

SNS, however, failed to adequately respond to TVT's arguments that were founded, for the most part, on Florida law.  The Court must address the Florida law issues here first based upon the elementary principle that one should not reach constitutional questions unless truly necessary and only if there are no other grounds, such as state law principles, upon which an issue can be decided.  *See, e.g., Alltel Communications, Inc. v. City of Macon*, 345 F.3d 1219, 1221 (11th Cir. 2003) (citing *Santamorena v. Georgia Military Coll.,* 147 F.3d 1337, 1343 (11th Cir.1998)).

Indeed, long before the Supreme Court constitutionalized the review of punitive damage awards, courts have recognized that a new trial may be warranted by an excessive or inadequate jury award.  When it is determined that the damages awarded by a jury are excessive but the finding of liability is supported by the evidence, it is appropriate to order remittitur or a new trial limited to the issue of damages.  *See, e.g., Simon v. Shearson Lehman Bros., Inc.,* 895 F.2d 1304, 1310 (11th Cir. 1990); *Wilson v. Taylor,* 733 F.2d 1539, 1549–50 (11th Cir. 1984), *overruled on other grounds, Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701 (1989).  A plaintiff, of course, may always choose a new trial over remittitur.  *See* U.S. Const. amend. VII; *Johansen v. Combustion Eng'g, Inc.,* 170 F.3d 1320, 1329 (11th Cir. 1999) ("[N]o judgment for a remittitur may be entered without the plaintiff's consent because the Seventh Amendment prohibits the court from substituting its judgment for that of the jury's regarding any issue of fact.").  The decision whether to grant a new trial or remittitur on the grounds of excessive damages is a matter within the sound discretion of the district court.  *E.g., Middlebrooks v. Hillcrest Foods, Inc.,* 256 F.3d 1241, 1249 (11th Cir. 2001); *Simon v. Shearson Lehman Bros., Inc.,* 895 F.2d at 1310.

The federal "shock the conscience" test for an excessive jury award does not apply here.  In a claim arising under state law, the court must first look to state substantive law

to determine whether the verdict is excessive.  *See Roboserve, Ltd. v. Tom's Foods, Inc.,* 940 F.2d 1441, 1446 (11th Cir.1991).  The Supreme Court affirmed that principle in *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415 (1996), where the Court held that state substantive law standards for excessive jury awards must be applied in federal court even if they have the effect of increasing judicial control over a verdict.  Therefore, this court must determine whether the jury's punitive damage award is within the confines established by Florida law, and to determine by reference to federal procedural standards, developed under Rule 59, whether a new trial or remittitur should be ordered.  *See Johansen,* 170 F.3d at 1332 n.21; *see, e.g., Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.,* 99 F.3d 587, 589 (4th Cir. 1996).

In Florida, the public policy of the state is clearly embodied in the Florida statutes addressing punitive damage awards, and specifically section 768.74(5):

> In determining whether an award is excessive or inadequate in light of the facts and circumstances presented to the trier of fact and in determining the amount, if any, that such award exceeds a reasonable range of damages or is inadequate, the court shall consider the following criteria: (a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact; (b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable; (c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture; (d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and (e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.

These criteria must be evaluated with the legislature's intent in mind, set forth in subsection (6) of this statute:

> It is the intent of the Legislature to vest the trial courts of this state with the discretionary authority to review the amounts of damages awarded by a trier of fact in light of a standard of excessiveness or inadequacy.  The Legislature recognizes that

> the reasonable actions of a jury are a fundamental precept of American jurisprudence and that such actions should be disturbed or modified with caution and discretion.  However, it is recognized that a review by the courts in accordance with the standards set forth in this section provides an additional element of soundness and logic to our judicial system and is in the best interests of the citizens of this state.

"This section did not, however, alter the 'longstanding principles' governing a trial court's deference to a jury's assessment of damages." *Aurbach v. Gallina,* 721 So. 2d 756, 758 (Fla. 4th DCA 1998).  A court should not declare a verdict excessive merely because it is higher than the amount that the court itself considers the jury should have awarded. Rather, "[t]he verdict should not be disturbed unless it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Normius v. Eckerd Corp.,* 813 So. 2d 985, 988 (Fla. 2d DCA 2002) (quoting *Bould v. Touchette,* 349 So. 2d 1181, 1184-85 (Fla.1977)).  In that event, the verdict should be "reduced to the highest amount which the jury could have properly awarded." *Rety v. Green,* 546 So. 2d 410, 420 (Fla. 3d DCA 1989) (quoting *Lassitter v. Int'l Union of Operating Eng'rs,* 349 So. 2d 622, 627 (Fla. 1977)).

The Florida Supreme Court recently reiterated these principles of Florida law:

> Florida law requires that an appellate court review a punitive damages award to make certain that the manifest weight of the evidence does not render the amount of punitive damages assessed out of all reasonable proportion to the malice, outrage, or wantonness of the tortious conduct.  Additionally, an award must be reviewed to ensure that it bears some relationship to the defendant's ability to pay and does not result in economic castigation or bankruptcy of the defendant.

*Engle v. Liggett Group, Inc.*, 945 So. 2d 1246, 1263 (Fla. 2006) (internal citations omitted).

This Court is, therefore, duty bound under Florida law to review the jury's punitive award to determine if it is either excessive or adequate.  *See Rety,* 546 So. 2d at 418 ("A jury's wide-ranging authority to determine [punitive] damages . . . is not an unbridled one

and has long been subject to limited trial court superintendence . . . to prevent so-called haywire or runaway jury verdicts from standing."). The Court's review of that award has been extensive. Not only has the Court reviewed the entire record in this case, but it too has measured the punitive award here in relation to other cases involving similar conduct. After examining published cases and other sources of information, the Court finds that a $6.8 million punitive award in a tortious interference case is likely one of the largest ever in Florida.

In comparing the award with other similar economic tort cases, whether for fraudulent misrepresentation, defamation, civil theft, theft of trade secrets, etc., the punitive award in this case ranks well above among some of the higher punitive awards (in cases where awards or verdicts were upheld). There have been substantially higher jury verdicts, of course, as any review of the jury verdict reporters would reveal. But in cases where only tortious interference cases were found to have warranted punitive damages, the court has found materially few cases where verdicts of this magnitude were ultimately upheld.

