**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 05-CIV-21113-TORRES

SLIP-N-SLIDE RECORDS, INC.,

               Plaintiff,

v.

TVT RECORDS, LLC,

               Defendant.

_____/

TEEVEE TOONS, INC.

               Counterclaimant,

v.

SLIP-N-SLIDE RECORDS, INC., *et al,*

               Counter-Defendants.

_____/

## ORDER ON TVT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

This matter is before the Court on Defendant TVT's Rule 50(b) Motion for Judgment as a Matter of Law [D.E. 453]. Upon review of the Motion, Plaintiff's Response, and TVT's Reply in Support, this matter is ripe for disposition. For the reasons that follow, TVT's Motion must be Denied.

### I.  BACKGROUND

Plaintiff's Slip-n-Slide ("SNS") sued TVT for tortious interference, declaratory relief, and temporary and permanent injunctive relief in connection with the sale, marketing, and distribution of an album entitled "Welcome to the 305" ("305 Album") that contained musical recordings by rap artist Armando Perez ("Perez"), known professionally as

"Pitbull," that were originally owned by music producer Julian Boothe ("Boothe"). TVT counterclaimed against SNS, Rudebwoy Entertainment ("Rudebwoy"), 305 Music ("305 Music"), and individuals Allen Waserstein ("Waserstein"), Robert Henderson ("Henderson"), and Theodore Lucas ("Lucas") for trademark infringement and Lanham Act claims under 15 U.S.C. 1125(a) in connection with TVT's "Pitbull" mark and logo.

After a two-week jury trial, the jury returned a verdict for SNS on the tortious interference claims. *See* Special Verdict Form [D.E. 430]. Specifically, the jury determined that:

- TVT intentionally and unjustifiably interfered with SNS's contract with Alternative Distribution Alliance, Inc. ("ADA") that was known to TVT, and TVT intentionally and unjustifiably interfered with SNS's business relationship with ADA and ADA's retailers;

- TVT acted partly out of malice and also through improper methods;

- TVT's interference was the cause of damages to SNS;

- SNS suffered compensatory damages in the gross amount of $2,279,200.00;

- SNS did not fail to mitigate damages;

- TVT engaged in intentional misconduct or gross negligence in interfering with SNS's contract with ADA or with SNS's business relationships with ADA and ADA's retailers; and

- a total amount of $6,837,600.00 in punitive damages was awarded to SNS against TVT.

TVT's pending Motion raises only three issues upon which the Court can grant judgment to TVT as a matter of law on SNS's claims for tortious interference. First, SNS lacked standing to assert its tortious interference claims because Boothe transferred all relevant rights he had in Pitbull's album to RudeBwoy, not SNS. Second, SNS failed to

meet its burden of proving causation to sustain its tortious interference claims because
TVT's cease and desist ("C&D") letters did not cause any third party to discontinue the
distribution of SNS's 305 Album.  And, third, SNS failed to mitigate its damages.

## II.   ANALYSIS

### A.   *Standard of Review for Rule 50 Motion*

Fed. R. Civ. P. 50 is the mechanism for defendants to challenge the sufficiency of
a plaintiff's evidence at and after the close of the case:

> (a)(1) If during a trial by jury a party
> has been fully heard on an issue and
> there is no legally sufficient evidentiary
> basis for a reasonable jury to find for
> that party on that issue, the court may
> determine the issue against that party
> and may grant a motion for judgment as
> a matter of law against that party with
> respect to a claim or defense that cannot
> under the controlling law be maintained
> or defeated without a favorable finding
> on that issue.

"The standard for granting a renewed motion for judgment as a matter of law under
Rule 50(b) is precisely the same as the standard for granting the pre-submission motion
under 50(a)."  *Chaney v. City of Orlando,* 2007 U.S. App. LEXIS 8288, *16-18 (11th Cir.
2007) (quoting 9A Wright and Miller, *Federal Pract. & Procedure* § 2537 (2d ed. 1995)).
Further, "any renewal of a motion for judgment as a matter of law under Rule 50(b) must
be based on the same grounds as the original request for judgment as a matter of law
prior to the case being submitted to the jury." *Id.* (quoting *Doe v. Celebrity Cruises, Inc.,*
394 F.3d 891, 903 (11th Cir. 2004)).

Thus, under both Rule 50(a) and 50(b), a moving party must meet a heavy burden
in order to prevail on a motion for judgment as a matter of law.  The standard of review
for a district court to grant the motion is whether "when the facts and inferences are

viewed in the light most favorable to the opposing party, 'point so strongly and overwhelmingly in favor of one party the Court believes that reasonable men could not arrive at a contrary verdict.'" *United States v. Vahlco Corp.,* 720 F.2d 885, 889 (11th Cir. 1983) (quoting *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir. 1969)). The court must "affirm the jury verdict unless there is no legal basis upon which the jury could have found for [the plaintiff]." *Telecom Tech. Servs., Inc. v. Rolm Co.,* 388 F.3d 820, 830 (11th Cir. 2004). In other words, the Court cannot re-weigh the evidence or substitute itself as the trier of fact. *See, e.g., Robbins v. Koger Props., Inc.,* 116 F. 3d 1441 (11th Cir. 1997).