The absence of any similarly high punitive awards for tortious interference cases, at least in Florida, does not of course per se preclude this case from warranting such an award. As Florida law requires, the Court must focus instead on the particular facts and circumstances of *this* case. But the absence of any similar awards at this level certainly should give us pause, if for nothing else than to make sure that the award that is entered in this case is consistent with the public policy judgments of the elected representatives of the people of Florida. For we would be ignoring our obligation to faithfully apply Florida law and Florida policy if we shrugged our shoulders to the fact that the punitive award in this case is extraordinary – quite extraordinary. *See, e.g., Rety,* 546 So. 2d at 419 (affirming remittitur of punitive damage award under Florida law "because no libel verdict

in the state or in the country has ever been upheld which even remotely approaches the amount of compensatory and punitive damages awarded in this case.").

In one recent case, for instance, the Fifth District Court of Appeal affirmed a sizable tortious interference award involving multiple defendants. *See Winkler v. Super Vision Int'l, Inc.,* 877 So. 2d 732 (Fla. 5th DCA 2004) (unpublished disposition affirming circuit court judgment). In that case, however, the $3.4 million compensatory award (against multiple defendants) was accompanied by a $10,000,000 punitive award (cumulatively against four defendants). No defendant, however, was assessed a punitive award greater than $3,000,000. *See* 3 Fla. Jury Verd. Rptr. 1-49, 2002 WL 32128170 (Sept. 26, 2002).

In a Florida case involving a higher punitive award, the defendants in a complex economic tort and breach of contract case were assessed $1.5 million in compensatory damages and $4 million in punitive damages on a tortious interference count. *See Johnson Enterp. of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290 (11th Cir. 1998). The defendants argued in that case that, among other things, the punitive award was excessive under Florida law. The Eleventh Circuit reversed the jury's finding of liability (for reasons that clearly do not apply to this case), however, and vacated the damages award in its entirety. Thus, the Court did not review the argument that a $4 million punitive award was excessive (although the trial court upheld that amount below). *See also Chicago Title Ins. Corp. v. Magnuson,* 487 F.3d 985 (6th Cir. 2007) (vacating $32.4 million punitive award in tortious interference case because conduct in question did not rise to level required for punitive damages under Ohio law and new trial on compensatory damages was also necessary).

The oft-cited defamation case, *Rety v. Green,* is also an illustrative application of Florida punitive damage principles to a case involving a malicious intentional tort. In that case, the jury awarded $12,500,000 in compensatory damages, and $10,000,000 in

punitive damages arising from malicious defamatory statements that ruined a plaintiff's business through false claims of anti-semitism that were systematically distributed to many third parties. 546 So. 2d at 410, 417. The appellate court affirmed a remittitur of the compensatory damage award to $2.5 million, and reversed a remittitur of the punitive award to $50,000. The appellate court agreed that, given its extraordinary nature, the punitive award was properly reduced, but the amount of reduction was itself excessive. The appellate court adjusted the maximum punitive amount that could reasonably be awarded to $2.5 million – the same amount as the reduced compensatory award. *Id.* at 420-21.

Cases that follow principles similar to those that govern Florida law are also worth considering. In a very recent case from Pennsylvania, for instance, a tortious interference claim resulted in compensatory damages of $105,000 and punitive damages of $1.3 million. *See CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.,* 499 F.3d 184 (3rd Cir. 2007). On remand from a prior appeal, the trial court retried the punitive damages issue and the second jury awarded $30 million. The trial court remitted that second award to $2 million. On second appeal, the Third Circuit further reduced that award to $750,000. *Id.* at 193-94. A key factor in the Court's decision was the fact that "economic torts are 'less worthy of large punitive damages awards than torts inflicting injuries to health or safety.'" *Id.* at 191-92 (quoting *Inter Med Supplies, Ltd. v. EBI Med. Sys., Inc.,* 181 F.3d 446, 467 (3rd Cir. 1999)). *See also Zachair, Ltd. v. Driggs,* 762 A.2d 991 (Md. Ct. App. 2000) (affirming remittitur of punitive damage award for tortious interference claim under Maryland law from $5.1 million to $775,000 against two defendants, where economic tort involved and multi-million punitive award far exceeded other similar awards in jurisdiction).

The *Inter Med* case cited in *CGB* is also illustrative. In that tortious interference case, the jury awarded $48 million in compensatory damages and $100 million in punitive damages. The trial court upheld the compensatory award and remitted the punitive award to $50 million. On appeal to the Third Circuit, applying New Jersey law, the appellate court affirmed the finding of liability on tortious interference and the $48 million compensatory award. The punitive award, however, was held to be still too excessive in light of the purely economic nature of the tort and the court further reduced the award to only $1 million. 181 F.3d at 464-70. *See also International Minerals & Resources, S.A. v. Bomar Resources, Inc.,* 2001 WL 196691 (2nd Cir. Feb. 26, 2001) (affirming tortious interference judgment under New York law for $19.5 million in compensatory damages and a remitted punitive damage award of $1.5 million (reduced from $37.5 million)).

Yet another analogous case can be found in the Eastern District of Missouri where, like this one, a plaintiff's tortious interference claim went to the jury in the face of defendant's Lanham Act claims. *See Machine Maintenance & Equip. Co. v. Cooper Indus., Inc.,* 661 F. Supp. 1112 (E.D. Mo. 1987). The jury awarded $1.8 million in compensatory damages and $10 million in punitive damages to the plaintiff on the tortious interference claim. The jury rejected the defendant's Lanham Act counterclaim. The trial court affirmed the compensatory damage award that, again like this one, was based upon lost profit calculations supported by expert testimony. The court found, however, that the punitive award was excessive under Missouri law and remitted the award to only $100,000. *Id.* at 1116-18.

On the other hand, in a tortious interference case under Tennessee law a substantial $5 million punitive award was upheld in the face of $815,000 in compensatory damages. *See Cambio Health Solutions LLC v. Reardon,* 2007 WL 627834 (6th Cir. Feb. 27, 2007). The punitive award, however, was assessed against three

separate defendants, and the highest award against any single defendant was $3 million. The Sixth Circuit affirmed both liability and the damage awards in response to excessiveness arguments. *See also Australian Gold, Inc. v. Hatfield,* 436 F.3d 1228 (10th Cir. 2006) (affirming judgment that included $500,000 compensatory damages award and $3.2 million punitive award for tortious interference claims against multiple defendants under Oklahoma law; highest punitive award against a single defendant was $1 million).