Accordingly, this Court must deny TVT's motion for judgment as a matter of law if SNS presents enough evidence to create a substantial conflict in the evidence on an essential element of SNS's case. *See, e.g., Pickett v. Tyson Fresh Meats, Inc.,* 420 F.3d 1272, 1278 (11th Cir. 2005). That means that SNS had to present enough evidence at trial to permit a reasonable jury to find in SNS's favor on each and every element of its claims. *See, e.g., Bogle v. Orange County Bd. of County Comm'rs,* 162 F.3d 653, 659 (11th Cir. 1998).

### B.    *Standing Based on Assignment of Rights to RudeBwoy*

TVT's motion starts with the argument that SNS did not have the right to release the "Welcome to the 305" album, and thus had no standing to bring its tortious interference claims, because there was an alleged "gap in title." TVT is quite convinced that this gap occurred because Boothe assigned all his "rights" to Pitbull's recordings to RudeBwoy (a corporate identity that Boothe solely owned and controlled) before he (and not RudeBwoy) purportedly assigned the same rights to 305 Music (which in turn assigned the distribution rights to SNS). In other words, TVT contends that the entire case must be dismissed, along with the jury's verdict of course, because the plaintiff that

filed this complaint originally, SNS, never technically legally acquired any rights to Pitbull's demos and, thus, cannot have standing.

What the Court continues to find surprising about this argument is that TVT stakes so much of its case on this "gotcha" argument without ever undertaking even a cursory analysis of the law that would govern it. The only authorities that TVT has ever relied upon are basic principles of standing law that hold that failure to have standing at the filing of a lawsuit deprives the court of subject matter jurisdiction, and that lack of standing cannot be cured during the course of the litigation. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992), and *Paradise Creations, Inc. v. UV Sales, Inc.,* 315 F.3d 1304 (Fed. Cir. 2003), *cited in* TVT's Motion at 26. That is it. TVT has never bothered to provide the Court with an analysis of Florida contract or assignment principles that would support its argument. TVT's Motion treats this issue as if it was plain as day and so deeply-rooted in the law that no in-depth analysis was ever required.[1]

Indeed, TVT took the same approach at trial. For an issue that TVT stakes so much of its case on, TVT chose to provide the jury with *one sentence* of argument relating to it in its closing. *One sentence.* Yet, TVT's pending Motion sharply characterizes this issue as a slam-dunk reason why the Court must absolutely enter judgment for TVT as a matter of law.

Unfortunately, SNS for its part took the same approach and left the legal analysis of the issue for the Court. Thus, although it should not have had to do so in light of the parties' shallow analysis of the issues raised, the Court has reviewed this issue very

---

[1] It is worth noting here that TVT never filed a Rule 17 motion for joinder of parties who were real parties in interest, nor ever moved to dismiss the complaint for failure to join indispensable parties. TVT did file a motion for summary judgment, however, that raised this issue – and did so, again, very meagerly.

carefully to make sure that TVT's trapdoor argument did not have some merit.  The Court concludes from that review that it does not.

We must start where the parties should have started – with Florida law.  The issue raised deals with several "assignments" of rights that occurred in Florida by Florida parties.  Thus, one must determine how Florida law treats the creation of and effect of assignments in order to begin to understand TVT's position.

An assignment under Florida law is "like any other contract."  *Hartford Ins. Co. of The Midwest v. O'Connor,* 855 So. 2d 189, 191 (Fla. 5th DCA 2003).  And just like any other contract, a court must determine whether the terms of the contract are susceptible to an interpretation by the court as a matter of law.  *See, e.g., Hamilton Const. Co. v. Board of Public Instruction of Dade County,* 65 So. 2d 729 (Fla. 1953) (where contracts are clear and unambiguous, they should be construed as written, and the court can give it no other meaning).  A court must also determine whether, instead, the terms used are unclear, indefinite or ambiguous, in which case an issue of fact may exist as to what the contract required.  *See, e.g., Arriaga v. Florida Pacific Farms, L.L.C.,* 305 F.3d 1228, 1246-47 (11th Cir. 2002) (whether a contract provision is ambiguous is a question for the court, and the court can resolve that ambiguity if the facts are undisputed); *Royal Am. Realty, Inc. v. Bank of Palm Beach & Trust Co.,* 215 So. 2d 336, 338 (Fla. 4th DCA 1968) (holding that contract language is ambiguous where "it is, in fact, reasonably or fairly susceptible to the different constructions being advocated by the parties").

If an issue of fact does exist as to the terms of the contractual agreement, then the trier of fact should consider parol evidence.  *E.g., Arriaga,* 305 F.3d at 1247 (summarizing types of parol evidence available under Florida law to ascertain meaning of ambiguous contracts); *First Capital Income & Growth Funds, Ltd.-Series XII v. Baumann,* 616 So. 2d 163, 165 (Fla. 3d DCA 1993) (parol evidence can be presented when the terms of the

agreement are ambiguous).  To determine the intent of the parties, the trier of fact may "receive evidence extrinsic to the contract for the purpose of determining the intent of the parties at the time of the contract." *Gulf Cities Gas Corp. v. Tangelo Park Serv. Co.,* 253 So. 2d 744, 748 (Fla. 4th DCA 1971).  One can also consider circumstances surrounding the parties at the time the contract was made.  *See, e.g., Clark v. Clark,* 79 So. 2d 426, 428 (Fla. 1955). Additionally, "custom and usage" may be considered in construing ambiguous terms.  *See, e.g., Farr v. Poe & Brown, Inc.,* 756 So. 2d 151, 152-53 (Fla. 4th DCA 2000).