What all these and other cases demonstrate is, simply, that the punitive award against a single defendant in this case is inordinately large, whether one focuses only on Florida cases or cases nationwide in the tortious interference arena. The first element required for the Court to exercise its superintendent discretion is thus met because this $6.8 million award exceeds the "maximum limit of a reasonable range within which the jury may properly operate." *Normius v. Eckerd Corp.,* 813 So. 2d at 988. The Court does not reach this conclusion lightly, for it has conferred great deference to the jury's work in this case, for the careful attention the jury paid to the evidence, and for the careful deliberation that it engaged in pursuant to the Court's instructions. And, as the preceding section demonstrates, the jury's function in cases like this is precisely to stand in the shoes of the community at large to exercise that "peculiar" discretion "as to the degree of punishment to be inflicted" based upon the circumstances of each case and "their assessment of the degree of malice, wantonness, oppression or outrage . . . from the evidence." *Winn v. Lovett Grocery,* 171 So. 214, 221-22 (Fla. 1936).

The Court's respect for and deference to the jury's decision remains. The Court does not find that this verdict was a product of undue bias, passion, or prejudice. The Court finds that the evidence supports its conclusion that TVT engaged in intentional or reckless conduct, partly with malice and through improper methods in this case. The Court also agrees that the jury's verdict did not take into account factors other than the

evidence presented in the case, nor was it based on pure speculation or conjecture. To the contrary, when one examines this verdict objectively, the facts justifying punitive damages were palpable and compelling. Thus, the first three factors found within section 768.74(5) fully support the jury's finding of liability and their determination that TVT's conduct in this matter warrants a multi-million dollar punitive award.

That said, however, by its very nature a jury sees only the trees. The jury would, indeed, violate the Court's instructions if it did otherwise. The Court, however, pursuant to Florida law, is required to see the trees as well as the forest. Florida law requires that the trial judge have *limited* discretion to review for overall reasonableness the amount of a jury's verdict before entering a legally binding judgment. *See Engle v. Liggett Group,* 945 So. 2d at 1263-65; *Rety v. Green,* 546 So. 2d at 418. That judgment must reflect a balanced verdict between "excessiveness" and "adequacy." Fla. Stat. § 768.74(6). Clearly, this verdict is adequate for the task at hand – punishing TVT and deterring all others similarly situated who would consider directly interfering with another's customers in this way.

The jury's verdict, however, is also far more than necessary to send that message. The fourth and fifth factors set forth in section 768.84(5) cut in favor of reducing the jury's verdict. They clearly require the Court to measure the degree of proportionality between the verdict and the injury suffered. The $6.8 million award cannot be deemed reasonably proportional for many of the reasons articulated in the cases discussed above. First and foremost, these cases repeatedly focus on the distinction between economic tort cases and personal injury or environmental damage cases. The Supreme Court recognized the importance of this issue in framing the due process test for punitive awards. *See State Farm v. Campbell,* 538 U.S. at 419; *BMW v. Gore,* 517 U.S. at 575. That test starts with an analysis of "the harm caused" being physical as opposed to

economic, as well as whether the conduct at issue showed a reckless disregard for the "health and safety" of others. These considerations also clearly apply under Florida law. *See, e.g., St. John v. Coisman,* 799 So. 2d 1110 (Fla. 5th DCA 2001) (ordering remittitur of $300,000 punitive award in civil rights case (in part per Fla. Stat. § 768.74) where conduct did not involve severe personal injuries or harm like rape, sexual assault, severe physical injuries, violence or long term confinement).[6]

Second, the proportionality analysis must also take into account the fact that the events giving rise to this litigation were not a continuous and systematic pattern of malicious behavior. Instead, the events here were based upon a one-time event – the planned distribution of SNS's Pitbull record and TVT's plan to stop that distribution. As malicious and wanton as that conduct was, it did not involve conduct that would continue to repeat itself and that would be dragged out over much time. Nor was the conduct here a fraudulent scheme designed to shut down SNS's business. The conduct, in other words, was serious, but not so egregious and injurious that it could justify an extraordinary punitive award for a commercial tort case. This conclusion thus supports a reduction in the jury's punitive award.

Third, a factor that the Supreme Court recognized for due process purposes also applies here under Florida's test for excessiveness; namely, whether the wrongful conduct produced a substantial or small amount of economic damages. *See State Farm v. Campbell,* 538 U.S. at 425. Obviously, if reckless conduct produces only a small amount of compensatory damages, a greater amount for punitive damages may be required to adequately send a message to the wrongdoer to refrain from that conduct again. But in

---

[6]    As further evidence of this, even in cases involving significant personal injuries or wrongful death, there are many examples where awards for non-economic or punitive damages similar to this one were remitted under Florida law. *See, e.g., Glabman v. de la Cruz,* 954 So. 2d 60 (Fla. 3d DCA 2007) (remanding for new trial or remittitur of $8 million pain and suffering award in wrongful death case).

a case, like this one, where the jury found a substantial multi-million dollar compensatory award based upon a reasonable degree of certainty, the need for an even greater punitive award is lessened. Here, the jury awarded $2.3 million in compensatory damages. The Court has upheld that award. That fact, however, clearly cuts against an even greater sum necessary for an adequate punitive award.[7]

And, fourth, the jury heard evidence in this case regarding TVT's net worth. Clearly, the jury could have – and likely did – discount the testimony of Steve Gottlieb, who testified that the company's net profits were only about $8 million. The Court should not focus on that testimony, by itself. *See Rety v. Green,* 546 So. 2d at 421. Nevertheless, there was no contrary evidence in the record and SNS conceded that TVT was not a "major" record label and was, instead, a large independent record company. These facts all demonstrate that TVT is not a multi-national billion dollar corporation that would not blink at a $6.8 million punitive award. To the contrary, the total amount of this award would likely constitute a majority of the company's profits during any one year. Thus, to a limited extent the evidence of financial worth in this record also supports a reduction in the punitive damage award. *See Engle v. Liggett Group,* 945 So. 2d at 1263-64, 1265 n.8 (punitive damages should not be so large that they result in "economic castigation" or "unlawful crippling" of defendants); *Zuckerman v. Robinson,* 846 So. 2d 1257 (Fla. 4th DCA 2003) (trial court should have remitted $200,000 punitive award that had effect of bankrupting defendant, following *Arab Termite & Pest Control of Florida v. Jenkins,* 409 So. 2d 1039 (Fla. 1982) ("Since the defendant's financial position is proper for the jury to