A true assignment contract must be interpreted under these same guidelines.  *See, e.g., Hochstadt v. Gerl,* 678 So. 2d 1310, 1312 (Fla. 4th DCA 1996) (construing assignment agreement as a matter of law, determining that the assignment was clear on its face, and finding that even if ambiguous parol evidence compelled finding that assignment was valid and enforceable); *Health Application Sys., Inc. v. Hartford Life & Acc. Ins. Co.,* 381 So. 2d 294, 297 (Fla. 1st DCA 1980) (construing purported assignment agreement as a matter of law and determining that no valid assignment had been created).

A pure legal "assignment" is a transfer of all the interests and rights to the thing assigned.  *See, e.g., Department of Rev. v. Bank of America,* 752 So. 2d 637 (Fla. 1st DCA 2000); *Rose v. Teitler,* 736 So. 2d 122 (Fla. 4th DCA 1999).  The assignee thereafter stands in the shoes of the assignor and may enforce the contract against the original obligor in his own name.  *E.g., Dove v. McCormick,* 698 So.2d 585 (Fla. 5th DCA 1997); *State Farm Fire & Cas. Co. v. Ray,* 556 So. 2d 811, 813 (Fla. 5th DCA 1990).  Because a legal assignment vests in the assignee the right to enforce the contract, an assignor normally retains no rights to enforce the contract after it has been assigned.  *See Estate of Basile v. Famest, Inc.,* 718 So. 2d 892 (Fla. 4th DCA 1998).

A true assignment, however, must be unqualified to accomplish this. If the terms of the assignment agreement are qualified, then the assignment may be construed as being limited by its terms, or otherwise as being so qualified that it does not constitute a valid assignment. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Gonnella,* 677 So. 2d 1355 (Fla. 5th DCA 1996) (an *"unqualified" assignment* transfers to the assignee all the interest of the assignor under the assigned contract, and the assignor has no right to make any claim on the contract once the assignment is complete, *"unless authorized to do so by the assignee"*) (emphasis added); *State Farm Fire & Cas. Co. v. Ray,* 556 So. 2d 811, 813 (Fla. 5th DCA 1990) (same); *Livingston v. State Farm Mut. Auto. Ins. Co.,* 774 So. 2d 716, 718 (Fla. 2d DCA 2000) (restating this "general rule").

The critical issue, therefore, is whether or not the assignor retained control over the subject matter of the assignment. If the assignor retained all control over the subject matter and only promised to pay another monies received out of a designated fund, then there was never a valid and enforceable assignment. *E.g., Health Application Sys.,* 381 So. 2d at 297 ("A mere agreement to pay a debt out of a designated fund does not operate as a legal or equitable assignment, since the assignor retains control over the subject matter. . . . Such an agreement amounts only to a mere promise to pay, and does not meet the test of an intention on the part of the assignor to give, and of the assignee to receive, present ownership of the fund.") (citations omitted).

Accordingly, as this Court put it in another case, the Court's task here is to "determine (1) exactly what has been assigned to make certain that the [assignee] is the real party in interest, and (2) that a valid assignment has been made." *University Creek Assocs. II, Ltd. v. Boston Am. Fin. Group, Inc.,* 100 F. Supp. 2d 1337, 1339 (S.D. Fla. 1998) (citing 6A C. Wright, A. Miller & M. Kane, *Federal Prac. & Procedure* § 1545 (2d ed. 1990)).

Therefore, we turn first to what it was that Julian Boothe assigned to RudeBwoy, as per TVT's argument that Boothe entered into an unqualified and total assignment of any and all his rights to Pitbull's recordings. RudeBwoy, it is claimed, was conferred a total and limitless assignment, thereby depriving Boothe of any further interest in the Pitbull recordings. Thus, when Boothe executed a written agreement that assigned all his distribution rights in the recordings to 305 Music in November 2004, Boothe had nothing to assign at that point. Therefore, 305 Music and SNS never had any rights to distribute the album when SNS filed its complaint against TVT.

TVT relies *entirely* on one document as evidentiary support for its position. TVT cites Defendant's Exhibit ("DX") 38 as "uncontradicted" evidence that whatever rights Boothe had were transferred to Boothe's corporate entity, RudeBwoy. Yet, TVT takes very little time or effort to demonstrate to the Court that it constitutes a valid assignment or an assignment at all. After reviewing that document, one can see why.

TVT's only evidence is a letter signed by Julian Boothe, to Pitbull's agent and lawyer, Angie Martinez, dated June 17, 2004, in which he memorializes a conversation when she agreed to "an assignment of the agreement to Pitbull Productions, Inc." (DX 38). He asks her to consent to the assignment of rights to RudeBwoy. She counter-signs the letter on behalf of Pitbull and "approves" the assignment.