---

[7]    That being said, in the event that the compensatory damage award is reassessed on appeal, that may require the trial or appellate court to determine whether the punitive damage award should also be reconsidered at that time. *See* Fla. Stat. § 786.74(5); *Engle v. Liggett Group,* 945 So. 2d at 1264-65 (requiring trial court to measure punitive damages against amount of compensatory damages to assure reasonable relationship, as per *Ault v. Lohr,* 538 So. 2d 454, 456 (Fla. 1989)).

consider in imposing punitive damages, it must be considered along with the malice of the defendant's conduct in ruling on the question whether the jury's assessment is excessive in light of the manifest weight of the evidence.  Punitive damages should be painful enough to provide some retribution and deterrence, but should not be allowed to destroy the defendant.") and *Joab, Inc. v. Thrall,* 245 So. 2d 291 (Fla. 3d DCA 1971) ("In awarding punitive damages the jury may properly punish each wrongdoer by exacting from his pocketbook a sum of money which, according to his financial ability, will hurt, but not bankrupt.")).

Consequently, based upon the Court's careful consideration of all these factors, the Court is left with the firm and definite conviction that a reduction in the punitive award is warranted under section 768.74.  To counter that, SNS could rely upon the fact that the jury's punitive award was clearly intended to represent three times the amount of compensatory damages proven in the case.  SNS could also then rely upon section 768.73 as evidence that the jury's verdict fell within the parameters set by the Florida legislature because the most that could be awarded under this statute is a three-to-one ratio between compensatory and punitive damages.

The problem with that argument is that section 768.73 represents the outer limit for punitive awards under Florida law and does not supplant the analysis required of the Court under section 768.74.  The Court must read the two statutes together.  Thus, it is fair to say that the Legislature has not precluded the type of analysis discussed here when it "capped" punitive damages in section 768.73.  And section 768.73(1)(d) expressly incorporates this principle: "This subsection is not intended to prohibit an appropriate court from exercising its jurisdiction under s. 768.74 in determining the reasonableness of an award for punitive damages that is less than three times the amount of compensatory damages."  Therefore, the stated policy of the Legislature found in sections

768.73 and 768.74 is clear and unambiguous: a judge is required to balance the excessiveness and adequacy of a jury's punitive award in every case. The three-to-one cap is just one factor that the Court can consider in that analysis.[8]

Having found that the punitive award must be reduced, the question that follows is even harder – how large should that reduction be in this case? Given all the factors discussed above, the Court concludes that "the highest amount which the jury could have properly awarded" in a case like this is the entire amount of compensatory damages found in the record: $2.3 million. As the cases discussed above show, that award would still represent one of the highest punitive awards in the State of Florida, and one of the highest in the nation as a whole, against a single defendant. That award clearly falls within the upper range of punitive awards in tortious interference cases. Accordingly, the Court finds that this is the highest amount that the evidence supports in this case. *See Rety v. Green,* 546 So. 2d at 420; *Lassitter,* 349 So. 2d at 627.

This award is also consistent with the reduced punitive award upheld in *Rety v. Green* that involved facts quite analogous to those here. Defamatory statements were maliciously distributed to third parties, causing substantial compensatory damages. A $10 million punitive award, although justified on the facts, was held to be excessive under Florida law and remitted to $2.5 million – an amount that was also commensurate with the amount of damages proved in the record. 546 So. 2d at 418-22. Here, malicious

---

[8]     The same is true of SNS's argument that the $6.8 million punitive award falls within the constitutional parameters required by the due process clause, as per *State Farm v. Campbell* and *BMW v. Gore.* That particular argument is moot at this point because the Court is remitting the award under Florida law. But, for what it is worth, it is certainly possible that a 3 to 1 ratio in this case, involving intentional conduct and a finding of malice by the jury, may not be per se unconstitutional under those cases. *See infra* section D.3 (addressing whether the remitted punitive award violates due process). That the award is constitutional does not mean, however, that the Court should not exercise its discretion under Florida law to review the award for reasonableness when required by the facts and circumstances of the case.

interference by direct contact with third parties caused SNS substantial money damages and prevented SNS from reaping the financial benefits to which it was entitled. A substantial lost profit award has been entered and a remitted punitive award for that same amount adequately compensates SNS for its damages and punishes and deters TVT from engaging in that conduct in the future.

Reasonable people could conclude otherwise, of course. Some could say that a much lower award is required, while others would increase the award here. But this Court has a unique vantage point. We sat through the trial, heard the same evidence, and considered the same record. From that vantage point, we can say with some reasonable degree of assurance that any award greater than $2.3 million would be excessive, and that any materially lower award would not be sufficient to further the jury's liability findings and enforce Florida law in this case. *See Rety v. Green,* 546 So. 2d at 418 (trial judge has limited discretion to reduce jury's award as it can "consider the credibility of the witnesses along with the weight of all of the other evidence" and to enter such order "when the *manifest* weight of the evidence dictates such action.") (quoting with emphasis *Smith v. Brown,* 525 So. 2d 868, 870 (Fla. 1988)).

Accordingly, under the Seventh Amendment the Court must offer SNS the choice of a new trial or a remittitur. *See Johansen,* 170 F.3d at 1329 ("[N]o judgment for a remittitur may be entered without the plaintiff's consent because the Seventh Amendment prohibits the court from substituting its judgment for that of the jury's regarding any issue of fact."). The Court finds that it must exercise its discretion in this case and grant SNS that option of a new trial or remittitur on the grounds of excessive punitive damages, but limited *only* to the amount of punitive damages that must be awarded in this case. *See, e.g., Middlebrooks,* 256 F.3d at 1249.

### 3.   *Excessiveness of Remitted Punitive Award Under Due Process Clause*

As stated earlier, although SNS may have won the day on the argument that a $6.8 million punitive award was not constitutionally excessive, the issue that the Court must now turn to is narrower.  The pending question is whether the remitted $2.3 million award, as per Florida law, satisfies the constitutional test for excessiveness as per the due process clause of the Fourteenth Amendment.  The Court readily finds, for the reasons that follow, that the remitted award is constitutional and should not be modified any further.