RudeBwoy, however, never executes that document. Nor does Julian Boothe ever counter-sign the document as President of RudeBwoy. It is not a written contract in any way, shape or form. It is, instead, exactly what it purports to be: a letter memorializing an agreement between Pitbull's agent and Boothe to authorize a yet-to-be executed assignment of rights to RudeBwoy. There is no clear and definite language in this document that could ever be construed as an assignment agreement. Therefore, there is no language in this document with which the Court can find that it is what TVT purports

it to be.  Instead, the Court finds that "it is, in fact, reasonably or fairly susceptible to the different constructions being advocated by the parties." *Royal Am. Realty, Inc.,* 215 So. 2d at 338.  Therefore, under Florida law, the Court must find that this document is in and of itself ambiguous – at best.

Having made that finding, the Court cannot determine, without examining parol evidence, what legal effect should be attached to this letter.  And, because SNS clearly disputes the effect of the document, there is a substantial factual dispute arising from this document as to what, *if anything,* Boothe transferred to RudeBwoy in June 2004. This finding, alone, is likely enough to deny the pending motion for judgment as a matter of law.  The Court cannot grant TVT's motion based solely on this piece of paper that hardly constitutes what one would expect to be found in an assignment agreement.

The document is, however, clearly evidence that Boothe intended to execute an assignment to RudeBwoy.  That is where the next step of the process requires us to go. What was Boothe's intent in executing this document and in accomplishing its purposes? Was there any evidence in the record that contradicted Boothe?  At trial, both parties to the purported assignment testified:   Julian Boothe.  We say that because he was the purported assignor as well as the assignee because RudeBwoy was his wholly owned corporate entity and, to boot, he was its President.  So, technically, the testimony from both parties to this "assignment" was presented to the jury at trial.

Boothe testified that the document that TVT relies upon was only intended to get Pitbull's approval for the assignment and to determine where the accounting for the masters should be sent. [Trans. 2/28/2007 at 171].  Boothe did not testify that DX 38 was, in fact, the assignment instrument.  When pressed, Boothe went further and testified that DX 38 was only assigning to RudeBwoy "just monies as far as payments." [*Id.* at 195].  In other words, Boothe testified that the only thing he assigned to RudeBwoy was

the right to obtain his monies, for accounting purposes, from whatever was obtained for Pitbull's recordings.

Thus, as between the two parties to the purported assignment, there is factual agreement that Boothe *did not* confer on RudeBwoy an unqualified assignment that left Boothe with no further ownership interest in the Pitbull recordings. To the contrary, Boothe's testimony was that he only intended to confer a partial assignment limited to collecting monies received from the sale of the Pitbull recordings. Therefore, from this record neither the Court *nor* the trier of fact – the jury – could reasonably conclude that Boothe transferred his ownership rights to the Pitbull recordings to RudeBwoy.

Further support for this position can be found in this record. Significantly, PX 3 – the assignment agreement that was formally executed between 305 Music and Boothe that TVT now claims was ineffective – was admitted at trial and constitutes strong evidence that supports Boothe's testimony at trial. That document shows that Boothe warranted that "[he] has all the rights granted herein and is under no restriction with respect thereto that would adversely affect any of the rights granted to [305 Music] hereunder." (PX 3 at 7 ¶10(a)). Moreover, Boothe warranted that "[he] possesses full power and authority to enter into and to perform this Agreement . . . ." (*Id.* at 7 ¶10(e)).

Based on all this evidence, at best, Boothe's assignment to RudeBwoy was highly qualified, and the general rule that the assignor loses the right to raise a legal claim over the subject matter of the assignment would clearly *not* apply. *See, e.g., State Farm v. Gonnella,* 677 So. 2d at 1355 (an *"unqualified" assignment* transfers to the assignee all the interest of the assignor under the assigned contract, and the assignor has no right to make any claim on the contract once the assignment is complete, *"unless authorized to do so by the assignee"*). Based on Boothe's testimony and the highly unclear terms of DX 38, the trier of fact could only conclude that the assignee – RudeBwoy – expressly

authorized the assignor – Boothe – to retain ownership rights to the Pitbull recordings. Simultaneously, the assignor did not intend to confer on the assignee his ownership rights to Pitbulls' recordings.   That is theoretically possible under Florida law, *id.,* and that is what the record reveals in the light most favorable to SNS.

That assumes, however, that there ever was a valid assignment to begin with.  SNS has not argued the point, but it seems to be glaring on this record that even if Boothe intended to execute an assignment (to himself under the name of RudeBwoy) he technically never did so.   An assignment that purports to distribute or pay monies obtained from a specific fund is not in fact an assignment.  There must be more than that to give rise to a legal assignment under Florida law.  *See Health Application Sys.,* 381 So. 2d at 297 (no valid assignment created because "mere agreement to pay a debt out of a designated fund does not operate as a legal or equitable assignment, since the assignor retains control over the subject matter. . . . ").   To put it differently, because Boothe testified that he at all times intended to retain control over the Pitbull recordings [Trans. 02/28/2007 at 194], he in fact never consummated an assignment under Florida law.

Therefore, his subsequent assignment – through a written assignment agreement (PX 3) that looks very different from the document TVT relies upon (DX 38) – was not invalid or ineffective as TVT claims because he no longer "owned" the rights to the recordings.  To the contrary, whether he knew why or not, Boothe *did* own and control the rights to the recordings on November 15, 2004.