Under the due process clause, punitive damages awards under state law are constitutional to punish unlawful conduct and deter its repetition.  *E.g., BMW v. Gore,* 517 U.S. at 568.  However, "[i]t should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm v. Campbell,* 538 U.S. at 419.  How one is to determine whether conduct is "so reprehensible" or to determine whether a given award is "grossly excessive" depends upon a three-pronged test adopted in *BMW v. Gore.*

The first *BMW* guidepost – the degree of reprehensibility of a defendant's misconduct – is the most important indicator of the reasonableness of a punitive damages award.  *State Farm v. Campbell,* 538 U.S. at 419; *Action Marine, Inc. v. Continental Carbon, Inc.,* 481 F.3d 1302, 1318 (11th Cir. 2007) ("Of the three guideposts, the reprehensibility of a defendant's conduct is the most relevant").  Among the factors that may be considered in determining a party's degree of reprehensibility are whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved

> repeated actions or was an isolated incident; and the harm
> was the result of intentional malice, trickery, or deceit, or
> mere accident.

*State Farm v. Campbell,* 538 U.S. at 419.

The Court took many of these factors into account in the preceding section in affirming the necessity for a substantial punitive award, as per the jury's verdict, but not to the extent necessary for an extraordinary award.  The harm caused here was purely economic against a small company that had some potential financial vulnerability.  The harm was caused by intentional and knowing conduct that was partly based on malicious purposes.  These factors point in the direction of a million dollar award in a case with two million dollars in damages.  But, the conduct here was not a repeated series of actions or a pattern of conduct designed to eliminate the competition.  It was, as stated earlier, largely a one-time event.

Whether or not the jury's original $6.8 million award satisfies this first test, it is clear that the Court's remitted award of $2.3 million takes these factors properly into account.  It reflects the need for a substantial punitive award based upon intentional and reckless conduct that is directly proportional to the harm actually caused by that conduct.  That type of award best reflects the degree of reprehensibility at issue here.

Under the second guidepost from *BMW v. Gore,* the Court must examine "the disparity between the actual or potential harm suffered by the plaintiff and punitive damages award . . . ."  517 U.S. at 581-82.  This inquiry focuses on the "ratio" between compensatory and punitive damages to assess whether a punitive award is "both reasonable and proportionate to the amount of the harm to the [plaintiffs] and the general damages recovered."  *Bogle v. McClure*, 332 F.3d 1347, 1362 (11th Cir. 2003).

In *Bogle,* for instance, a ratio of 4-to-1 was upheld under this test, but the Court emphasized that there is no way to "identify concrete constitutional limits on the ratio

between harm, or potential harm, to the plaintiff and the punitive damages award." *Id.* (quoting *Campbell*, 538 U.S. at 424); *see also Action Marine,* 481 F.3d at 1320-23 (affirming 5-to-1 ratio in case involving intentional environmental injury against multiple plaintiffs (defendant was assessed a $17.5 million punitive award as against a $3.2 million award)).

Even though there is no precise mathematical formula, the $6.8 million award originally entered in this case fell within a 3-to-1 ratio. SNS may have had a good argument that such a limited award clearly satisfied the first and second guideposts. But without question a $2.3 million punitive award in this case, when combined with a $2.3 million compensatory award, squarely falls within the constitutional line for excessiveness. While the Supreme Court in *Campbell* declined to impose a bright-line limit on punitive damage awards, it did go so far as to explain that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." 538 U.S. at 424. Moreover, it is particularly significant that the Court added: "When compensatory damages are substantial, then a lesser ratio, *perhaps only equal to compensatory damages,* can reach the outermost limit of the due process guarantee." *Id.* at 425 (emphasis added).

Here, the Court's remitted award precisely follows that principle. The compensatory damage award was substantial, properly so given the high degree of damage that TVT caused. But, at the same time, that substantial award mitigates against a punitive award that materially exceeds that same amount. The remitted award is indeed equal to the compensatory award in this case. Accordingly, under the second guidepost, and as per *BMW v. Gore* and *State Farm v. Campbell,* the Court finds that the remitted award does not violate TVT's due process rights.

Finally, the third guidepost has been held not generally applicable to civil economic tort cases like this one.  The third factor is a comparison of the award with "available civil and criminal penalties the state provides for. . . ."  *Action Marine,* 481 F.3d at 1323 (citing *BMW v. Gore,* 517 U.S. at 583).  That factor is truly not relevant to a tortious interference action in the music industry, as compared with a case involving a highly regulated industry like on involving an environmental damage case.  *See id.* at 1232-24.  Therefore, its application here is inconsequential.

In assessing those factors under the due process clause that are relevant, however, the Court is satisfied that there is no basis to reduce the remitted $2.3 million award any further under *BMW v. Gore.*  Such an award, with a 1-to-1 ratio, adequately reflects the degree of reprehensibility here and takes into account the proportionality analysis required by the Constitution as interpreted after 1991.  *See Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1 (1991).

### E. *Jury Instructions and Verdict Form*

TVT argues that the Court erred when it denied TVT's request to include proposed jury instructions on "causation," "intervening factor," and that a Counterclaim could not be the basis of a tortious interference claim.  TVT also argues that the Special Verdict Form erroneously conflicted with the Jury Instructions on the issue of malice.

Federal Rule of Civil Procedure 51(c) sets forth the procedures that must be followed in order to preserve objections to jury instructions or verdict forms.

(c) Objections.

(1)   A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds of the objection.

(2)  An objection is timely if:

(A)  a party that has been informed of an instruction or action on a request before the jury is instructed and before final jury arguments,

as provided by Rule 51(b)(1), objects at the opportunity for objection required by Rule 51(b)(2); or

(B)  a party that has not been informed of an instruction or action on a request before the time for objection provided under Rule 51(b)(2) objects promptly after learning that the instruction or request will be, or has been, given or refused.