This analysis of the record, again, is stated in the light most favorable to SNS. That is the Court's obligation under Rule 50.  There was evidence in this record that could lead a reasonable juror to conclude otherwise.  As TVT points out, after DX 38 was executed Boothe began obtaining mechanical licenses from other artists/recording companies whose music was utilized in his Pitbull album.  The letters seeking the

mechanical licenses were under the cover of "RudeBwoy" and signed by Boothe as President of RudeBwoy. That clearly constitutes circumstantial, if not direct, evidence that RudeBwoy was assigned more than what Boothe claims it was assigned.

Moreover, after this issue was first raised SNS tried to "cure" the problem by a purported "Corrective Quit Claim" document that ratified and confirmed that Rudebwoy neither possessed nor asserted any rights in the album and all such rights were duly vested in SNS. (PX 28). TVT, quite logically, argues from that document that SNS itself recognized that it had no rights in the Pitbull recordings after the complaint was filed in this case and tried to fix that after-the-fact (which it cannot do under the standing doctrine). Rather than helping SNS's position, the Court agrees with TVT that this document actually supports TVT's argument that Boothe's version of events may not have convinced even SNS or SNS's lawyers.

The jury, however, as trier of fact rejected TVT's evidence and clearly found Boothe's testimony credible on this point and dismissed the effect of the so-called curative ratification document. The jury's finding that TVT's tortious interference caused damages to SNS impliedly also found that SNS possessed valid distribution rights to the recordings, which were received from 305 Music, which in turn received those rights from Boothe in November 2004. Additionally, TVT never introduced *any* testimony from any other witnesses that contradicted Boothe's version of events. Thus, the jury really had very little evidence with which to find for TVT on this question. To be fair, how could TVT do that, given the fact that both parties to the purported assignment – Boothe and Boothe as President of RudeBwoy – testified identically, and there were no other parties or witnesses to those events.

Nevertheless, that there was an abundance of competent substantial evidence for the jury to reject TVT's assignment of rights defense. And, as stated earlier, TVT did not

think much of its defense in any event because it never asked the jury to focus on it in opening statement and used only one sentence in an hour's-worth of closing argument to ask the jury to find that SNS did not properly own the distribution rights to the recordings.  TVT never asked for an instruction that dealt with this issue.  TVT never asked for the Court to include a question on the verdict form that specifically asked the jury to consider this assignment issue.  Instead, TVT has only trumpeted this argument now in an effort to undermine the jury's verdict, but on an issue that TVT never gave the jury a fair chance to consider from the start.  To be frank, that smacks of litigation gamesmanship and arrogance – the same type of arrogance that the jury found worthy of punitive damages based upon the evidence presented at trial.

The Court's commentary aside, it is not the function of the Court to make credibility or factual determinations under the guise of Rule 50 review.  *See also Jackson v. State of Alabama State Tenure Comm'n,* 405 F.3d 1276, 1281 (11th Cir. 2005).  The jury found Boothe credible and rejected TVT's evidence.  The only question now is whether or not there was competent and substantial evidence in the record to support that finding.  And, if there are conflicting inferences that can be drawn from that evidence, it is not the Court's role to pick the better one.  Instead, all reasonable inferences from the evidence must be drawn in SNS's favor.  *See also Daniels v. Twin Oaks Nursing Home,* 692 F.2d 1321, 1325 (11th Cir. 1982).

Based upon this standard of review, SNS must prevail on TVT's standing/assignment of rights argument.  There is *nothing* about this issue that could conceivably call for a judicial determination as a matter of law.  The entire issue is mired in a cloud of ambiguity.  The only way to resolve it would be to hear the testimony of the knowledgeable witnesses and determine their truthfulness.  That is a jury function.  TVT's reliance on DX 38 or PX 28 is not enough with which to rule in its favor on a Rule 50

motion, in the face of the testimony of Julian Boothe, the testimony of Julian Boothe as President of RudeBwoy, the testimony of SNS's Ted Lucas who believed that he had obtained all the distribution rights to the Pitbull recordings, the ambiguous language of DX 38, the absence of any formal "assignment agreement" between Boothe and RudeBwoy, the unambiguous warranties included in PX 3, and indeed the apparent invalidity of any "assignment" between Boothe and RudeBwoy under Florida law.

Because the Court cannot find as a matter of law that Boothe did not have ownership rights to the Pitbull recordings in November 2004 when he individually transferred those rights to 305 Music, TVT's standing argument fails. The Court finds that there was competent substantial evidence in this record that shows that SNS had standing to file this action against TVT. *See Barger v. City of Cartersville*, 348 F.3d 1289, 1291-92 (11th Cir. 2003) (plaintiff has Article III standing to assert a claim if: "(1) [it] can show that [it] has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to conduct of the defendant; and (3) it is likely, not just merely speculative, that the injury will be redressed by a favorable decision."). SNS had rights to distribute the album and TVT's tortious conduct prevented SNS from distributing that album. That is a concrete and particularized injury in fact. The jury's favorable verdict here goes a long way to redressing that injury. Therefore, SNS had standing to file this action and seek damages for tortious interference.