The Eleventh Circuit has interpreted Rule 51 strictly, requiring a party to clearly object to a jury instruction or jury verdict form prior to jury deliberations in order to preserve the issue on appeal.  *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1329 (11th Cir. 1999).  A party who fails to raise an objection to a jury instruction or verdict form prior to jury deliberations waives its right to raise the issue on appeal.  *Id.* (citing *Wood v. Pres. of Spring Hill Coll.*, 978 F.2d 1214, 1221 (11th Cir. 1992)).  This ensures the trial judge has an opportunity to correct the error before the jury has begun deliberations. *Id.*

First, TVT complains that the Court erred in denying its request for a separate jury instruction that explained "causation" and included an express statement that an intervening factor, such as the filing of the Counterclaim in this case, could effectively break the chain of causation.  TVT claims that the Court's refusal to instruct the jury on intervening factor effectively eliminated its prime defense to the tortious interference claims.

By making a specific objection to the causation instruction during the charge conference, TVT preserved this issue for discussion here.  However, as the Court explained during the charge conference, the material elements of TVT's proposed instruction on causation were incorporated into the court-crafted instruction on the elements of the tortious interference claims.  Because the court-crafted causation instruction was fundamentally the same as the one proposed by TVT, TVT's proposed instruction was redundant.  The Court acknowledged that TVT had in general correctly

stated the law on causation, but noted that the proposed language did not track the standard language used in Florida cases.

The Court reaffirms its prior ruling. The Jury Instructions ultimately submitted to the jury both individually and as a whole did not misstate the law nor mislead the jury to TVT's prejudice, thus no abuse of discretion occurred. *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1543 (11th Cir. 1996) ("So long as the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed in the instructions."); *United States v. Starke*, 62 F.3d 1374, 1380 (11th Cir. 1995) (the issue is "whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled." (internal citation omitted)); *see also KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 194 Fed.Appx 591, 601 (11th Cir. 2006) ("Jury instructions must be put in context; [a trial court should] consider the allegations of the complaint, the evidence presented, and the arguments of counsel when determining whether the jury understood the issues or was misled.").

Moreover, the jury instructions on tortious interference or proximate causation are well established in Florida. The language the Court incorporated into this instruction was taken, almost verbatim, from the Florida Standard Jury Instructions or the Eleventh Circuit pattern instructions. Indeed, the Court's instruction on causation here was *identical* to the instruction given in the *KMS Rest. Corp.* case that was also challenged on appeal after a second trial. *See id.* The Eleventh Circuit held in that unpublished case that Judge Gold's instructions correctly stated the law to the jury. The same holds true here.[9]

_____

[9]    Moreover, as the record demonstrates, TVT failed to proffer *any* Florida case that incorporated the particular language that TVT requested. The best and only case it relied upon was a case based upon Mississippi law, not Florida law. The Court was correct to follow Florida cases and Florida jury instructions with how it worded the causation instruction. But, again, the language used in the Court's instruction is not

Second, TVT also claims that the Court erred in refusing to instruct the jury that the filing of the Counterclaim could not be the basis of a tortious interference claim. However, TVT never made this specific objection at any point prior to jury deliberations. Accordingly, TVT has waived the issue. *Farley*, 197 F.3d at 1329. Given TVT's failure to object, the only ground upon which it may now seek reversal of the verdict is through application of the plain error rule, to prevent a miscarriage of justice. *Id.* (reciting the four requirements for plain error, and reiterating the principle that reversal for plain error in the jury instructions or verdict form will occur only in exceptional cases where the error is so fundamental as to result in a miscarriage of justice).   Nothing of the kind has occurred here.  The Court correctly instructed the jury on the law and TVT argued to the jury that it should follow that instruction and determine that the counterclaim was an intervening cause.  The jury rejected that argument, but not because of any error in the instructions.

Third, and finally, TVT claims that the Special Verdict Form was in conflict with the Jury Instructions and improperly forced the jury to conclude that TVT acted either totally or partly with malice.  TVT posits that if the jury wanted to conclude that TVT had acted without any malice at all, the verdict form gave them no opportunity to do so.  TVT maintains the jury instead should have been asked whether or not TVT acted with any malice, and then – and only then, assuming an affirmative response – whether it acted (a) solely with malice or (b) partly with malice and used improper means.  TVT contends the Court's failure to use its proposed verdict interrogatory on malice in effect directed a

---

materially different in any event from the language proposed by TVT.  Both instructions required the jury to find the same thing – a continuous and direct connection between the interference and SNS's damages.  The jury was properly instructed and the verdict reflects that.

verdict against TVT on its privilege defense, and provided a predicate for punitive damages.

It is almost frivolous to argue that TVT did not waive this issue because it did not raise this objection before the jury retired to deliberate.  *See Farley*, 197 F.3d at 1329. It is well established that the failure to specifically object to the form of a verdict before the jury is charged constitutes a waiver of any objection to that verdict form.  *See also Golub v. G.W. Gant & Assocs., Inc.,* 863 F.2d 1516, 1521 (11th Cir. 1989) ("Thus, a challenge to the form of interrogatories can be made via a post-judgment motion only if first presented and rejected in the form of an objection to the court's charge to the jury. Because Gant made no such objection, either at the charge conference or when the judge distributed the special verdict form to the jury, it waived its right to this appeal."); *Nimnicht v. Dick Evans, Inc.,* 477 F.2d 133, 134 (5th Cir.1973) (form of jury interrogatories in a special verdict must be raised before the jury is charged or are otherwise waived); *Central Progressive Bank v. Fireman's Fund Ins. Co.,* 658 F.2d 377, 380-81 (5th Cir. Unit A Oct. 1981) ("[T]he Bank made no specific objection to [Interrogatory 3] until on motion for new trial and on appeal, thereby waiving any objection.").

Here, TVT clearly waived the issue by not raising any objection either during the charge conference or, even, during the reading of the verdict form to the jury.  At the very least, if TVT had an objection it could have raised it after the jury was charged but before they reached a verdict.  TVT failed to do so.  And, merely submitting a proposed verdict form (or jury instruction) does not constitute a preservation of the right to challenge the court's instructions unless it is clear that the proposal was specifically rejected by the court and the proposing party objected to the instruction ultimately given.  *See, e.g., Industrial Dev. Bd. v. Fuqua Indus., Inc.,* 523 F.2d 1226, 1238 (5th Cir.1975).

Even worse, the issue raised has not just been waived; it constitutes invited error. Where invited error exists, it even precludes a court from "invoking the plain error rule and reversing." *United States v. Davis,* 443 F.2d 560, 564-65 (5th Cir.1971). The Eleventh Circuit has squarely held that where a party, rather than just remaining silent and not objecting to a proposed jury instruction, responds to the court's proposal with the words "the instruction is acceptable to us," this constitutes invited error. *See, e.g., United States v. Fulford,* 267 F.3d 1241, 1247 (11th Cir. 2001).