### C.   *Evidence of Causation to Prove Tortious Interference*

To prevail on its tortious interference claims at trial, SNS was required to prove (1) the existence of a business relationship with ADA; (2) TVT's knowledge of the relationship; (3) TVT intentionally and unjustifiably interfered with the relationship; and (4) that SNS

suffered damages as a result.  *Gossard v. Adia Serve., Inc.*, 723 So. 2d 182, 184 (Fla. 1998); *KMS Rest. Corp. v. Wendy's Int'l, Inc.* 361 F.3d 1321, 1325 (11th Cir. 2004).

The jury determined that TVT intentionally and unjustifiably interfered with SNS's relationship with ADA, acting partly with malice and through improper methods, when Jacqueline Sussman, Esq., TVT's Executive Vice President in charge of legal and business affairs, sent the March 28, 2005, Cease and Desist ("C&D") letters to ADA and its retailers.  *See* Special Verdict Form 1b. [D.E. 430 at 2].  Those letters threatened litigation against the recipients if SNS released and distributed the 305 Album.

The jury also found that TVT recklessly exercised rights that it claimed it was protecting. A "Cease and Desist" could have, appropriately, been sent to SNS and SNS's representatives.  That could have been deemed privileged under Florida law.  When TVT distributed the letters, however, to the entire distribution chain, for the admitted purpose of stopping distribution of the album, TVT crossed the line.  TVT's actions at that point were intentional and reckless.  TVT, the jury found, could no longer claim a privilege when it used these improper methods to accomplish its purposes.

Nevertheless, TVT asserts in its Rule 50 motion that SNS failed to satisfy the causation element required to state a tortious interference claim because its it was incumbent upon SNS to prove, as an essential element of its tortious interference claims, that ADA breached its contract with SNS, and that such breach was caused by TVT's interference.  The Court rejects this argument at least for purposes of SNS's tortious interference with a business relationship claim.[2] Florida law does not require that a party

---

[2]      SNS is not entitled to any additional damages based upon the jury's finding that TVT interfered with SNS's contract with ADA.  The compensatory damages awarded applied to either the contract claim or the business relationship claim.  Thus, even if TVT is correct that the interference with contract claim cannot stand, the jury's alternative finding that TVT interfered with SNS's business relationship can support the compensatory and punitive damages awards.

show an actual breach of contract occurred in order to succeed on that tortious interference claim. *Ethan Allen, Inc. v. Georgetown Manor, Inc.,* 647 So. 2d 812, 814 (Fla. 1994). SNS was required to prove the existence of a contractual or business relationship with ADA; that TVT knew of the relationship; that TVT intentionally and unjustifiably interfered with the relationship; and that SNS suffered damages as a result. *Gossard,* 723 So. 2d at 184; *KMS,* 361 F.3d at 1325. To meet these elements, SNS only had to show that the business relationship provided it with "existing or prospective legal or contractual rights." *Ethan Allen,* 647 So. 2d at 814 (quoting *Register v. Pierce,* 530 So. 2d 990, 993 (Fla. 1st DCA 1988)).

The Court finds that there was substantial competent evidence in this record to support the jury's findings that these elements was met. This is not a case where SNS had some anticipation that it could locate future customers to purchase its Pitbull album. To the contrary, by the date the C&D letters were distributed, SNS had already marketed the album, arranged for its distributors to distribute the album, and established a customer base that would purchase the album, at least at the wholesale level. This evidence was sufficient with which the jury could find that business relationships had already been established and that SNS had a reasonable basis to expect that it could market its album based upon those existing arrangements. *See Ethan Allen,* 647 So. 2d at 815 (citing *Charles Wallace Co. v. Alternative Copier Concepts, Inc.,* 583 So. 2d 396, 397 (Fla. 2d DCA 1991) ("an action for intentional interference . . . will lie if the parties' understanding would have been completed if the defendant had not interfered."); *United Yacht Brokers, Inc. v. Gillespie,* 377 So. 2d 668 (Fla. 1979) (claim for tortious interference can be maintained even though business relationship is based on a contract which is void and unenforceable)).

Second, TVT's Rule 50 Motion then argues that SNS failed to prove that its March 28th C&D letters caused ADA to stop distribution of the 305 Album.  TVT attempted to show at trial that ADA stopped distribution of the album not as a result of the C&D letters, but only after Warner Music Group's in-house counsel and ADA's outside trademark counsel conducted a thorough investigation into the bases for and validity of TVT's Counterclaim against SNS.  For instance, in support of this argument TVT presented as Defendant's Exhibit 138 an email from ADA's president, Andy Allen, in which he explained that ADA would not release the 305 Album "given the current litigation in connection with the Pitbull album and the nature of TVT's claims in connection therewith."  From this one paragraph email, TVT argues that, as a matter of law, no other contrary evidence presented at trial prevents this Court from entering judgment in TVT's favor on the causation element of the claims.