The record reveals that the Court discussed the particular language in question with the parties and proposed verdict form sub-questions 1.b/2.b, assuming a positive finding of intentional and unjustified interference in question 1.a/2.a, as a way of assuring that there would be no inconsistent verdicts with respect to the malice v. improper methods question. [Trans. 3/12/2007 at 5-10]. When presented with the option of adding the interrogatory question asking whether the jury found an intentional and unjustified interference solely with malice, or partly with malice but through improper methods, TVT's counsel expressly agreed that this inquiry should have been made, and did not object to any of the wording proposed by the Court. Indeed, SNS arguably raised an objection, at least initially, because of the questions' redundancy with the Court's instructions on the definition of an "intentional and unjustified interference" but the Court, agreeing with TVT's counsel, insisted in retaining the interrogatory questions to assure that the record would be clear as to the factual finding the jury made. Again, TVT's counsel agreed and stated "Yes, I have no problem with that. . . . That would be appropriate." [*Id.* at 11:19-21].

To say now that the verdict form erroneously questioned the jury ignores TVT's invited error, or at the very least ignores TVT's waiver of the issue. The fact is, however, that there was no error at all for the reasons explained by the Court during the parties'

discussion of the verdict form. In order for the jury to find for SNS on question 1.a/2.a, the predicate question, it had to have found that TVT acted with malice by "intentionally and unjustifiably" interfering with SNS's contract or relationship with ADA. The Court's instructions defined that element as requiring under any circumstance that "malice is always necessary for tortious interference with business relationships." [Court Instruction at 9]. Further, the definition of "unjustifiably interfering" required the jury to find that TVT "acted solely with malice or . . . . acted only partly with malice but utilized improper methods." [*Id.*].

Thus, in order to answer the predicate question 1.a/2.a, the jury had to have found that TVT acted with some degree of malice. As TVT requested, questions 1.b/2.b then asked the jury to specifically identify whether that finding was "solely with malice" or only "partly with malice." The jury's verdict unambiguously reflects that the jury found that TVT did not act solely with malice, but instead acted partly with malice as well as through improper methods. TVT is quite wrong when it says that the verdict form required the jury to find malice and provided it no alternative, had the jury intended to find that TVT did not have any malice. Had that been the case, the jury simply had to answer "NO" to the predicate question of unjustified interference because "malice" is "always necessary" for the jury to make that finding. The jury, however, answered that question "YES" and, thus, there is no doubt that the jury, based upon its own deliberation, found that TVT acted with malice.

Finally, even if the language of the verdict form was erroneous and not invited error, TVT fails to show how the language used constitutes plain error. The jury would not have awarded SNS $6.8 million in punitive damages had the jury actually believed that TVT had not engaged in malicious conduct. For TVT to argue that the jury might have actually thought otherwise is patently silly. In any event, the Special Verdict Form

did not misstate the law nor mislead the jury to TVT's prejudice, and no abuse of discretion occurred.  *See Bateman*, 79 F.3d at 1543.

### F.   *Evidentiary Rulings*

#### 1.   *Testimony about Events Occurring after March 28, 2005*

TVT asserts that the jury verdict was the product of inflammatory evidence relating to events that occurred *after* March 28, 2005, the date the C&D letters were sent.  TVT contends those events were irrelevant to the jury's determination of TVT's alleged malicious intent at the time it sent the C&D letters, because it was the state of TVT's mind at the time the letters were sent that was the relevant inquiry.   Thus, TVT complains, evidence of the following post-March 28th events should not have been admitted:

a)      its April 28, 2005 trademark application, and the subsequent denial of that application by the USPTO;

b)      a letter from Pitbull's lawyer, Nicole Page, dated June 29, 2005, objecting to the filing of the trademark application;

c)      testimony by Alan Levine accusing TVT's president, Steve Gottlieb, of attempting to induce him to give false testimony in this case long after this lawsuit was filed; and

d)      Ted Lucas's testimony that following commencement of this case, Gottlieb threatened to take his master recordings from him.

The Court finds that the aforementioned evidence was relevant to the claims raised and/or the defenses asserted during the course of trial, either on the tortious interference claim and/or TVT's own trademark infringement claim.   Additionally, TVT failed to contemporaneously object to much of this testimony and so waived any claim of error in its admission.   TVT's trademark application, the USPTO's denial of the same, and the

letter from Pitbull's lawyer regarding TVT's trademark application, were relevant to rebut TVT's assertion that it owned protectible rights in the logo and was acting in good faith when it sent the C&D letters.

With regard to Levine's testimony about Gottlieb's alleged extortion attempt, as SNS correctly points out, TVT raised only technical objections to Levine's testimony (form and relevancy) on direct examination.   When asked at a break about this line of questioning, counsel for TVT indicated to the Court that his only objection was to testimony regarding specific disputes between TVT and the Diaz Brothers, not to the substantive questions about Gottlieb's alleged extortion attempt.  Similarly, TVT did not object when Lucas discussed Gottlieb's threat to take Pitbull's recordings, and even cross-examined Lucas on this subject.  As no timely objection or motion to strike was made to this testimony, TVT waived any claim of error in its admission.   In any event, this testimony was relevant for the same reasons that the jury was permitted to hear about TVT's quest for trademark protection from the USPTO.