The Court finds, however, that there was competent substantial evidence in this record to support the jury's finding that ADA stopped distribution as a result of the severe effects of the C&D letter.  Rick Joseph, Ted Lucas and Julian Boothe testified that ADA was obligated to release the 305 Album under the terms of its written agreement with SNS and that it did not do so as a result of the C&D letters sent by TVT.  By way of the deposition testimony of Michael Black, ADA's corporate representative, the jury heard there were several reasons for ADA's decision not to distribute the 305 Album, all directly stemming from TVT's C&D letter.  SNS also presented evidence that the C&D letters caused 95% of ADA's accounts to not buy the 305 Album.  Ted Lucas testified that on 30 prior albums released by SNS, every one of the 85 retailers purchased each of SNS's records.  However, none of the recipients of the C&D letter purchased the 305 Album; the sole purchaser was an entity that did not receive a copy of the C&D letter.

Furthermore, the Court instructed the jury properly that it had to find that TVT's C&D letters were the cause of SNS's damages through a natural and continuous sequence. *Gossard,* 723 So. 2d at 184 (citing Restatement (Second) of Torts § 766 (1979)). Had the jury found that other events intervened to break that chain, the jury was instructed to find for TVT.  Instead, however, the jury found that SNS had proved that the effects of the C&D letters were continuous and led directly to the refusal of SNS's distributors to market or distribute the album any further.

Accordingly, the jury was permitted to draw the logical inference from all this evidence that TVT's C&D letter was the primary cause of ADA's refusal to distribute SNS's album.  The jury considered, and rejected, TVT's argument that reasons other than the C&D letters caused the distribution of the album to fail.

TVT, however, then claims that ADA witness Black lacked competent personal knowledge to testify in a manner that was contrary to DX 138 – the Andy Allen email.  Yet, TVT forgets that ADA named Black as their corporate representative on the issues relevant to this litigation.  His deposition testimony, therefore, is not simply as some incidental witness.  For purposes of this case, he *was* ADA.  *See, e.g., Stone v. Morton Int'l, Inc.,* 170 F.R.D. 498, 500 (D. Utah. 1997) (statements by the designated representative of a corporation are treated as a statement of the corporation); *Sprint Comms. Co. LP v. Theglobe.com, Inc.,* 236 F.R.D. 524 (D. Kan. 2006) (same); *United States v. M&T Mortgage Corp.,* 235 F.R.D. 11, 22 (D.D.C. 2006) ("the agents' testimony is generally admissible as a statement of the corporation.").

Moreover, although TVT highlighted in its motion statements that Black made in his deposition that could discount the strength of his testimony, TVT ignored other statements Black testified to that greatly supported SNS's version of events.  Black testified that there were several reasons for ADA's decision not to distribute the "Welcome

to the 305" album. (Black Dep. at 238). These reasons centered around the problems created by the 90 Cease and Desist Letters sent by TVT to 95% of ADA's customers.  (*Id.* at 238).  ADA's customers ("the Accounts") failed to buy the album because of TVT's threats to sue them.  (*Id.* at 241).  TVT's Cease and Desist Letters "hurt the market" for the "Welcome to the 305" album such that it made no economic sense for ADA to distribute the album.  (*Id.* at 225).  He also testified that ADA believed that if it released the album, it would be sued by TVT.  (*Id.* at 262-263).  Like its Accounts, ADA took TVT's threats very seriously because TVT had a industry-wide reputation for being litigious. (*Id.* at 264).

Likewise, ADA did not distribute the 305 album for digital downloads because of the 90 Cease and Desist Letters (*Id.* at 348).  The C&D letters sent to the Accounts also negatively affected SNS's overall business relationship with ADA.  (*Id.* at 363-364). Finally, Mr. Black testified that ADA's four biggest accounts (Anderson, AEC, Transworld & Tower Records) did not buy any "Welcome to the 305" albums after they received the Cease and Desist Letters from TVT.  (*Id.* at 225).

In short, TVT's inferences from ADA's testimony starkly contrast with the inferences that SNS draws from that testimony.  That is what we call in legal jargon a "fact issue."  Fact issues are for the jury, not the Court, to determine.  And, significantly, nothing stopped TVT from timely deposing and/or calling as a witness someone else from ADA, like Andy Allen, who would rebut ADA's own corporate representative's testimony. That could have been done.  But TVT failed to do so.  TVT, therefore, is stuck with the record that we have in this case.  That record presents a compelling factual dispute that supports either side's case.

But because we must look at this record in the light most favorable to SNS as per the jury's verdict, SNS's case prevails.  That case is simply stated.  The Cease and Desist

letters hurt SNS's relationship with ADA, soured ADA on the idea of distributing this album, "hurt the market" even if ADA had wanted to distribute the album, and forever poisoned SNS's ability to release the album.  These were all directly and proximately caused by TVT's tortious interference.  *See, e.g., St. John's River Water Mgmt. Dist. v. Fernberg Geological Svs., Inc.,* 784 So. 2d 500, 505 (Fla. 5th DCA 2001) ("'Induce' means to cause on party 'to choose one course of conduct over another. . . . The inducement may be by persuasion or intimidation so long as the party induced is free to choose one course over another if he or she is willing to suffer the consequences.  The term 'otherwise causing' refers to the situation where the party is left no choice because he or she is rendered incapable of carrying on the business relationship.").