### 2. *In Limine Motions*

TVT claims that the Court erred in ruling on three motions *in limine* which resulted in manifest injustice to it.

a)    TVT sought to preclude testimony about the validity of the TVT recording agreement.  However, TVT argued it held superior rights to Pitbull's recordings by virtue of this recording agreement, making its interference in SNS's relationship with ADA privileged.  Because TVT relied on the agreement as the basis for its counterclaim and as an affirmative defense, the interpretation and validity of the agreement was placed in issue and was relevant in this case.  The Court upholds its prior ruling on this motion.

b)    TVT complains that the Court erred in denying its *Daubert* motion as to SNS's damages expert, Gregory McBowman.  TVT contended that McBowman was not

qualified to opine on projected lost record sales, and second, that projected sales of new record releases cannot be determined with any precision, making McBowman's testimony unreliable and speculative. The Court stands by its earlier ruling for the same reasons previously stated and based on the persuasive reasoning of *TVT Records v. Island Def Jam Music Group*, 250 F. Supp. 2d 341, 349-51 (S.D.N.Y. 2003). *See* Omnibus Order on Pre-Trial Motions [D.E. 398] at 10.

c)      TVT also complains that the Court erred in granting SNS's motion to exclude evidence of 305 Music, Inc.'s ("305 Music") entitlement to proceeds of the lawsuit. TVT argues this evidence showed that SNS itself suffered no damages, which TVT claims is an essential element of SNS's claim (entitlement to damages, as opposed to simply the amount of damages). However, SNS, Julian Boothe, and 305 filed declarations in this case and gave unrebutted testimony confirming that all rights to prosecute this claim belong to SNS, and that Boothe and 305 merely have a claim to recover from SNS a portion of the proceeds that SNS may be awarded. The Court upholds its prior ruling on this motion on the grounds that this issue was irrelevant to TVT's defenses and would unnecessarily confuse the jury. *Id.* at 4.

**G.      *Trial Conduct***

First, consistent with its ruling on SNS's motion *in limine* on evidence related to the distribution of proceeds from the 305 Album to Julian Boothe and/or 305 Music [D.E. 398 at 4], the Court excluded the April 4, 2005 letter from Ted Lucas to Alan Waserstein, which TVT alleges confirmed that 305 Music was the real "primary litigant" in this action, and that it, and not SNS, controlled all offers of settlement and decisions regarding the litigation. This evidence was irrelevant in light of the evidence that 305 Music and SNS acknowledged and agreed that SNS was the real party in interest and it would prosecute

the case on their collective behalf.  It would have been prejudicial and unduly confusing to the jury to argue otherwise in light of the unrebutted testimony.

Second, TVT complains that numerous fact witnesses were permitted to opine as to the meaning and interpretation of the contracts at issue in this case - questions of law for the Court, TVT argues, not for SNS's lawyer witnesses.  TVT also points out that these witnesses were not designated as experts on music industry contracts.  However, TVT did not object to much of the testimony these lawyer-witnesses gave on the topic of the contracts in this case.  These witnesses were listed on SNS's pretrial witness list and were deposed before trial, so TVT knew the substance of their testimony.  Having failed to object, TVT cannot now complain about their testimony.  Moreover, TVT can hardly be heard to complain about such an issue since its key witness, Steve Gottlieb, testified at length as to his interpretation of the parties' contracts and the law.  The admission of such testimony did not unduly confuse the jury in this case in any event.

Third, TVT complains that the Court arbitrarily cut off its cross-examination of Ted Lucas, advising the examining lawyer after approximately two hours and fifteen minutes that he only had thirty more minutes in which to conclude his cross.  This allegedly caused extreme prejudice to TVT by unfairly hindering its ability to present its case to the jury.  However, the Court limited TVT's examination of Lucas because he had little knowledge of the facts and circumstances regarding Pitbull's master recordings, one of the primary issues in the case, and the cross-examination was greatly exceeding the limited nature of the direct examination.  In particular, TVT has not proffered exactly what information it was prevented from eliciting from Lucas on cross-examination.

Moreover, had the information been crucial to its case, TVT could have called Lucas in its case-in-chief, but it elected not to do so.  SNS notes that its direct examination of Lucas lasted one hour as compared to TVT's three-hour cross-examination.  Meanwhile,

SNS points out that TVT was permitted to cross-examine Boothe, who factors significantly in this case, the entire day. Clearly, the extent of permissible cross-examination is within the sound discretion of this Court. *E.g., United States v. Matthews*, 168 F.3d 1234, 1244 (11th Cir.) ("Limitations on the scope and extent of cross-examination are matters expressly committed to the sound discretion of the trial judge . . . ."), *amended on other grounds*, 181 F.3d 1205 (11th Cir. 1999). No abuse occurred here.

Indeed, the Court finds that both sides were able to present their cases in the manner in which they wanted with little interference from the Court. Moreover, the Court finds that both parties' counsel adequately and forcefully presented their clients' arguments to the jury. The trial was fair in every material respect.

### H. *False Advertising and Trademark Infringement Counterclaims*

TVT, finally, contends that the jury findings that it failed to prove its false advertising and trademark infringement claims are against the clear weight of the evidence. The Court readily upholds the ruling it made at the close of the evidence, on the basis that the jury heard ample evidence to support SNS's defenses that TVT did not have standing to assert a trademark infringement claim with regard to the stylized version of Pitbull's mark and that TVT failed to present any necessary evidence of consumer confusion.

In support of SNS's position that TVT lacked a protectible interest in the "Pitbull" mark, Angela Martinez, Pitbull's lawyer, and other witnesses testified that TVT did not acquire any protectible legal rights in the "Pitbull" mark based on the executed contracts between Pitbull, DBMG and TVT. Martinez testified that Pitbull filed and obtained a registration of the mark with the USPTO, and that Pitbull hired a trademark lawyer who sent a letter to TVT to oppose TVT's claimed interest in the Pitbull mark. The foregoing witnesses, along with TVT's expert Elliot Goldman, testified that in the music industry,

it is the artist (Pitbull) and not the record company (TVT) that owns and controls the artist's performing name.  This evidence clearly supported the jury's rejection of TVT's counterclaims.

### III.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED and ADJUDGED**:

1.      Defendant Teevee Toons, Inc.'s Motion for a New Trial or Remittitur [**D.E. 452**] is **GRANTED in part and DENIED in part**.

a.      With the exception of the amount of the punitive damages award, TVT's motion for new trial or remittitur is **DENIED.**

b.      TVT's motion for new trial or remittitur with regard to the amount of the punitive damages award is **GRANTED.**  The Court will order a remittitur of the punitive award from $6,837,600.00 to $2,300,000.00 or, otherwise, conduct a new trial to determine the amount of punitive damages that must be awarded in this case.  Plaintiff Slip-N-Slide Records, Inc. shall file with the Court a statement within five (5) business days of the date of this Order as to which of these two options it will elect.  An amended judgment shall then be entered at that time.  If Plaintiff desires additional time to consider the remittitur issue, it may file a motion to that effect, but the Court will not issue an amended judgment or modify the Court's pending stay of execution of the judgment until that time.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 31st day of October, 2007.

EDWIN G. TORRES
United States Magistrate Judge