Moreover, the jury could also find that SNS had proved its burden of demonstrating causation based on SNS's fourteen-year track record of successfully creating and marketing hip-hop albums with gold and platinum selling artists Trick Daddy, Trina and Rick Ross.  In this regard, SNS presented compelling testimony from Booth and Lucas that: 1) SNS had made susbstantial efforts in creating, marketing and promoting the 'Welcome to the 305" album prior to its release date; 2) there were no contingencies that would have prevented the distribution of the album by ADA; 3) but for the interference by TVT, the album would have been distributed by ADA to the Accounts, some of which had placed more than 100,000 preorders; and 4) except for an account named AFFESS (a distributor of records for the armed services) no Account submitted an order for the album after receiving the C&D letter. For these reasons, and construing the evidence in the light most favorable to SNS, the jury's causation finding was adequately supported by ample evidence in the record.

Finally, SNS presented evidence that the effect of the C&D letters was not simply a result of TVT's caution to third parties that Pitbull's logo was misused on the marketing

materials, but instead by TVT's false assertion that TVT owned all rights to Pitbull's music and that SNS had no right to distribute that record. The jury found that this reckless conduct caused SNS damages and warranted punitive damages. The jury was thus able to find from the conflicting evidence that ADA's decisions were based upon the C&D letters it and its customers received from TVT. Competent substantial evidence in this record supports that conclusion. The Court will not upset that finding based on TVT's Rule 50 motion because the evidence was more than sufficient to support SNS's tortious interference claims.

### D.   *Evidence of Failure to Mitigate Damages*

Finally, TVT asserts that no evidence was presented in support of the jury's finding that SNS failed to mitigate its reasonable damages. TVT asserts that SNS's failure to accept two offers to release the 305 album was unreasonable and provides evidence of its failure to mitigate. TVT forgets, however, that TVT had the burden of proving its affirmative defense of a failure to mitigate damages. Moreover, the evidence supporting the jury's determination on this issue was credible and competent.

TVT had the burden of showing at trial that SNS breached its duty to mitigate its damages if it were reasonably able to do so. *Messer v. E.F. Hutton & Co.*, 833 F.2d 909, 921 (11th Cir. 1987) ("It is well established under Florida law that a party cannot recover damages he could have prevented through the exercise of reasonable care and diligence."); *Graphic Assoc., Inc. v. Riviana Restaurant Corp.*, 461 So. 2d 1011, 1014 (Fla. 4th DCA 1984) (duty to mitigate damages prevents a party from recovering those damages inflicted by a wrongdoer which the injured party "could have avoided without undue risk, burden, or humiliation.") (citing Restatement (Second) of Contracts § 305(1) (1979)). However, in fulfilling this duty to mitigate, SNS was not obligated to accept offers that were not commercially reasonable or made no economic sense. *See, e.g., Lowenstein v. Weintraub,*

759 F. Supp. 140 (S.D.N.Y. 1991) (defendant not obligated to accept a settlement offer to mitigate damages that involved less money than prior agreement).

The first offer discussed by TVT was a "settlement offer" from TVT to buy "Welcome to the 305" for $100,000. Ted Lucas testified that this offer was neither reasonable nor acceptable because: 1) TVT did not guarantee it would actually release the album; 2) the $100,000.00 was not an advance on the sale of future albums; and 3) TVT would not give SNS the right to receive royalties from any future sales. Ted Lucas further testified that this offer was rejected because SNS had already spent hundreds of thousands of dollars to record, market and prepare the release of "Welcome to the 305" and that TVT "just wanted to take SNS's masters" and not pay SNS full value. For these reasons, Lucas testified that he did not consider TVT's offer to be commercially reasonable.

The Court finds that this was competent and substantial evidence with which the jury could find that TVT had failed to establish its defense that SNS did not properly mitigate its damages. Based on this record evidence, the Court cannot find that TVT met its burden as a matter of law.

The second offer relied upon by TVT was made by distributor Koch Entertainment. Ted Lucas again provided evidence that the Koch offer was neither acceptable nor commercially reasonable because: 1) the offer did not contain a guarantee that Koch would actually release "Welcome to the 305"; 2) the offer was tied to TVT's approval; 3) Lucas believed that TVT was involved in the offer; and 4) in light of his recent experiences with TVT, he did not believe TVT would distribute the album. Lucas further testified that he did not trust TVT to honor any agreement, especially because TVT had wrongfully prevented him from originally releasing the "Welcome to the 305" album. Lucas added that if he made the agreement with either TVT or Koch, he believed that "Welcome to the 305" would never be released, and he had no expectation that SNS would ever see any

return from the sale of the album.  Significantly, TVT introduced little evidence other than Steve Gottlieb to rebut Lucas's testimony.  Clearly, the jury rejected Gottlieb's testimony repeatedly, and likely did so here again by crediting Lucas's testimony.  Again, that is the jury's role.

The Court, therefore, cannot find with respect to this issue that TVT proved its mitigation defense as a matter of law.  There is more than adequate and competent evidence in the record to support the jury's findings that SNS did not fail to mitigate its damages.  TVT's third argument in its Rule 50 motion also lacks merit.

### *III.   CONCLUSION*

For the foregoing reasons, it is hereby **ORDERED and ADJUDGED**:

Defendant Teevee Toons, Inc.'s Renewed Motion for Judgment as a Matter of Law [**D.E. 453**] is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 31st day of October, 2007.

_____
EDWIN G. TORRES
United States Magistrate Judge